Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N Street, Ste. 100
Anchorage, Alaska 99501
Email: crichards@alaskaprofessionalservices.com

Daniel R. Suhr (WI No. 1056658)
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjusticecenter.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| **SMITH,** et al., | |
| Plaintiffs, | Case No. 3:22-cv-00077 |
| v. | [*PROPOSED*] |
| **HELZER,** et al., | MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION |
| Defendants. | FOR PRELIMINARY INJUNCTION |

## INTRODUCTION

Speech about elections, candidates, and issues lies at the core of the First Amendment's protection for the marketplace of ideas. For that reason, any attempt by government to stifle or control such speech deserves the strongest judicial scrutiny. This is a burden Alaska's Ballot Measure 2 cannot meet.

Ballot Measure 2, passed in November 2020 and operating to govern the upcoming 2022 election in Alaska, places new and unprecedented burdens on the rights of citizens to speak about matters of public concern. The law requires that donors redundantly report donations to avoid incurring thousands of dollars in fines. It demands that speakers fill their ads with extensive disclaimers for the entirety of an ad's run time, converting ads from communications about issues into an advertisement of a speaker's contributors. It further requires disclosure of not only donors but also the donors of donors—i.e., of donors who gave money to someone who in turn gave money to a speaker—demanding comprehensive genealogies of contributions that run far afield from any state interest in protecting the integrity of elections or curtailing corruption.

Plaintiffs are entitled to a preliminary injunction because they are likely to succeed on the merits of their claims that the on-air donor disclaimer requirement, the disclosure of donor layers, and the requirement that donors double-report contributions all violate the First Amendment's protections of political speech and association.

Moreover, it is vital that this Court act now to prevent irreparable injury to Plaintiffs. At this case's filing, the 2022 general election is less than seven months away. Plaintiffs, and hundreds of other speakers like them, will have their speech stifled if not granted preliminary relief ahead of that contest. The loss of First

Amendment rights for even a short time is an irreparable injury under any circumstance, but the damage is most acute where, as here, the challenged restrictions implicate an impending election about which citizens should have the right to speak freely.

Plaintiffs therefore ask this court to issue an order preliminarily enjoining the challenged portions of Ballot Measure 2 while this case remains ongoing.

## STATEMENT OF FACTS

In November 2020, Alaska voters approved Ballot Measure 2, the most sweeping overhaul of election procedures in the State's history. Plaintiffs challenge three aspects of the scheme.

First, Ballot Measure 2 requires donor disclosure, not only by political committees and other groups, but simultaneously by the donors themselves. Section 7 provides that anyone who contributes as little as $2,000 in aggregate in a calendar year to any group that makes independent expenditures, or even might possibly consider making independent expenditures in the future, must themselves file a report with the commission within 24 hours of the donation. Under Section 15, anyone who forgets or neglects to file this immediate disclosure is subject to civil fines of up to $1,000 per day, whether the oversight is intentional or simply out of ignorance. This is on top of the required disclosures by independent

3

expenditure groups themselves, rendering the requirements of Section 7 and 15 redundant.

Second, Ballot Measure 2 imposes multiple extensive disclaimer requirements on political advertising. Under Section 11, television and internet advertisements must include, for the entirety of the ad, a disclaimer detailing (1) the individual or entity who paid for the ad along with the funder's city and state of principal place of business and (2) the name and city and state of residence of the five largest contributors to the speaker. Section 12 requires that any ad funded with out-of-state donations include on screen—for its entirety—the statement that "A MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF ALASKA." AS 15.13.090(g).

Third, Sections 6, 9, 14, and 18 of Ballot Measure 2 compel not only the disclosure of an entity's donors, but also any donors to the entity's donors, and in turn any donors to the entity's donors' donors, requiring secondary disclosure of third-parties who have not themselves chosen to speak or advocate in Alaska elections.

The State does not keep these sweeping and unprecedented disclosures in confidence, as it might if it were only using the information to further its interest in enforcing its laws. Rather, Defendant members of the Commission post donor reports on the agency's website, so anyone can see a donor's name, home address,

and occupation.[1] Under Ballot Measure 2, anyone who gives money to an organization that then donates money to some other entity that then makes independent expenditures can find their name posted on a government website as a supporter of a cause or candidate—exposing them to harassment or retaliation based on their ostensible support of a candidate they might never have even heard of. As a result, some donors will decline to participate at all rather than see their members disclosed.

Plaintiffs are individuals and organizations subject to Ballot Measure 2. Two plaintiffs are independent expenditure groups—Families of the Last Frontier and the Alaska Free Market Coalition. As such, they will be responsible for complying with the disclaimer (Count II) and disclosure (Count III) requirements of Ballot Measure 2. The other plaintiffs are individual donors with proven track records of supporting independent expenditure groups and other political and charitable organizations at levels greater than $2,000 in a calendar year. As such, they will be subject to the disclosure requirements (Counts I and III) and their names may be included among the top five donors required in the disclaimer requirement (Count II).

## STANDARD OF REVIEW

The four factors for a preliminary injunction are familiar: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

---

[1] https://doa.alaska.gov/apoc/SearchReports/.mselves.

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"Courts asked to issue preliminary injunctions based on First Amendment grounds face an inherent tension: the moving party bears the burden of showing likely success on the merits and yet within that merits determination the government bears the burden of justifying its speech-restrictive law." *Cal. Chamber of Commerce v. Council for Educ. & Rsch. on Toxics*, No. 21-15745, 2022 U.S. App. LEXIS 6952, at *17-18 (9th Cir. Mar. 17, 2022). The Ninth Circuit has instructed courts how to navigate that tension: "[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Id*.

## ARGUMENT

### I. Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits. On each of the three claims discussed below, they have raised at least a colorable claim, and they show why the government cannot justify its restrictions given the appropriate level of scrutiny.

6

## A. Compelling individual donors to report donations to independent expenditure groups violates the First Amendment.

Sections 7 and 15 of Ballot Measure 2 compel individual independent expenditure donors to report donations to Defendants within 24 hours—even though the law already requires the recipients of such donations to report exactly the same information. This sort of repetitive campaign finance law, duplicating existing disclosure requirements, is overly burdensome and unjustifiable. *See McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) ("This 'prophylaxis-upon-prophylaxis approach' requires that we be particularly diligent in scrutinizing the law's fit.").

"Regardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *Ams. for Prosperity Found. v. Bonta* (*AFPF*), 141 S. Ct. 2373, 2383 (2021). For the challenged provision of Ballot Measure 2 to survive, "there must be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and 'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *Id.* (quoting *Doe v. Reed*, 561 U. S. 186, 196 (2010)).

The Supreme Court has recognized that laws requiring disclosure of campaign contributions may serve a governmental interest because "disclosure helps voters to define more of the candidates' constituencies." *Buckley v Valeo*, 424 U.S. 1, 81 (1976). But this interest must be cabined by the inherent harms of

7

disclosure requirements, since "when it comes to a person's beliefs and associations, broad and sweeping state inquiries into these protected areas discourage citizens from exercising rights protected by the Constitution." *AFPF*, 141 S. Ct. at 2384 (cleaned up) (quoting *Baird v. State Bar of Ariz.*, 401 U. S. 1, 6 (1971) (plurality opinion)). Thus, filing requirements that are "onerous" and "unduly" burdensome should be struck down. *Yamada v. Snipes*, 786 F.3d 1182, 1195-96 (9th Cir. 2015). *See FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 254 (1986) (plurality) (stating that when a law imposes "[d]etailed record-keeping and disclosure obligations" and other "administrative costs that many small entities may be unable to bear," it is unconstitutional).

The rule's burdensome nature suffices by itself to render the requirement unconstitutional. Under Ballot Measure 2, anyone donating as little as $2,000 must meet the sort of compliance burdens typically reserved for sophisticated parties who have the expertise—and the lawyers—to ensure they are following the rules. Imposing such burdens on issue groups and political committees might be a reasonable strategy to achieve Alaska's legitimate interest. Imposing them on anyone who writes a moderate-sized check is not.

Requiring individuals to meet standards usually reserved for sophisticated parties violates the First Amendment: "The average citizen cannot be expected to master on his or her own the many campaign financial-disclosure requirements set

forth" by Ballot Measure 2. *Sampson v. Buescher*, 625 F.3d 1247, 1259 (10th Cir. 2010). First, every donor of even a modest amount of money must know of his or her obligation to report within 24 hours, itself a tremendous burden. But this is exacerbated by the law's language, which requires both encyclopedic and prophetic knowledge of Alaska independent expenditure groups. Under Section 7 of Ballot Measure 2, a donor must report not only a contribution to an active independent expenditure group, but also a contribution to any group that has made independent expenditures in the past two years or is likely to do so in the future. AS 15.13.040(r). Even if every donor can search APOC's website for past independent expenditures every time he makes a contribution, he can hardly be expected to precisely predict which groups APOC will believe will engage in such expenditures in the future. "Faced with the complex and formalized requirements" normally required of sophisticated political organizations, many donors will "conclude that their contemplated political activity is simply not worth it and opt not to speak at all." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 840 (7th Cir. 2014). "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day." *Citizens United v. FEC*, 558 U.S. 310, 324 (2010). Yet that is precisely the position in which Alaska puts donors who make moderate-sized donations.

9

And Alaska imposes this burden on citizens even though it *already has* a source of the *same information.* Disclosure of donations by the donee political entities—which the law required before Ballot Measure 2 and still requires (AS 15.13.040(d))—fulfills any legitimate interest Alaska may claim. There is no state interest in requiring individual donors to report information to the government that the government already has. The First Amendment cannot countenance purely performative restrictions on core political speech.

The best Alaska can argue is that the individual disclosure requirement serves as a crude sort of audit procedure: by demanding compliance from the entities on both ends of the transaction, the State can cross-reference the reports and discover donations that an entity failed to disclose. But a state "is not free to enforce any disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *AFPF*, 141 S. Ct. at 2386. Discovering stray errors or concealments does not justify Alaska casting "a dragnet for sensitive donor information . . . even though that information will become relevant in only a small number of cases." *Id.* at 2387. The fact that this procedure may make enforcing campaign finance rules administratively somewhat easier is of no moment. *See Id.* ("California's interest is less in investigating fraud and more in ease of administration. This interest, however, cannot justify the disclosure requirement.").

10

Double disclosure might allow Alaska to catch some misbehavior it would otherwise miss. And so would triple disclosure, or quadruple. Alaska could require everyone to report the donations of their neighbors, or their employees. It could ask them to keep track of their parents' political spending, and their children's. Each additional reporting party would provide *some* marginal increase in the information available to Alaska's campaign finance regulators. But the costs imposed on First Amendment rights would far outweigh each *de minimis* increase in government oversight. Requiring disclosures by citizen donors *and* recipient organizations cannot survive exacting scrutiny, under which "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'" *AFPF,* 141 S. Ct. at 2483 (quoting *Reed*, 561 U. S. at 196). Here the burden on individual donors is great, and the marginal gain to the state is very small.

Finally, the government has no business requiring disclosure of current donations to groups that engaged in independent expenditures in the past or may do so in the future. To be upheld, disclosure requirements must be "tied with precision to specific election periods" and "carefully tailored to pertinent circumstances." *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1117-18 (9th Cir. 2019). These requirements are not tied with precision or carefully tailored. If Families of the Last Frontier engaged in an independent expenditure two years ago,

but has not done so since, Defendants have no interest in knowing its donors, much less broadcasting them on the Internet. When a group stops speaking about candidates, the government's interest in knowing its donors also stops, and the group reverts to the traditional First Amendment protection for the privacy of its supporter lists. *AFPF*, 141 S. Ct. at 2383. Similarly, the government has no interest in knowing donors to groups that are likely to engage in independent expenditures. If the group makes independent expenditures, then it will have to report all of its donors for the past calendar year. AS 15.13.040(b). But if the donor guesses wrong about a group's likelihood to engage in an independent expenditure, or reports out of an abundance of caution in the face of huge fines, or if the group plans to do so but then changes its mind or strategy, the Defendants again have no sufficient interest in knowing the group's donors. The usual presumption of privacy for groups must prevail unless and until a group actively engages in electoral communications; anything more is not "carefully tailored" to the government's interests.

This Court should therefore find that Plaintiffs are likely to succeed on the merits of their claim that the individual disclosure requirement is unconstitutional.

### B. Compelling speakers to recite government-imposed scripts on campaign materials violates the First Amendment.

The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). The

12

general rule is that the government may not compel a person "to utter what is not in his mind." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943). Compelled speech on the government's behalf is impermissible if it "affects the message conveyed." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. Of Bos.*, 515 U.S. 557, 572 (1995). Put another way, the government violates a speaker's First Amendment rights by "interfer[ing] with the [speaker's] ability to communicate its own message." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 64 (2006).

"Laws that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as other content-based laws. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). "Content-based laws— those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). In other words, such laws are "subject to strict scrutiny." *Id.* at 165.

The Supreme Court recently applied these settled principles in *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018). At issue was a California statute that compelled clinics licensed to serve pregnant

women to post a notice about abortion rights. Unlicensed clinics were required to post a notice that they were not licensed to provide medical services.

The Court concluded that the required notices for licensed clinics were compelled speech. Those clinics had to "provide a government-drafted script about the availability of state-sponsored services, as well as contact information for how to obtain them." *Id.* at 2371 (cleaned up). "By compelling individuals to speak a particular message," this requirement "alter[ed] the content of their speech." *Id.* (cleaned up). And though the Court focused on the unlicensed clinic requirement's lack of tailoring, the Court characterized this requirement as "a government-scripted, speaker-based disclosure requirement." *Id.* at 2377.

*NIFLA* dooms Alaska's donor disclaimer requirement. Like California's licensed clinic notice, Alaska's requirement that Plaintiffs list their top donors on their speech is a "government-drafted script" whose exact wording is set by statute. Plaintiffs are compelled to alter their speech to incorporate the government's message just as the pregnancy centers were forced to alter their speech to incorporate the government's notice. By requiring crisis pregnancy centers to post a notice about California's state-sponsored abortion services, California's licensed clinic notice effectively altered the message of crisis pregnancy centers seeking to counsel pregnant women against having an abortion. Similarly, the Alaska donor disclaimer requirement forces Plaintiffs to alter their advertisements that seek to

14

inform or convince people on a particularly political issue, to also encourage viewers or listeners to consider Plaintiffs' own donors.

If anything, the speech alteration is even more severe here, for instead of merely posting a government-provided notice, petitioners must change their own speech to accommodate the government's. And this intrusion on speech is especially offensive to the First Amendment because it pertains to speech about elections—an area "integral to the operation of our system of government," where the First Amendment should have "its fullest and most urgent application." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (cleaned up).

The on-ad donor disclaimer here is content-based and thus subject to strict scrutiny because compelled speech is content-altering.[2] "Mandating speech that a

---

[2] It should separately be subject to strict scrutiny because it is triggered "because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. Such "facial distinctions" that "defin[e] regulated speech by particular subject matter" constitute "obvious" content-based restrictions. *Reed*, 576 U.S. at 163; *see also, e.g., Burson v. Freeman*, 504 U.S. 191, 197–98 (1992) (plurality opinion) (regulation of speech near polling places "a facially content-based restriction" because it was limited to speech "related to a political campaign"); *NetChoice, LLC v. Moody*, No. 4:21cv220-RH-MAF, 2021 U.S. Dist. LEXIS 121951, at *29 (N.D. Fla. June 30, 2021) (law content-based because it applied "only to material posted 'by or about a candidate[]'"). Nevertheless, some cases have not applied strict scrutiny to certain disclosure provisions. *E.g., Buckley*, 424 U.S. at 64. This Court need not resolve any doctrinal discrepancy because the compelled-speech requirement here is also content-altering.

speaker would not otherwise make necessarily alters the content of the speech." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988). "Since all speech inherently involves choices of what to say and what to leave unsaid," *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 11 (1986) (plurality opinion), the compelled speech requirement here harms Plaintiffs in multiple ways. It both restricts their ability to speak their preferred message and forces them to speak a message they do not want to voice.

First, Plaintiffs cannot use those portions of their advertisements that the government commandeers. Such a feature has been recognized in other content-based compelled speech cases as a "penalty" on speech. For instance, in *Miami Herald Publishing Co. v. Tornillo*, the Court considered a statute that granted political candidates equal space in a newspaper to reply to criticism, the Court noted that this "compelled printing" imposed a "penalty" on publishers, including "the cost in printing and composing time and materials and in taking up space that could be devoted to other material the newspaper may have preferred to print." 418 U.S. 241, 256 (1974). Here, similarly, the government's speech consumes ad time that displaces petitioners' preferred speech.

The requirement here also forces organizations like petitioners to speak the government's own message. Plaintiffs believe strongly in the right to privacy for citizens and would not include their donors' information in their advertisements if

16

not forced to by the law. Shaw Decl. ¶¶ 5, 6, & 9; Strait Decl. 4, 5 & 7. ¶¶ Forcing an organization committed to limited government and personal freedom to announce the names of its donors in advertisements is similar to forcing pro-life groups to share information about abortion access. "[W]hen dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised." *Hurley*, 515 U.S. at 576. Donors may be less likely to support groups that appear to violate their own principles. And listeners' rights are harmed too, for Plaintiffs' message is distorted by government interference. *Cf. Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("[T]he Constitution protects the right to receive information and ideas.").

The requirement also forces Plaintiffs to change the subject of their advertisements: from informing or trying to convince listeners about a political issue to talking about Plaintiffs' donors. The government's forced speech about the speaker's funding distracts the listener from the speaker's intended message. *Wash. Post v. McManus*, 944 F.3d 506, 515 (4th Cir. 2019) ("many political advocates today also opt for anonymity in hopes their arguments will be debated on their merits rather than their makers," or in this instance their makers' funders).

The compelled disclosure is no less offensive because it compels statements of fact rather than statement of opinion: the "general rule that the speaker has the

17

right to tailor the speech[] applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact." *Hurley*, 515 U.S. at 573. The problem is the government-mandated change in the content of one's speech, not whether the new content is neutral, factual, or otherwise non-ideological.

Thus, Alaska's mandate is a regulation of "pure speech"—not merely a regulation of "the mechanics of the electoral process." *McIntyre*, 514 U.S. at 345.

The Ninth Circuit recognized this "constitutionally determinative distinction between on-publication identity disclosure requirements and after-the-fact reporting requirements" in *ACLU of Nevada v. Heller*, 378 F.3d 979, 991 (9th Cir. 2004). The court found that "requiring a publisher to reveal her identity on her election-related communication is considerably more intrusive" because it "necessarily connects the speaker to a particular message directly." *Id*. at 992. In contrast, "[c]ampaign regulation requiring off-communication reporting of expenditures made to finance communications does not involve the direct alteration of the content of a communication." *Id*. Because the Nevada law at issue in that case forced the ACLU to alter the content of its message, and not merely file information after the fact with the state, it was subject to strict scrutiny. *Id*. Alaska's mandate likewise requires speakers to alter the content of their messages and should therefore receive strict scrutiny.

Even if this Court were to subject the disclosure requirement here to exacting scrutiny, it would still fall. The rule pertains to independent expenditures, so it cannot serve any anti-corruption or regulatory avoidance interests. *Citizens United*, 558 U.S. at 357. The only state interest it could serve is an informational interest. And that interest is already fulfilled by the existing requirement that all independent expenditure donors be disclosed to APOC, which posts their information on the Internet.[3] Thus, the new disclosure rule only provides, at best, a marginal gain in convenience for viewers to see these names on the ad itself, rather than having to trouble themselves to find it on the Internet.

"The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures she would otherwise omit," so the government's "informational interest is plainly insufficient." *McIntyre*, 514 U.S. at 348–49. Informational interests do not carry the same weight as, for example, "preventing fraud." *Id.* at 49; *accord Doe*, 561 U.S. at 197 (refusing to rely on an "informational" interest); *id.* at 206–08 (Alito, J., concurring) (explaining why such an interest is weak); *id.* at 238–29 (Thomas, J., dissenting) (same). *See also Sampson*, 625 F.3d at 1257 (noting a purely informational disclosure requirement "has some value, but not that much.").

---

[3] State of Alaska, APOC Online Reports, https://aws.state.ak.us/ApocReports/IndependentExpenditures/.

This makes good sense. "The inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source" or its supporters. *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 777 (1978). Instead, "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 534 (1980) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

The on-ad sponsor disclaimer (the name of the independent expenditure committee) alone easily satisfies any informational interest that might exist. Who sponsored the ad "will signify more about the candidate's loyalties than the disclosed identity of an individual contributor will ordinarily convey." *Vote Choice v. DiStefano*, 4 F.3d 26, 35 (1st Cir. 1993). Indeed, conveying the top-five donors on the ad may decrease viewers' information by giving them a distorted view of the organization's overall donors.

Even if the government could show some important informational interest here, the on-ad donor disclaimer requirement is not narrowly tailored to that interest. "Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—because First Amendment freedoms need breathing space to survive." *AFPF*, 141 S. Ct. at 2384 (cleaned up). A "reasonable assessment of the

burdens imposed by disclosure should begin with an understanding of the extent to which the burdens are unnecessary." *Id.* at 2385.

As discussed, all the information conveyed by the on-ad donor disclaimer is already available to the public under the law's other provisions, "at the click of a mouse" (or less). *McCutcheon*, 572 U.S. at 224. The on-ad disclaimer cannot be narrowly tailored to further an interest that is already satisfied.

The requirement is also over-inclusive. Many donors may give money to an organization for reasons unrelated to a particular ad. If donors were motivated to support an organization's advocacy in a state other than Alaska, or because of its work on another issue or campaign, or to support general office operations rather than campaign-oriented advertisements, they would be disclosed, yet their disclosure would not provide Alaskans with particularly interesting or relevant information. *Cal. Republican Party,* 2004 U.S. Dist. LEXIS 22160, at *18-21. Some disclosed donors might even see their names listed on a message with which they do not agree—potentially *misleading* voters.

Of course, organizations could voluntarily choose to disclose their top five donors on advertisements—and citizens who care about such disclosure could reward them by favoring their messages. If that information were important to citizens, the marketplace of ideas would lead to disclosure. And Alaska's law already uses more narrowly tailored means to provide that same information.

Sanctioning this more speech-restrictive requirement flouts the Supreme Court's recent admonition that "[t]he government may regulate in the First Amendment area" through "compelled disclosure regimes" "only with narrow specificity." *AFPF*, 141 S. Ct. at 2384 (cleaned up).

Finally, the restriction is especially onerous because the required disclaimers will take up a significant portion of the advertisement. In the commercial context, the Ninth Circuit has struck down mandatory warnings as compelled speech in situations where the requirement was only that the "warning occupy at least 20% of the advertisement." *Am. Bev. Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019); *accord R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1208 (D.C. Cir. 2012) (striking down tobacco warning labels that took up 20% of the packaging). But the extensive disclaimers here cover far more—requiring not just the names but also identifying information for five different donors, and on top of that the State's all-caps warning about donations from out-of-state, for the entirety of the ad, commandeering even more speech than the health warning in *American Beverage Association*, and in a context far more vital than sugary drinks. AS 15.13.090(c). This burden is even more pronounced in a radio ad, where the names of contributors must be read aloud. *Id*. at (d). The significant amount of space taken up by the State's mandated scripts exacerbates the compelled speech problem.

This Court should therefore find that Plaintiffs are likely to succeed on the merits of their First Amendment challenge to Alaska's on-air disclaimer requirement for donors.

**C. Compelling Plaintiffs to recite the out-of-state disclaimer violates the First Amendment.**

As with the "top five" disclaimer requirement, this Court should also find that Ballot Measure 2's disclaimer requirement for out-of-state contributions fails strict scrutiny. Section 12 of the law requires that any independent expenditure entity that receives more than 50% of its aggregate contributions from "true sources" with their principal place of business outside Alaska must include as a part of their speech the government authored statement: "A MAJORITY OF CONTRIBUTIONS TO [THIS GROUP] CAME FROM OUTSIDE THE STATE OF ALASKA." As indicated in Strait's declaration (¶ 10), Plaintiff Families of the Last Frontier has received more than 50% of its contributions in the past from contributors outside Alaska and intends to solicit outside Alaska to raise money in 2022. The Ninth Circuit ruled just last year that Alaska's out-of-state contribution limit violated the First Amendment. *Thompson v. Hebdon*, 7 F.4th 811, 824 (9th Cir. 2021). This Court should likewise find that Plaintiffs are likely to succeed on the merits of their claim that the out-of-state disclaimer requirement violates the First Amendment.

23

Laws that discourage a certain class of people from making political contributions and thus burden political speech are "subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 340 (cleaned up). Such laws are "presumptively invalid." *Schultz v. City of Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000).

Out-of-state campaign contribution restrictions like Alaska's are routinely invalidated by courts. Again, last year the Ninth Circuit struck down Alaska's nonresident aggregate limit, which barred candidates from accepting more than $3,000 per year from non-Alaskans. As the court recognized, "[a]t most, the law aim[ed] to curb perceived 'undue influence' of out-of-state contributors—an interest that is no longer sufficient after" the Supreme Court's decisions in *McCutcheon* and *Citizens United*. *Thompson*, 7 F.4th at 824. The Ninth Circuit rejected Alaska's argument that the state had an interest in avoiding the appearance of undue out-of-state influence, pointing out that the only relevant inquiry was whether the state could show an interest in preventing actual corruption, and that Alaska's argument "sa[id] nothing about corruption." *Id*. The court concluded that "Alaska fail[ed] to demonstrate that the risk of quid pro quo corruption turns on a donor's particular geography." *Id*. at 825. The court found "no indication that the First Amendment interest in protecting political access waxes or wanes depending

24

on the representative relationship between contributor and candidate." *Id*. at 826 n.6.

Likewise, in *Landell v. Sorrell*, the Second Circuit held that Vermont's law prohibiting candidates, political parties, and political action committees from receiving more than twenty-five percent of their donations from out-of-state donors violated the First Amendment. 382 F.3d 91, 146 (2d Cir. 2004). The court recognized "that many non-residents have legitimate and strong interests in Vermont and have a right to participate, at least through speech, in those elections." *Id*. at 147. The court thus held that Vermont had "no sufficiently important governmental interest" to justify "disproportionately curtailing the voices of some, while giving others free rein, because it questions the value of what they have to say." *Id*. at 146, 148.

Other courts that have considered the issue have invalidated similar bans. A district court struck down South Dakota's ban of out-of-state contributions to ballot question committees because it "ban[ned] all direct political speech from one segment of society." *SD Voice v. Noem*, 380 F. Supp. 3d 939, 948 (D.S.D. 2019). The court held that the claimed interest in self-government was neither compelling nor important, and that the law failed narrow tailoring because it left other avenues for out-of-state residents to contribute. *Id*. at 949.

Likewise, in *We the People PAC v. Bellows*, a district court granted a preliminary injunction prohibiting Maine's Secretary of State from enforcing Maine's law that restricted out-of-state petition circulators. 519 F. Supp. 3d 13, 40 (D. Me. 2021) (appeal filed). The court said that such "residency restrictions" were "severe burdens and unconstitutional under a strict scrutiny review." *Id*. *Bellows* tracks a long line of cases invaliding restrictions on out-of-state circulators under the First Amendment. *See, e.g., Citizens in Charge v. Gale*, 810 F. Supp. 2d 916, 927 (D. Neb. 2011) (collecting cases).

This Court should similarly invalidate the out-of-state disclosure disclaimers here. Section 12 impermissibly burdens the protected speech of both donors and groups by compelling them to speak the government's message implying that out-of-state funding is somehow suspect or disreputable. The disclaimer serves no anti-corruption interest—the donors to independent expenditure groups are already disclosed to the state, and to the public on the state's website, so one can easily determine whether any particular group draws its support from outside Alaska— and rival groups can point out this supposed foreign influence in their own speech if they think it will matter to Alaska's voters. Compared to this traditional give-and-take of politics, Section 12's disclaimer requirement is more likely to mislead than enlighten: including the government's required message will only imply that

26

there's something shady about a groups funding, devoid of any context by which voters could make a reasoned judgment.

Nor is Alaska's supposed interest narrowly tailored to its claimed interest. Section 19 defines "outside-funded entity" as a group that takes donations from a true source with a principal place of business outside Alaska. But one's principal place of business is a poor proxy for one's interest in Alaska's elections. Indeed, a donor could have significant operations in Alaska, even a majority of its operations, while happening to be headquartered elsewhere. *See, e.g., Hertz Corp. v. Friend*, 559 U.S. 77 (2010) (noting corporation's principal place of business was in New Jersey even though its biggest market was California).

"If the State chooses to tap the energy and the legitimizing power of the democratic process, it must accord the participants in that process . . . the First Amendment rights that attach to their roles." *White*, 536 U.S. at 788 (cleaned up). The Framers designed the First Amendment "to secure the widest possible dissemination of information from diverse and antagonistic sources" and thereby "to assure unfettered interchange of ideas for bringing about of political and social changes desired by the people." *Buckley*, 424 U.S. at 49. To permit the government to "restrict the speech of" out-of-state supporters "to enhance the relative voice of others is wholly foreign to the First Amendment." *Id*. at 48-49. Because the statute violates core speech rights, it violates the First Amendment. Thus, the plaintiffs

27

will likely prevail on the merits that the out-of-state requirement violated the First Amendment.

### D. Compelling secondary donor disclosure violates the First Amendment.

The freedom of association guaranteed by the First Amendment includes a right to the privacy in those associations. *NAACP*, 357 U.S. at 466; *AFPF,* 141 S. Ct. at 2382. Ballot Measure 2 violates this freedom of private association by compelling independent expenditure groups to track and disclose not only their own donors, but also donors to those donors, and donors to those donors' donors, reaching out infinitely to what it defines as the "true source" of the money. This requirement violates free association by requiring disclosure of donations not related to electoral spending.

Again, "[r]egardless of the type of association, compelled disclosure requirements are reviewed under exacting scrutiny." *AFPF*, 141 S. Ct. at 2383. And again, disclosure requirements must be "tied with precision" and "carefully tailored" to actual electoral activity. *Nat'l Ass'n for Gun Rights*, 933 F.3d at 1117-18.

The Supreme Court has recognized that the government has an interest in disclosure of dollars "that [are] unambiguously campaign related." *Buckley*, 424 U.S. at 81. Thus, government may require disclosure of donors to campaign committees and independent expenditure groups. *Id*. It may even require secondary

donor disclosure by groups that raise money for explicitly political purposes, and then make direct expenditures or make donations to candidates or committees, such as political parties or political action committees. *Id*. But the State crosses a constitutional line when it chases every dollar down a disclosure rabbit hole to its "true source," the person or corporation who earned it. Under this framework, the "true source" of the money is "a person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services," as opposed to someone who "derived funds via contributions, donations, dues, or gifts," which Ballot Measure 2 terms an "intermediary." Section 9 prohibits so-called "dark money" transactions, and crucially Section 6 requires disclosure of the "true source" and any "intermediaries."

This "true source" disclosure requirement is not "tied with precision" or "carefully tailored" to actual electoral activity. Consider: a church supports a pro-life organization like Alaska Right to Life with a $2,000 donation, intending to support legislative efforts to advance pro-life laws. Months later, separate from its lobbying activities, the pro-life organization makes an independent expenditure. The church must now disclose all of its tithers and members who give over $2,000 annually to APOC. Another example: a realtor joins the Alaska Realtors Association but explicitly chooses not support the Realtors PAC, preferring not to

29

have his political giving disclosed online. The Alaska Realtors nevertheless sponsor a table at a Chamber of Commerce luncheon, and eleven months later the Chamber makes an independent expenditure. Suddenly the original realtor finds his name on APOC's website—the exact result he sought to avoid by not giving to the Realtors PAC. In either of these scenarios, or any of a hundred others that are likely to arise, the original donation was not made with a political intention, and its disclosure is not "tied with precision or carefully tailored" to an electoral activity.

The First Amendment restricts burdensome disclosure requirements because "each governmental demand for disclosure brings with it an additional risk of chill." *AFPF*, 141 S. Ct. at 2389. The "true source" requirement burdens speech in several ways.

First, it demands that recipients disclose information they may not even have access to. Entities generally do not track the finances of other entities—indeed, nonprofits' donor lists are valuable and contain closely held information that implicates both associational privacy and the groups' ability to compete in the marketplace for donations; requiring disclosure of those lists is equivalent to demanding that companies publicize their sales leads.

Second, compelled secondary disclosure chills speech by limiting who an independent expenditure group may solicit funds from. The "true source" requirement is a departure from accepted practice around the country, and many

potential donors will refuse to participate in Alaskan elections rather than severely alter their usual operations, which are conducted on the basis of donor privacy.

Third, it sweeps up innocent third parties who do not have any nexus to Alaska elections—e.g., a random citizen in Maryland or Wisconsin who donated to a group they were familiar with, only to discover later that their home address has been posted on the Internet, not because of who they gave to, but because of the political speech of another group they've never heard of, never donated to, and may even disagree with—all because some portion of the money they gave to a different entity for a different cause ended up weaving its way to a group engaged in political speech in Alaska.

Indeed, the "true source" requirement is not only burdensome, it is *misleading*, in that it associates donors with causes they may have no interest in at all, and even causes they oppose. People give money to a particular entity for a particular purpose, among many purposes that entity may have. Jane Doe may donate to a libertarian-minded nonprofit because she supports that group's position against foreign military interventions. She will be very surprised to find her name among the funders of ads opposing an increase in Alaska's tax rates, a policy position she has never considered and happens to disagree with. But it turns out the group she donated to also provides funding to independent expenditure groups that advocate for lower taxes.

In this sense, the "true source" requirement doesn't simply punish association, it also *compels* association, affiliating donors with whatever cause or speaker somehow comes into possession of the funds, regardless of the original donor's intent or beliefs. This compulsory association likewise violates the First Amendment, since "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning. . . . [A] law commanding involuntary affirmation of objected-to beliefs would require even more immediate and urgent grounds than a law demanding silence." *Janus v. AFSCME*, 138 S. Ct. 2448, 2464 (2018) (quoting *W. Virginia Bd. of Ed.*, 319 U. S. at 633 (cleaned up)).

Finally, the State here is trying to hijack an established term of art in campaign finance law and use it for a totally different and insidious purpose. "True source" has an accepted meaning in campaign finance law pertaining to the use of "straw donors"—i.e., when Person A gives money to Person B so that Person B will in turn make a donation with those funds to evade contribution limits. "True source" rules at the FEC and in other states prevent the use of straw donors to illegally evade contribution caps. 11 C.F.R. § 110.4(b)(2)(i) ("true contributor"). Alaska has taken that term of art and repurposed it to require disclosure of all donors back to the original human person or corporation that earned the money. True "true source" rules may serve the government's strong interest in rooting out corruption, but Alaska's so-called "true source" rule serves only an attenuated

32

informational interest: the weakest of the possible interests a campaign finance rule might serve. And here the informational interest places a compliance burden on, and violates the privacy of, persons who give without any knowledge of eventual use of some sliver of their funds for political purposes. This is not precisely or carefully tailored to a sufficient informational interest for actual electoral activity.

## II. Plaintiffs will suffer irreparable injury without an injunction.

The 2022 election is only months away, and if not granted relief now, Plaintiffs will never be able to get the speech Ballot Measure 2 curtails back. If denied a preliminary injunction in this case, they will be forced to make a choice: either allow their speech relevant to the upcoming election in November to be chilled by Ballot Measure 2, or undertake that speech and subject themselves, and their donors, to Alaska's burdensome and punitive disclosure regime. *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012).

To be put to this choice is, itself, a First Amendment injury, and "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Court should therefore find that Plaintiffs will be irreparably injured without an injunction.

## III.    The balance of equities favors Plaintiffs.

As explained above, Plaintiffs face irreparable injury if the preliminary injunction is not issued. And since Plaintiffs are likely to succeed on the merits, "there is no significant state or public interest in curtailing debate and discussion of a ballot measure," or any other topic relevant to the upcoming election. *Citizens Against Rent Control/Coalition for Fair Hous. v. Berkeley*, 454 U.S. 290, 299 (1981).

The balance of equities therefore supports this Court enjoining Ballot Measure 2 to protect Plaintiffs' right to First Amendment expression, since "[t]he injury to the plaintiffs' First Amendment rights outweighs the [government's] interest in enforcing impermissible campaign finance laws." *W. Tradition P'ship v. City of Longmont*, Civil Action No. 09-cv-02303-WDM-MJW, 2009 U.S. Dist. LEXIS 103436, at *21 (D. Colo. Oct. 21, 2009) (citing *Elam Construction, Inc. v. Regional Transportation District*, 129 F.3d 1343, 1347 (10th Cir. 1997)).

## IV.    An injunction is in the public interest.

The enforcement of constitutional rights is, by definition, always in the public interest. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The First Amendment allows a multitude of voices to speak when it comes to important policy questions. The public benefits from robust debate on these topics. It will benefit even more if that debate is expanded by allowing Plaintiffs to undertake

34

their issue advocacy without the risks imposed by Ballot Measure 2. The Court

should therefore find that the issuance of the preliminary injunction is in the public

interest.

## CONCLUSION

For the forgoing reasons, Plaintiffs' Motion for Preliminary Injunction

should be granted.

Dated: April 14, 2022


Daniel R. Suhr (WI No. 1056658)*
Liberty Justice Center
440 N. Wells St. Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjusticecenter.org

/s/
Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N Street, Ste. 100
Anchorage, Alaska 99501
Email: crichards@alaskaprofessionalservices.com

*pro hac vice