Scott M. Kendall (AK No. 0405019)
Jahna M. Lindemuth (AK No. 9711068)
Cashion, Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, Alaska 99501
Phone: (907) 222-7932
Fax: (907) 222-7938
scott@cashiongilmore.com
jahna@cashiongilmore.com


*Attorneys for Intervenor-Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| DOUG SMITH, ET AL., <br><br>            Plaintiffs, <br><br> v. <br><br> ANNE HELZER, IN HER OFFICIAL CAPACITY AS CHAIR OF THE ALASKA PUBLIC OFFICES COMMISSION, ET AL., <br><br>            Defendants, <br><br> and <br><br> ALASKANS FOR BETTER ELECTIONS, INC., <br><br>            Intervenor-Defendant. | Case No. 3:22-CV-00077-SLG <br><br><br> **ALASKANS FOR BETTER ELECTIONS' MOTION TO DISMISS** |

I.     <u>INTRODUCTION</u>

       Plaintiffs are asking this Court to do what no other court has done before: create a

constitutional right to hide the source of political contributions. Plaintiffs assert that the

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 1 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 1 of 38

First Amendment gives individuals the right to anonymously contribute unlimited sums of money to independent expenditure organizations ("IEOs") to sway elections, even though individuals contributing directly to a candidate are not allowed the same anonymity.

This case presents a facial challenge to Ballot Measure 2's disclosure provisions that have been in effect for more than a year. And although the U.S. Supreme Court has struck down certain *limits* or *caps* on contributions, it has specifically approved *disclosure* requirements as a less restrictive, necessary, and constitutionally sound curative option. Because the First Amendment simply does not grant individuals or corporations the right to anonymously give unlimited sums of money to influence elections, Ballot Measure 2's disclosure provisions fall squarely within the bounds of the Constitution.

Plaintiffs specifically challenge Ballot Measure 2's: (1) 24-hour disclosure requirement for contributors to IEOs; (2) mandatory on-ad disclaimers, including a disclaimer if an IEO receives the majority of its contributions from outside of Alaska; and (3) the requirement to disclose a contribution's "true source" rather than reporting just a pass-through intermediary. Because these provisions in Alaska's election laws — adopted by ballot initiative — are constitutionally sound as a matter of law, this Court should dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 2 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 2 of 38

## II.     FACTUAL BACKGROUND

### A.     Voters Enact Ballot Measure 2 In November 2020.

#### 1.  Alaska's prior campaign finance disclosure system.

As the Ninth Circuit has previously recognized, "Alaska has a long history of regulating political influence and campaign finance."[1]  Because Ballot Measure 2 modified Alaska's campaign finance laws, it is worth explaining how Alaska's campaign finance rules operated prior to Ballot Measure 2's enactment.[2]

For background, an IEO is any entity that is required to report because it makes "independent expenditure[s]"[3] "to influence the outcome of an election."[4]  By law, an IEO's expenditures are "made without the direct or indirect consultation or cooperation

---

[1]     *Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 777 (9th Cir. 2006).

[2]     *See generally* former AS 15.13.010-.400 (2020).  The full text of Ballot Measure 2 is provided as Exhibit A to the Affidavit of Scott M. Kendall for ease of reference.  *See generally* Alaska's Better Elections Initiative [hereinafter Ballot Measure 2] (Exhibit A *to* Affidavit of Scott M. Kendall (May 16, 2022) [hereinafter Kendall Aff.]).  Ballot Measure 2 was incorporated by reference, but apparently not provided, in Plaintiffs' complaint.  *See* Complaint at ¶ 15 (Apr. 7, 2022) (Doc. 1).  The remaining exhibits and information in Mr. Kendall's affidavit are provided as additional background information for the Court, and to show Plaintiffs' lack of irreparable harm for Alaskans for Better Elections' concurrently-filed opposition to Plaintiffs' motion for preliminary injunction. *See generally* Kendall Aff.

[3]     Former AS 15.13.400(10) (2020); *see also* AS 15.13.400(11).

[4]     *See* former AS 15.13.400(8)(B), (13) (2020); *see also* AS 15.13.400(9)(B), (14). The corollary to a "group" under federal law is a so-called "SuperPAC."  The Federal Election Commission created the new class of independent expenditure-only political committees, i.e., "SuperPACs," in response to a D.C. Circuit decision.  *See generally SpeechNow.org v. FEC*, 599 F.3d 686 (D.C. Cir. 2010) (en banc); FEC Advisory Op. 2010-11 (Commonsense Ten) at 2-3.

with . . . a candidate" the IEO either supports or opposes.[5]  IEOs are required to register

prior to making any independent expenditures,[6] and must file periodic public reports about

their contributions and expenditures.[7]

Relevant here are four key aspects of Alaska law prior to Ballot Measure 2's

enactment.  First, no "person or group [could] . . . make a contribution anonymously, using

a fictious name, or using the name of another."[8]  But because Ballot Measure 2's definition

of "true source" had not yet been adopted,[9] IEOs routinely received contributions from

other organizations that obscured where their money actually came from.[10]

Second, IEOs were required to make a number of disclosures on their ads, including:

(1) its "three largest contributors . . . during the 12-month period before the date of the

---

[5]      See former AS 15.13.400(10) (2020); see also AS 15.13.400(11).  It is worth noting
that because 501(c)(3) nonprofit organizations are prohibited from influencing elections,
those nonprofit organizations cannot make contributions to IEOs.  See 26 U.S.C.
§ 501(c)(3) (stating that such organizations shall "not participate in, or intervene in . . . any
political campaign on behalf of (or in opposition to) any candidate for public office"); see
also AS 15.13.074(f).

[6]      See AS 15.13.052(a); see also AS 15.13.050(a).  Nongroup entities are also
prohibited from soliciting or accepting contributions to influence "the outcome of an
election unless the potential contributor is notified that the contribution may be used for
that purpose."  See AS 15.13.074(i).

[7]      See former AS 15.13.110 (2020); see also former AS 15.13.135 (2020).

[8]      See former AS 15.13.074(b) (2020).

[9]      See AS 15.13.400(19).

[10]      For example, one IEO received $3 million before Ballot Measure 2's effective date,
and the public will never know where, exactly, that money came from.  See James Brooks,
*National Republican group sidesteps new disclosure law with $3 million donation in
Alaska governor's race*, ANCHORAGE DAILY NEWS (Feb. 18, 2022),
https://www.adn.com/politics/2022/02/17/national-republican-group-sidesteps-new-
disclosure-law-with-3-million-donation-in-alaska-governors-race/.

communication";[11] (2) "the name and title" of an IEO's "principal officer,"[12] along with "a statement" from them "approving the communication";[13] (3) specific language explaining who the communication "was paid for by";[14] and (4) a certification that the communication "is not authorized, paid for, or approved by the candidate."[15] Prior to Ballot Measure 2, there was no requirement that the above-mentioned disclosures "remain onscreen throughout the entirety of" certain communications,[16] or that IEOs must disclaim if a majority "of its aggregate contributions" came from "outside Alaska."[17]

Third, IEOs were required to report all "contributions in excess of $50 in the aggregate during a calendar year,"[18] and contributors to ballot initiative groups were also required to independently file a report regarding any contribution of $500 or more within 30 days, even though the group receiving the donation would also report it.[19] Before Ballot Measure 2 contributors to IEOs, unlike contributors to ballot initiative groups, were *not* required to independently report.[20]

---

[11]     *See* AS 15.13.090(a)(2)(C); *see also* AS 15.13.090(e) ("In no case shall a person be required to identify more than three contributors under (a)(2)(C) of this section.").

[12]     *See* AS 15.13.090(a)(2)(A).

[13]     *See* AS 15.13.090(a)(2)(B).

[14]     *See* former AS 15.13.090(c), (d) (2020).

[15]     *See* AS 15.13.135(b)(2).

[16]     *See* former AS 15.13.090 (2020); *see also* AS 15.13.090(c).

[17]     *See* former AS 15.13.090 (2020); *see also* AS 15.13.090(g); AS 15.13.400(15).

[18]     *See* AS 15.13.040(e)(5)(A).

[19]     *See* AS 15.13.040(k). This requirement went into effect once a contributor made "a total of $500 or more" in contributions to such groups. *See id.*

[20]     *See* former AS 15.13.040 (2020).

Finally, IEOs were required to make periodic publicly-available reports of contributions and expenditures,[21] including reports "not later than 10 days after an independent expenditure has been made."[22] IEOs were also required to report any additional contribution or expenditure "that exceeds $250 . . . made within nine days of the election" within 24 hours.[23] Prior to Ballot Measure 2, the 24-hour reporting requirement did not apply to any contributions or expenditures that fell outside the nine-day period before an election.[24]

As further context, after Ballot Measure 2's passage, the Ninth Circuit struck down individual campaign contribution limits for candidates and groups.[25] As a result of that decision, there are currently *no* campaign contribution limits in Alaska; individuals can now make unlimited monetary contributions directly to candidates.[26] *However*, corporations cannot make such donations to candidates,[27] and all donations from

---

[21]    AS 15.13.110(a).

[22]    AS 15.13.110(h).

[23]    *See* AS 15.13.110(b); *see also* AS 15.13.110(h).

[24]    *See* former AS 15.13.110 (2020).

[25]    *See Thompson v. Hebdon*, 7 F.4th 811, 816 (9th Cir. 2021). The previous campaign contribution limit was $500. *See id.* at 816-17; *see also* former AS 15.13.070 (2020) (struck down, in part, by *Thompson*, 7 F.4th at 816).

[26]    *See* Advisory Opinion Decision, Alaska Public Offices Commission ("APOC"), AO No. 21-09 (Mar. 3, 2022) (Exhibit B *to* Kendall Aff.). Corporations may still make contributions to IEOs. *See* AS 15.13.040(r).

[27]    *See* AS 15.13.065(a).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 6 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 6 of 38

individuals *must* be made in the name of the person who is actually the source of the funds.[28]

### 2. Ballot Measure 2's changes to Alaska's campaign finance disclosure laws.

A group of nonpartisan Alaskans formed Alaskans for Better Elections, Inc. ("ABE") in 2019 to file Ballot Measure 2, an election reform ballot initiative.[29] Ballot Measure 2 proposed "three substantive changes to" "Alaska's election laws by: (1) replacing Alaska's [prior] party-based primary system with an open, nonpartisan primary; (2) establishing ranked-choice voting in general elections; and (3) adopting new disclosure and disclaimer requirements for [IEOs] and their donors."[30] And in November 2020, Alaskans voted to enact Ballot Measure 2 in an election with record turnout.[31] Although Ballot Measure 2's disclosure and disclaimer provisions went into effect in February 2021, the first elections where the open primary and ranked-choice voting provisions apply will take place this summer and fall.[32]

---

[28] *See* AS 15.13.074(b) ("A person or group may not make a contribution anonymously, using a fictitious name, or using the name of another.").

[29] *See Meyer v. Alaskans for Better Elections*, 465 P.3d 477, 490 (Alaska 2020).

[30] *Id.* at 490, 498.

[31] *See* 2020 General Election, Election Summary Report, Official Results, https://www.elections.alaska.gov/results/20GENR/data/sovc/ElectionSummaryReportRPT24.pdf (Nov. 30, 2020) [hereinafter 2020 General Election Results]. Because the State certified Ballot Measure 2's win on November 30, its provisions went into effect on February 28, 2021. *See* Alaska Const. art. XI, § 6 ("An initiated law becomes effective ninety days after certification[.]").

[32] The Alaska Supreme Court recently upheld a facial challenge to the other two substantive components of Ballot Measure 2: the top-four open nonpartisan primary and

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 7 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 7 of 38

Ballot Measure 2's proposed modifications to Alaska's campaign disclosure laws were featured prominently in its title,[33] ballot statement,[34] and intent language,[35] and were designed to help ensure "that voters have adequate and accurate information about who is paying for campaign communications to influence their vote."[36]  Relevant here are three of Ballot Measure 2's reforms to Alaska's disclosure and disclaimer requirements now challenged by Plaintiffs.

First, Ballot Measure 2 added new disclosure requirements for all contributions to an IEO that exceed "$2,000 in the aggregate during a calendar year."[37]  Those new

---

ranked-choice voting for general elections.  *See* Complaint at ¶ 19; *see also Kohlhaas v. State*, S-18210, Order (Alaska Jan. 19, 2022).

[33]     Ballot Measure 2 at 1 (Exhibit A *to* Kendall Aff.) ("An Act prohibiting the use of dark money by [IEOs] working to influence candidate elections in Alaska and requiring additional disclosures by these groups[.]").

[34]     *See* Ballot Language for Ballot Measure 2 (Exhibit C *to* Kendall Aff.) ("[Ballot Measure 2] would . . . require additional disclosures for contributions to [IEOs] and relating to the sources of contributions.  It would also require a disclaimer on paid election communications by [IEOs] funded by a majority of out of state money.").

[35]     *See* Ballot Measure 2 at 2 (Exhibit A *to* Kendall Aff.) ("The people of Alaska have the right to know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska.  This right requires the prompt, accessible, comprehensible, and public disclosure of the true and original sources of funds used to influence these elections, and is essential to the rights of free speech, assembly, and petition guaranteed by the First Amendment to the United States Constitution and shall be construed broadly.").

[36]     *Meyer*, 465 P.3d at 499 (citations omitted).  IEOs, and "dark money" groups, have become more prevalent since the U.S. Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010).  "[N]early $1.4 billion worth of [independent expenditures] were made during the 2016 election cycle, compared to $143.7 million in the 2008 cycle and $63.9 million in the 2004 cycle."  *See Citizens for Resp. & Ethics in Wash. v. FEC*, 971 F.3d 340, 344 (D.C. Cir. 2020).

[37]     *See* AS 15.13.040(j)(3); *see also* AS 15.13.040(r); AS 15.13.074(b).

provisions apply to both the contributor and the receiving IEO,[38] requiring disclosure by both within 24 hours,[39] and apply to contributions made to entities that either are an IEO, intend to become an IEO, or were an IEO "in the previous election cycle."[40]

Second, Ballot Measure 2 modified Alaska's on-ad disclaimer requirements by: (1) requiring those disclaimers to "remain onscreen throughout the entirety of the communication" for "broadcast, cable, satellite, Internet[,] or other digital communication[s]";[41] and (2) adding a new on-ad disclaimer[42] for any IEO that "receive[s] more than 50 percent of its aggregate contributions from . . . outside Alaska."[43] Ballot Measure 2 *did not* modify Alaska's existing top-three contributor disclaimer,[44] and placed no limitation or cap on out-of-state contributions to IEOs.[45]

---

[38]    *See* AS 15.13.040(r) (reporting requirement for contributors); AS 15.13.110(k) (reporting requirement for IEOs)

[39]    *See* AS 15.13.040(r) (reporting requirement for contributors); AS 15.13.110(k) (reporting requirement for IEOs)

[40]    *See* AS 15.13.040(r).

[41]    *See* AS 15.13.090(c).

[42]    *See* AS 15.13.090(g) ("A MAJORITY OF CONTRIBUTIONS TO (OUTSIDE-FUNDED ENTITY'S NAME) CAME FROM OUTSIDE THE STATE OF ALASKA.").

[43]    *See* AS 15.13.400(15).

[44]    *See* AS 15.13.090(a)(2)(C).  Alaska's "three largest contributors" disclaimer has been the law for over a decade.  *See* ch. 36, § 13, SLA 2010.  Ballot Measure 2 did clarify that the true source for an IEOs three largest contributors must now be disclosed.  *See* AS 15.13.400(19).

[45]    *See generally* Ballot Measure 2 (Exhibit A *to* Kendall Aff.).

Finally, Ballot Measure 2 stated that the "true source" would need to be disclosed for all major ($2,000+) contributions to IEOs.[46] The "true source" of those contributions is defined as "the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services."[47] This definition specifically excludes "intermediary" entities.[48] Ballot Measure 2 established new civil penalties for contributors who fail to report their major contributions to IEOs,[49] but did not change the civil penalties for the IEOs who receive those contributions.[50] There was also a corollary prohibition against the giving or receiving of contributions to IEOs exceeding $2,000 "without disclosing the true source of the contribution."[51] And Ballot Measure 2 requires that the true source *of a contribution* be

---

[46] *See* AS 15.13.400(19). Ballot Measure 2 also defined "dark money" as "a contribution whose source or sources, whether from wages, investment income, inheritance, or revenue generated from selling goods or services, is not disclosed to the public." *See* AS 15.13.400(5).

[47] *See* AS 15.13.400(19).

[48] *See id.* ("[A] person or legal entity who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source[.]").

[49] *See* AS 15.13.390(a)(2) (imposing a $1,000 per day maximum civil penalty for failing to timely report a contribution to an IEO); AS 15.13.390(a)(3) (providing that a contributor who fails to accurately report the true source of the contribution "is subject to a civil penalty of not more than the amount of the contribution," unless it was intentional, at which point the civil penalty cannot be "more than three times the amount of the contribution in violation").

[50] *See* AS 15.13.390(a)(1) (maintaining the $500 per day maximum civil penalty for any reporting violations made by IEOs).

[51] *See* AS 15.13.074(b); *see also* AS 15.13.400(5) (defining "dark money").

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 10 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 10 of 38

disclosed[52] — not the true source of all funds in the contributor's possession — so contributing organizations can and have begun segregating accounts to ensure that donors know whether their identities could be disclosed given Ballot Measure 2's new disclosure requirements.[53]

## B. Plaintiffs File Suit Nearly 18 Months After Ballot Measure 2 Passed.

Plaintiffs include five individuals who have made major contributions to IEOs and ballot initiative groups in their own names for prior statewide elections,[54] along with two Plaintiff IEOs that have sought to influence the outcome of state and municipal elections.[55] One Plaintiff, Families of the Last Frontier ("FLF"), has previously received substantial sums of "dark money" from outside of Alaska[56] — including over 99.5% of the $409,000

---

[52]   *See* AS 15.13.040(r) ("For purposes of this subsection, the reporting contributor is required to report and certify the true sources *of the contribution*[.]" (emphasis added)).

[53]   *See* Revised Advisory Opinion, Thomas R. Lucas, APOC Campaign Disclosure Coordinator, AO No. 21-11-CD (May 5, 2022) (Exhibit D *to* Kendall Aff.); APOC's Proposed Changes to Title 2, Chapter 50 of the Alaska Administrative Code ("AAC"), at 2 (May 9, 2022) (Exhibit E *to* Kendall Aff.) (proposing the addition of paragraph (e) to 2 AAC 50.270 to clarify when an entity need not "report donations" pursuant to AS 15.13.110(k)); *see also* AS 15.13.374(e) (establishing a safe harbor to follow advisory opinions); Order Continuing Consideration of Advisory Opinion, APOC, AO No. 21-11-CD (Feb. 2, 2022) (Exhibit F *to* Kendall Aff.) (allowing entities to rely on Alaska's safe harbor provision so that separate accounting for contributions to an IEO will protect donor identities for a parent entity that does not make any contributions to IEOs).

[54]   *See* Complaint at ¶¶ 5-9.

[55]   *See id.* at ¶¶ 10-11.

[56]   *See id.* at ¶ 41 ("[I]n the past[, FLF's] donations from outside the [sic] Alaska have accounted for more than 50% of FLF's total revenue.").

it received in 2018[57] — and also acted as an "intermediary" by contributing some of that outside "dark money" to another IEO.[58]

Nearly a year and a half after Ballot Measure 2 passed — and while seeking a preliminary injunction and claiming imminent irreparable harm[59] — Plaintiffs filed this suit: a facial challenge to invalidate IEO campaign disclosure requirements on First Amendment grounds.[60]  Plaintiffs' claims fail as a matter of law.

## III.  <u>LEGAL STANDARD</u>

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[61]  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw

---

[57]    *See* Kendall Aff. at ¶ 11 (showing FLF receiving $407,000 in contributions from the "Republican State Leadership Committee"); *see also* Kendall Aff. at ¶ 20 (showing FLF receiving $409,000 in income for the 2018 campaign cycle).  FLF received similar amounts of outside "dark money" — over 96.5% — in 2019.  *See* Kendall Aff. at ¶ 12 (showing FLF receiving $70,000 in contributions from "GOPAC" in 2019); *see also* Kendall Aff. at ¶ 20 (showing FLF receiving $72,500 in income for the 2019 campaign cycle).

[58]    *See* Kendall Aff. at ¶ 13 (showing that FLF made $16,000 and $7,000 contributions (respectively) to the Council on Good Government, another IEO, in 2020).

[59]    *See generally* Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction (Apr. 25, 2022) (Doc. 18-1) [hereinafter Plaintiffs' Motion].

[60]    *See generally* Complaint.  Plaintiffs challenge Ballot Measure 2's: (1) contributor reporting requirements; (2) top contributor and majority out-of-state contribution disclaimers; and (3) "true source" definition and disclosure requirements.  *See id.* at ¶¶ 60-75.

[61]    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

the reasonable inference that the defendant is liable for the misconduct alleged.'"[62]   In addition to the complaint, courts may also consider "materials incorporated into the complaint by reference, and matters of which the court may take judicial notice."[63]

Courts are directed to "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."[64]   But "the complaint must provide 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"[65]   Moreover, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."[66]

Because Plaintiffs have brought a First Amendment facial challenge to provisions of Ballot Measure 2, they can succeed only if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."[67]   "Facial challenges are disfavored for several reasons,"[68] because "they raise the risk of 'premature

---

[62]     *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678).

[63]     *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008) (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

[64]     *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citing *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007)).

[65]     *In re Riegel Pharms. Inc. Sec. Litig. Inter-Local Pension Fund GCC/IBT v. Deleage*, 697 F.3d 869, 875 (9th Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

[66]     *Iqbal*, 556 U.S. at 678.

[67]     *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008)).

[68]     *Washington State Grange*, 552 U.S. at 450.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 13 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 13 of 38

interpretation of statutes on the basis of factually barebones records,'"[69] "run contrary to the fundamental principle of judicial restraint,"[70] and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution."[71]

## IV.   ARGUMENT

Plaintiffs claim that the First Amendment prohibits the State from requiring: (1) 24-hour reporting by contributors of over $2,000 to IEOs; (2) on-ad disclaimers of an IEO's top contributors and whether a majority of an IEO's funds have come from outside Alaska; and (3) disclosure of the true source of large contributions to such groups.[72]   They are wrong as a matter of law and cannot meet their burden for a facial challenge.

The First Amendment does not give major contributors to IEOs the ability to ignore reporting obligations.  The First Amendment does not give IEOs carte blanche to influence the outcome of elections while concealing who is paying for its campaign advertisements. And the First Amendment does not give major contributors to IEOs the right to remain anonymous.

The U.S. Supreme Court has repeatedly concluded that disclosure and disclaimer requirements for election communications do not violate the First Amendment; rather, they

---

[69]    *Id.* (quoting *Sabri v. United States*, 541 U.S. 600, 609 (2004)).

[70]    *Id.*

[71]    *Id.* at 451; *see also id.* ("We must keep in mind that '[a] ruling of unconstitutionality frustrates the intent of the . . . people.'" (first alteration in original) (quoting *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006))).

[72]    *See* Complaint at ¶¶ 60-75; *see also* Plaintiffs' Motion at 7-33.

satisfy exacting scrutiny because they promote the government's, and the electorate's, need for information and their interest in informed elections. "The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech . . . in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."[73] Indeed, the First Circuit in *Gaspee Project v. Mederos* recently rejected a First Amendment challenge — very similar to Plaintiffs' — against a regime with lower reporting thresholds and more robust disclaimers than are at issue here. That regime included disclosures for contributions exceeding $1,000, and an on-ad disclaimer identifying the top *five* contributors to certain groups funding electioneering ads.[74] Because all of Ballot Measure 2's challenged campaign disclosure and disclaimer provisions easily satisfy exacting scrutiny, this Court should conclude that Plaintiffs have failed to state a claim for relief.

A. **Exacting Scrutiny Applies to Plaintiffs' First Amendment Claims Concerning Ballot Measure 2's Disclosure And Disclaimer Requirements.**

Although regulations that actually cap or bar political speech (i.e., limits on contributions or expenditures) are subject to strict scrutiny,[75] disclaimer and disclosure requirements for election communications are subject only to exacting scrutiny under the First Amendment. "Recognizing the important information-enhancing role that disclosure

---

[73]     *Citizens United*, 558 U.S. at 371.

[74]     *See generally* 13 F.4th 79 (1st Cir. 2021), *cert. denied*, 2022 U.S. LEXIS 2127 (Apr. 25, 2022).

[75]     *See Citizens United*, 558 U.S. at 340.

ABE's Motion to Dismiss                                                                                    Page 15 of 38
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 15 of 38

laws play, the [U.S.] Supreme Court and [Ninth Circuit] have subjected laws requiring speakers to disclose information in the electoral context to a somewhat less demanding standard than strict scrutiny, described as 'exacting scrutiny.'"[76]  And while Plaintiffs appear to acknowledge in their motion for preliminary injunction that their First Amendment claims must satisfy exacting scrutiny,[77] they rely heavily on strict scrutiny cases either concerning campaign contribution limits or prohibitions — *not* disclosure or disclaimer requirements — or they rely on inapposite cases not involving political speech at all.[78]

As the U.S. Supreme Court has repeatedly confirmed, "provid[ing] the electorate with information 'as to where political campaign money comes from'" justifies electoral disclosure laws and promotes "the 'free functioning of our national institutions.'"[79] Although election "[d]isclaimer and disclosure requirements may burden the ability to speak, . . . they [importantly] 'impose no ceiling on campaign-related activities,' and 'do not prevent anyone from speaking.'"[80]

---

[76]     *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1112 (9th Cir. 2019) (citing *Doe v. Reed*, 561 U.S. 186, 196 (2010)); *see Citizens United*, 558 U.S. at 366-67 (citing *Buckley v. Valeo*, 424 U.S. 1, 64, 66 (1976) (per curiam)); *see also McConnell v. FEC*, 540 U.S. 93, 137 (2003), *rev'd on other grounds*, *Citizens United*, 558 U.S. 310 (noting that strict scrutiny is not appropriate in the context of election speech).

[77]     Plaintiffs occasionally appear to argue for strict scrutiny, a standard not applicable here.  *See* Plaintiffs' Motion at 15 n.2.

[78]     *See id.* at 7-33.

[79]     *Buckley*, 424 U.S. at 66 (quotations omitted).

[80]     *Citizens United*, 558 U.S. at 366 (first quoting *Buckley*, 424 U.S. at 64; then quoting *McConnell*, 540 U.S. at 201).

The U.S. Supreme Court in *Buckley v. Valeo* explained that the governmental interests in disclosure of election spending include: (1) providing information; (2) deterring actual corruption or the appearance of corruption; and (3) permitting recordkeeping or easing the administrative burden for detecting violations.[81] In particular, *Buckley* held that appropriately tailored laws requiring political committees to disclose information about all contributions over $100 "helps voters to define more of the candidates' constituencies,"[82] and thus those laws "serve[] informational functions" and do not violate the First Amendment.[83] Similarly, in *McConnell v. FEC*, the Supreme Court upheld disclaimer and disclosure requirements to prevent electioneering spenders from "hiding behind dubious and misleading names" given "the competing First Amendment interests of individual citizens seeking to make informed choices in the political marketplace."[84]

In *Citizens United v. FEC* — the most recent seminal U.S. Supreme Court case involving First Amendment challenges to disclaimer and disclosure requirements for election communications — the Court upheld the campaign disclosure and disclaimer

---

[81]     *See* 424 U.S. at 66-68; *see also id.* at 66-67 ("[D]isclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek . . . office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches." (footnote omitted) (quotation omitted)).

[82]     *Id.* at 81.

[83]     *Id.* at 83-84.

[84]     540 U.S. at 197 (quoting *McConnell v. FEC*, 251 F. Supp. 2d 176, 237 (D. D.C. 2003)).

requirement at issue under "exacting scrutiny," which it held "requires a 'substantial relation' between the disclosure requirement and a 'sufficiently important' governmental interest."[85] The Supreme Court concluded in *Citizens United* that required disclaimers satisfied the First Amendment informational interest because such disclaimers "'provid[e] the electorate with information' and '[e]nsure that the voters are fully informed' about the person or group who is speaking."[86]

In the U.S. Supreme Court's more recent articulation of exacting scrutiny in *Americans for Prosperity Foundation v. Bonta* — a case which did *not* involve political speech — the Court further explained that, although "exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest."[87] Because the disclosure requirements at issue in *Americans for Prosperity Foundation* did not involve political speech — where the Supreme Court has already held that the electorate has a

---

[85]  558 U.S. at 366-67 (quoting *Buckley*, 424 U.S. at 64, 66) (citing *McConnell*, 540 U.S. at 231-32); *see also Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2383 (2021) (reiterating that exacting scrutiny requires "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" (quoting *Doe*, 561 U.S. at 196)).

[86]  *Citizens United*, 558 U.S. at 368 (first alteration in original) (first quoting *McConnell*, 540 U.S. at 196; then quoting *Buckley*, 424 U.S. at 76) (citation omitted); *see also id.* ("At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party."); *id.* at 369 ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election.").

[87]  *See* 141 S. Ct. at 2383; *see also id.* at 2385 ("[E]xacting scrutiny requires that there be 'a substantial relation between the disclosure requirement and a sufficiently important governmental interest,' and that the disclosure requirement be narrowly tailored to the interest it promotes." (quoting *Reed*, 561 U.S. at 196) (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960))).

competing constitutional right to information[88] — the government was also required to describe its interest and establish that the regulation in that case was narrowly tailored to the asserted interest.[89]

### B.    Contributor Disclosure Requirements Are Constitutional.

Plaintiffs' first claim is that Ballot Measure 2's requirement that contributors report the true source of any contribution of $2,000 or more to an IEO within 24 hours is unconstitutional.[90]  In essence, Plaintiffs assert that this new requirement on contributors is overly burdensome, duplicative, and unjustifiable.[91]  But Plaintiffs' first count misses the mark.

Prior to Ballot Measure 2, IEOs and certain contributors were already required to report lower contributions within short timeframes.[92]  Ballot Measure 2's new disclosure requirements for major contributors to IEOs — that any contributor report the true source of any contribution of $2,000 or more to an IEO within 24 hours — satisfies exacting scrutiny and therefore does not run afoul of the First Amendment.

---

[88]    *See Citizens United*, 558 U.S. at 369; *McConnell*, 540 U.S. at 197.

[89]    *See Ams. for Prosperity Found.*, 141 S. Ct. at 2383.

[90]    *See* Complaint at ¶¶ 60-64.

[91]    *Id.*

[92]    *See* AS 15.13.040(e)(5)(A) (requiring IEOs to report all contributions of $50 or more within 10 days); AS 15.13.110(a), (h) (same); AS 15.13.110(b), (h) (requiring IEOs to report all contributions and expenditures of $250 or more within 24 hours if occurring within 9 days of an election); AS 15.13.040(k) (requiring contributors to ballot initiative groups to independently report any contribution of $500 or more within 30 days).

The U.S. Supreme Court has consistently recognized that the government has an interest in requiring disclosure of contributions.[93]  After all, in *Buckley*, the Court upheld disclosure of all contributions to political committees exceeding $100 (5% of Ballot Measure 2's threshold).[94]

The D.C. Circuit has upheld the application of the political committee disclosure requirements to entities making independent expenditures, because "the public has an interest in knowing who is speaking about a candidate and who is funding that speech."[95] And more recently, in *Gaspee Project*, the First Circuit concluded that a $1,000 disclosure threshold for disclosing contributions to organizations that spend more than $1,000 on

---

[93]     *See Citizens United*, 558 U.S. at 369 ("[T]he public has an interest in knowing who is speaking about a candidate shortly before an election."); *id.* at 371 ("The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of . . . entities in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages."); *McConnell*, 540 U.S. at 196 ("[I]mportant state interests . . . — providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions — apply [to the law's] . . . disclosure requirements[.]" (footnote omitted)); *Buckley*, 424 U.S. at 66 ("[D]isclosure provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters[.]" (quotation omitted)); *id.* at 68 ("[D]isclosure requirements, as a general matter, directly serve substantial governmental interests."); *see also* Plaintiffs' Motion at 7 ("The Supreme Court has recognized that laws requiring disclosure of campaign contributions . . . serve a governmental interest because 'disclosure helps voters to define more of the candidates' constituencies.'" (quoting *Buckley*, 424 U.S. at 81)).

[94]     *See Buckley*, 424 U.S. at 82-84.

[95]     *See SpeechNow.org*, 599 F.3d at 698; *see also id.* at 696 ("The Supreme Court has consistently upheld organizational and reporting requirements against facial challenges.").

election-related communications was narrowly tailored to the government's informational interest.[96]

Given these holdings, there is no question that the $2,000 "line" established by Ballot Measure 2 is both sufficiently related and narrowly tailored to the State's informational interest in contributors to IEOs,[97] especially given the State's prior $50, $250, and $500 reporting thresholds in other contexts (which include a contributor reporting requirement at one quarter the contribution amount established by Ballot Measure 2).[98]

Additionally, Ballot Measure 2's provisions that require major donors to IEOs report their contributions within 24 hours, rather than relying solely on disclosure by the IEOs, similarly satisfies exacting scrutiny. Obviously, the contributor will *always* be in a better position than the IEO to both identify the true source of its own contribution and quickly report it because obviously the contributor must receive the funds prior to donating

---

[96]    *See Gaspee Project*, 13 F.4th at 88-90, *cert. denied*, 2022 U.S. LEXIS 2127. Likewise, the first appellate decision that opened the door to unlimited contributions to SuperPACs unanimously upheld the reporting requirements applicable to such political committees. *See SpeechNow.org*, 599 F.3d at 696-99. All federal political committees must disclose the identity of their contributors who give more than $200 within a calendar year. *See* 52 U.S.C. § 30104(b)(3).

[97]    *See Buckley*, 424 U.S. at 83 (noting that any disclosure "line is necessarily a judgmental decision, best left in the context of this complex legislation to . . . discretion"); *see also Gaspee Project*, 13 F.4th at 88-90.

[98]    *See* AS 15.13.040(e)(5)(A) (requiring IEOs to report all contributions of $50 or more); AS 15.13.110(b) (requiring IEOs to report all contributions of $250 or more within 24 hours if they are made "within nine days of the election"); AS 15.13.110(h) (same); AS 15.13.040(k) (requiring those who contribute $500 or more to ballot initiative groups to independently report their contributions).

them to the IEO.[99]  The State has an interest in "prompt disclosure" for contributions to

IEOs,[100] and has previously required reporting within 24 hours.[101]  Moreover, quick

disclosures are more informative and useful to voters than post hoc reporting,[102] and help

enable voters to "react to th[at] speech"[103] and "make informed choices in the political

marketplace."[104]  Ballot Measure 2's reasonable burden on major donors to IEOs to report

their own large contributions within 24 hours, and to share information about the source of

those contributions to the receiving IEOs, satisfies exacting scrutiny.[105]

---

[99]    *See* AS 15.13.400(19).  That is part of why Ballot Measure 2's maximum civil penalties for violations by both contributors and IEOs are *not* identical, which reflect the inherent disparity in information between the two sides of these contributions.  *Compare* AS 15.13.390(a)(2)-(3) (establishing penalties for contributors to IEOs), *with* AS 15.13.390(a)(1) (outlining penalties for IEOs).  If anything, Ballot Measure 2's provisions could be seen as protecting IEOs from unknowingly reporting false information about the true source of contributions received by correctly placing the burden of disclosing the true source of a contribution on the contributor itself.  *See* AS 15.13.390(a).  Placing the responsibility of reporting on the contributor is also important when some IEOs (like FLF) serve as both an IEO *and* as a contributor.  *See* Kendall Aff. at ¶ 13 (showing that FLF made $16,000 and $7,000 in contributions to another IEO, the Council on Good Government, in 2020).

[100]   *See Citizens United*, 558 U.S. at 370 ("With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters.").

[101]   *See* AS 15.13.110(b), (h).

[102]   *See Yes on Prop B v. City & Cnty. of San Francisco*, 440 F. Supp. 3d 1049, 1059 (N.D. Cal. 2020).

[103]   *See Citizens United*, 558 U.S. at 371.

[104]   *See id.* at 367 (quoting *McConnell*, 540 U.S. at 197).

[105]   It is telling that Plaintiffs have failed to allege any unconstitutional burden about Alaska's existing reporting requirements for contributors to ballot initiative groups.  *See* AS 15.13.040(k).

In moving for a preliminary injunction, Plaintiffs relied on inapposite cases. For starters, Plaintiffs take the U.S. Supreme Court's "prophylaxis-upon-prophylaxis" comment entirely out of context, which was not about disclosure at all;[106] instead, that language concerned a regime which imposed *limitations* on both contributions *and* expenditures, neither of which are at issue here.[107] And Plaintiffs fail to explain how *Americans for Prosperity Foundation* is at all relevant here.[108] That case involved neither disclosure to the public nor contributions related to elections. Rather, at issue was a tax regulation requiring confidential disclosure to the state Attorney General of top contributors to 501(c)(3) non-profit organizations (which do not engage in campaign speech); the rule did not require public disclosure, and the evidence showed that the government rarely (if ever) used the information provided.[109] The facts of *Americans for Prosperity Foundation* are fundamentally distinguishable from this case, where Ballot Measure 2 requires swift public disclosure of *campaign-related* contributions so that the electorate will know who is trying to influence their vote.

Finally, Plaintiffs' suggestion in their motion for preliminary injunction that contributors to IEOs will need access to a crystal ball is simply not true.[110] Alaska Statute 15.13.074(i) already requires certain IEOs to inform would-be contributors that

---

[106]    *See* Complaint at ¶ 62 (citing *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014)).

[107]    *See McCutcheon*, 572 U.S. at 221 (quoting *FEC v. Wisconsin Right to Life*, 551 U.S. 449, 479 (2007)).

[108]    *See* Complaint at ¶ 73.

[109]    *See Ams. for Prosperity Found.*, 141 S. Ct. at 2380.

[110]    *See* Plaintiffs' Motion at 9.

they intend to influence the outcome of an election before soliciting any contributions,[111] and other IEOs (like Plaintiffs) are required to report and make their intentions clear prior to making any expenditures.[112] Major contributors to IEOs simply do not make large donations over $2,000 without having a sense of how or whether their money will be used to influence an election, and would-be contributors must report such major contributions *only* if they reasonably believe the money will be used by an IE for election spending.[113] Moreover, Ballot Measure 2's "previous election cycle" lookback period not only provides a bright line to would-be contributors,[114] but also prevents an IEO from taking on massive amounts of debt during the campaign, only to have those debts conveniently paid for after the election to avoid all reporting requirements.[115]

Because Ballot Measure 2 has a higher disclosure threshold for contributions to IEOs than other regimes already found to satisfy exacting scrutiny, and places only reasonable burdens and obligations on major contributors to timely report their

---

[111]    AS 15.13.074(i) ("A nongroup entity may not solicit or accept a contribution to be used for the purpose of influencing the outcome of an election unless the potential contributor is notified that the contribution may be used for that purpose.").

[112]    *See* AS 15.13.050; *see also* AS 15.13.052; Complaint at ¶¶ 36, 48 (noting that Plaintiff IEOs have regularly registered).

[113]    *See* AS 15.13.040(r) (imposing a reporting requirement only on a contributor if they "know[] or ha[ve] reason to know [the receiving entity] is likely to make independent expenditures in one or more candidate elections in the current election cycle").

[114]    *See id.*

[115]    *See* Plaintiffs' Motion at 12 ("When a group stops speaking about candidates, the government's interest in knowing its donors also stops[.]"); *see also* Kendall Aff. at ¶¶ 16-17 (showing over $15,000 in contributions to an IE *after* an election, including $5,000 and $2,000 from Plaintiffs Smith and Griffin respectively).

contributions to IEOs, Ballot Measure 2's contributor disclosure provisions are both substantially related and narrowly tailored to the State's and electorate's informational interests. These provisions do not violate the First Amendment.

### C. Ballot Measure 2's On-Ad Disclaimers Are Constitutional.

Plaintiffs' second claim is that Alaska's on-ad disclaimer requirements, which were modified in part by Ballot Measure 2, are also unconstitutional.[116] Specifically, Plaintiffs argue that both a (non-existent) "top-5-donor disclaimer" and a factual statement about how a majority of an IEO's funds have come from outside of Alaska amount to improperly compelled speech.[117] Again, Plaintiffs are wrong. The provisions are constitutional.

Prior to Ballot Measure 2, Alaska law already required IEOs to include a number of disclaimers on ads.[118] All Ballot Measure 2 changed was to clarify that some disclaimers must now "remain onscreen throughout the entirety of the communication,"[119] and add a new disclaimer for any IEO that "receive[s] more than 50 percent of its . . . contributions . . . from outside Alaska."[120]

At the outset, despite Plaintiffs' oft-repeated refrain that Alaska's top-*five* contributor requirement is overly burdensome,[121] *no such requirement exists*. Rather,

---

[116]    *See* Complaint at ¶¶ 65-71.

[117]    *See id.*

[118]    *See* former AS 15.13.090(a)(2)(A)-(C) (2020); former AS 15.13.090(c), (d) (2020); AS 15.13.135(b)(2).

[119]    *See* AS 15.13.090(c).

[120]    *See* AS 15.13.400(15); *see also* AS 15.13.090(g).

[121]    *See* Complaint at ¶¶ 44, 55, 67; *see also* Plaintiffs' Motion at 4-5, 20-23.

AS 15.13.090(a)(2)(C) still requires that an IEO only disclose its top-*three* contributors.[122]

Alaska's required contributor disclaimer is therefore 40% less "burdensome" than Plaintiffs believe. In any event, the First Circuit in *Gaspee Project* recently upheld Plaintiffs' imaginary top-five contributor disclaimer regime.[123] If a top-five contributor disclaimer does not violate the First Amendment — and the U.S. Supreme Court has declined to say otherwise[124] — then neither should Alaska's top-three contributor disclaimer, which is 40% less onerous.[125]

Beyond this, neither of Ballot Measure 2's (actual) changes to Alaska's disclaimer requirements — nor AS 15.13.090 — violate the First Amendment.[126] The new requirement that certain on-ad disclaimers "must remain onscreen throughout the entirety of the communication" simply provides a clarification that "broadcast, cable, satellite, Internet or other digital communication[s]" now have similar requirements to print or otherwise "static" ads.[127] Such contemporaneous disclosures are very informative and

---

[122]    AS 15.13.090(a)(2)(C) (requiring "identification of the name and city and state of residence or principal place of business . . . of each of the person's *three* largest contributors" (emphasis added)); *see also* AS 15.13.090(e) ("In no case shall a person be required to identify more than three contributors under (a)(2)(C) of this section.").

[123]    *See* 13 F.4th at 91-93.

[124]    *See Gaspee Project*, 2022 U.S. LEXIS 2127 (Apr. 25, 2022) (denying cert).

[125]    *See also Mass. Fiscal All. v. Sullivan*, No. 18-12119-RWZ, 2018 U.S. Dist. LEXIS 189403 at *7-*9 (D. Mass. Nov. 6, 2018) (upholding a top-five contributor requirement).

[126]    Although Plaintiffs appear to assert that the disclaimers required by AS 15.13.090 violate the First Amendment, they almost exclusively focused on Ballot Measure 2's changes to on-ad disclaimers. *See* Complaint at ¶¶ 65-71; Plaintiffs' Motion at 12-28.

[127]    *See* AS 15.13.090(c).

useful to voters,[128] allowing voters to "react to th[at] speech" and "make informed choices in the political marketplace" without having to be familiar with researching online disclosure reports.[129]

In *Citizens United*, on an 8-1 vote,[130] the U.S. Supreme Court rejected an entity's First Amendment claim that it should not be "forc[ed] . . . to devote [time and space in] . . . each advertisement to [a] . . . disclaimer."[131]   As the *Citizens United* Court explained, "[w]ith the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters."[132]   There, the Court held that even a four-second audio disclaimer in a ten-second ad did not violate the First Amendment, even when the ad appeared to be promoting a movie about a candidate and not directly supporting or opposing the candidate.[133]   If an audio disclaimer can take up to 40% of an ad's running time without violating the First Amendment, then Ballot Measure 2's minor

---

[128]     *See Yes on Prop B*, 440 F. Supp. 3d at 1059 (citations omitted).

[129]     *See Citizens United*, 558 U.S. at 367, 371 (quoting *McConnell*, 540 U.S. at 197); *see also McConnell*, 540 U.S. at 258-59 (Scalia, J., concurring in part and dissenting in part) ("The premise of the First Amendment is that the American people are neither sheep nor fools, and hence fully capable of considering both the substance of the speech presented to them and its proximate and ultimate source.").

[130]     *See Citizens United*, 558 U.S. at 317 (explaining that eight Justices agreed with Part IV of the opinion, which pertained to disclaimer and disclosure requirements); *see also id.* at 366-71; *id.* at 395-96 (Stevens, J., concurring in part); *id.* at 480-85 (Thomas, J., dissenting in part).

[131]     *Id.* at 368.

[132]     *Id.* at 370.

[133]     *See id.* at 366-71.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                          Page 27 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 27 of 38

tweaks to Alaska's disclaimer requirements certainly satisfy exacting scrutiny against Plaintiffs' facial challenge.

Further, the new on-ad disclaimer for an IEO that receives a majority of its funding from outside Alaska is reasonable given Alaska's extensive history of outside influence in elections and the public's resulting interest in such information.[134]  It is one thing for one Alaska voter to influence another, it is quite another for entities or persons with no ties to Alaska to influence the outcome of elections within the State.  An on-ad disclaimer about funding from outside Alaska "helps voters to define more of the [IEO's] constituencies,"[135] and thus "serves informational functions" that do not violate the First Amendment.[136]

The cases Plaintiffs cite to support their argument that Alaska's disclaimer regime violates the First Amendment are easily distinguishable.[137]  First, with respect to on-ad disclaimers more generally, Plaintiffs rely almost exclusively on compelled speech cases

---

[134]    *See Thompson v. Dauphinais*, 217 F. Supp. 3d 1023, 1029 (D. Alaska 2016), *rev'd in part*, *Thompson v. Hebdon*, 140 S. Ct. 348 (2019) ("[S]everal factors . . . make Alaska highly, if not uniquely, vulnerable to corruption in politics and government. . . .  A . . . factor is Alaska's almost complete reliance on one industry for a majority of its revenues."); *see also id.* at 1039 ("[T]he unique combination of Alaska's small population, geographic isolation, and great natural resources make it extremely dependent on outside industry and interests. . . .  [S]uch dependency makes Alaska especially vulnerable to exploitation by outside industry and interests[.]").  Although the Ninth Circuit has since struck down Alaska's limits on out-of-state contributions, the district court's underlying factual findings are still relevant to provide context for Ballot Measure 2's new on-ad disclaimer.  *See Thompson v. Hebdon*, 909 F.3d 1027, 1031 (9th Cir. 2018); *see also Thompson v. Hebdon*, 7 F.4th at 824-27.

[135]    *Buckley*, 424 U.S. at 81.

[136]    *Id.* at 83.

[137]    *See* Complaint at ¶¶ 68-70.

that do not concern election-related speech at all.[138]  The U.S. Supreme Court in those cases considered different (and less compelling) government interests that would have forced disclaimers that were directly contradictory to the underlying purpose of the organizations.[139]  After all, forcing a pro-life organization to provide information that is categorically opposed to its mission has nothing to do with requiring a factual disclaimer about funding in election communications.[140]  But when the Court has looked at disclaimers in the election context, the government's strong informational interest has been found to justify on-ad disclaimers, even when those disclaimers might dilute the IEO's stated goals.[141]  And Plaintiffs' reliance on *McIntyre v. Ohio Elections Commission*[142] and *ACLU of Nevada v. Heller*[143] is also misplaced.[144]  At issue in both of those cases was the ability of citizens to engage in *de minimus* and unorganized anonymous political speech for or

---

[138]  *See id.*; *see also* Plaintiffs' Motion at 12-23.

[139]  *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018) (concluding that a regulation requiring a pro-life organization to disclose ways to obtain an abortion violated the First Amendment); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995) (holding that the First Amendment's right to free association permits an organization to restrict who may participate in its parade).

[140]  *See generally NIFLA*, 138 S. Ct. 2361.

[141]  *See Citizens United*, 558 U.S. at 366-71; *McConnell*, 540 U.S. at 196-202; *Buckley*, 424 U.S. at 66-68; *see also Yes on Prop B*, 440 F. Supp. 3d at 1057 (distinguishing an election disclaimer from a commercial disclaimer at issue in *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749 (9th Cir. 2019)).

[142]  514 U.S. 334 (1995).

[143]  378 F.3d 979 (9th Cir. 2004).

[144]  *See* Plaintiffs' Motion at 18-19.

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 29 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 29 of 38

against initiatives.[145] Here, there are already minimum contribution and expenditure thresholds to protect limited and unsophisticated political speech from arguably burdensome requirements,[146] and Ballot Measure 2 did not change Alaska's disclaimer and disclosure requirements for ballot initiatives.[147]

Finally, Plaintiffs' repeated attempt to equate *outright limitations* on out-of-state contributions with Ballot Measure 2's *conditional disclaimer* about such contributions should be rejected.[148] All of the cases cited by Plaintiffs concern unconstitutional limitations or bans on IEOs or candidates actually receiving out-of-state contributions.[149] *None* of those cases apply to Ballot Measure 2's requirement for factual, content-neutral disclaimers for IEOs that receive over 50% of their contributions from sources outside Alaska.[150] Plaintiffs have also offered no evidence for their suggestion that a disclaimer of this kind is derogatory; their opinion may not be shared by other viewers. And Plaintiffs are free to add whatever information they like about the source of their funds or why those

---

[145]    *See McIntyre*, 514 U.S. at 337-38 (concerning a small number of anonymous pamphlets for an initiative); *Heller*, 378 F.3d at 1000-02 (explaining why limited anonymous speech for ballot initiatives may be protected under the First Amendment).

[146]    *See* AS 15.13.110.

[147]    *See* AS 15.13.110(g).

[148]    *See* Complaint at ¶ 68; *see also* Plaintiffs' Motion at 23-28.

[149]    *See generally Thompson v. Hebdon*, 7 F.4th 811; *Landell v. Sorrell*, 382 F.3d 91 (2d Cir. 2002), *rev'd by Randall v. Sorrell*, 548 U.S. 230 (2006); *We the People PAC v. Bellows*, 519 F. Supp. 3d 13 (D. Me. 2021); *SD Voice v. Noem*, 380 F. Supp. 3d 939 (D. S.D. 2019).

[150]    AS 15.13.090(g).

sources are honorable.[151]  The required information is simply a fact that some voters will find useful and is far less restrictive than a limit or outright prohibition on out-of-state contributions.

Despite Plaintiffs' suggestion to the contrary, the First Amendment does not protect a "right" to conceal the sources of funding for campaign speech.  Just because Families of the Last Frontier would prefer not to disclaim that it actually receives the vast majority of its funds from outside the Last Frontier does not make Ballot Measure 2 unconstitutional.[152]  The State has an informational interest in providing voters with "the information needed to hold corporations and elected officials accountable for their positions and supporters,"[153] which includes Ballot Measure 2's disclaimer for when a majority of an IEO's contributions come from people or entities who are not from Alaska.[154]  That is why the U.S. Supreme Court has upheld disclaimer requirements in the past, recognizing that an IEO will still have the opportunity to try to explain the disclaimer

---

[151]  *See Meese v. Keane*, 481 U.S. 465, 467-68, 480-82 (1987) (concluding that requiring that a foreign film on acid rain being labeled as "political propaganda" did not violate the First Amendment, noting that film producers are free to include additional information about themselves to their viewers).

[152]  *See* Complaint at ¶ 41; *see also* Kendall Aff. at ¶¶ 11-12, 20 (showing that over 99.5% of FLF's contributions in 2018, and over 96.5% of its contributions in 2019, consisted of "dark money" from outside Alaska).  Indeed, FLF has "adopt[ed a] seductive name[]" to obscure its donors' true purposes and affiliations.  *See Citizens Against Rent Control/Coal. for Fair Hous. v. City of Berkeley*, 454 U.S. 290, 298 (1981).  It speaks volumes that FLF wants to "hid[e] behind [a] dubious and misleading name[]" by not having to disclose that it, in fact, received a majority of its contributions from "families" outside Alaska.  *McConnell*, 540 U.S. at 197 (quoting *McConnell*, 251 F. Supp. 2d at 237).

[153]  *See Citizens United*, 558 U.S. at 370.

[154]  *See* AS 15.13.090(g).

to its viewers if it wishes.[155]  Disclaimers are a reasonable "cost" for unlimited free speech, and Ballot Measure 2's minor changes to Alaska's disclaimer requirements for IEOs satisfy exacting scrutiny.[156]

## D.     "True Source" Disclosure Requirements Are Constitutional.

Finally, Plaintiffs claim that the First Amendment protects them from disclosing the "true source" of major contributions to IEOs, mischaracterizing the requirement as having to disclose a "layered donor."[157]  Plaintiffs suggest that disclosing the "true source" of contributions of $2,000 or more to IEOs will improperly "chill" free speech, include unsuspecting true sources, improperly disclose valuable confidential donor lists to the public, and be overly burdensome.[158]  These arguments fail, and the provisions are constitutional.

Before Ballot Measure 2, no "person or group [could] . . . make a contribution anonymously, using a fictitious name, or using the name of another."[159]  But IEOs were still

---

[155]     *See Citizens United*, 558 U.S. at 366-70; *see also Meese*, 481 U.S. at 480-82.

[156]     *See Citizens United*, 558 U.S. at 371 ("The First Amendment protects political speech; and disclaimer permits citizens and shareholders to reach to the speech . . . in a proper way.").

[157]     *See* Complaint at ¶¶ 72-75.  This would only be the case if the contributor is an intermediary.  *See* AS 15.13.400(19).

[158]     *See* Complaint at ¶¶ 72-75.

[159]     *See* former AS 15.13.074(b) (2020); *see also* 52 U.S.C. § 30122 ("No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.").

ABE's Motion to Dismiss

able to receive "dark money" contributions from obscured sources.[160] This loophole was fixed in Ballot Measure 2.

Rather than being over or under inclusive, Ballot Measure 2's "true source" reporting requirement more precisely tailors Alaska's disclosure regime to advance the State's informational interest. The U.S. Supreme Court has explained that the whole purpose of disclaimer and disclosure requirements is to know who, exactly, is making contributions to influence the outcome of elections.[161] Ballot Measure 2's true source definition gets at precisely that, goes no further than necessary, and only applies to major contributions ($2,000 or more) to IEOs.[162] It is difficult to imagine a better fit to achieve the State's informational interest at issue here: the *real* source of political contributions.

---

[160]    *See* AS 15.13.400(19). Indeed, FLF itself has both received and contributed substantial sums of "dark money" in the past. *See* Kendall Aff. at ¶¶ 11-12, 20 (showing that over 99.5% of FLF's contributions in 2018, and over 96.5% of its contributions in 2019, consisted of "dark money" from outside Alaska); *see also* Kendall Aff. at ¶ 13 (showing that FLF made $16,000 and $7,000 contributions (respectively) to the Council on Good Government, yet another IEO).

[161]    *See Citizens United*, 558 U.S. at 367 ("[D]isclosure could be justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending." (alteration in original) (quoting *Buckley*, 424 U.S. at 66)); *McConnell*, 540 U.S. at 196; *see also Buckley*, 424 U.S. at 67 ("Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants[.]" (quotation omitted)); *Mariani v. United States*, 212 F.3d 761, 775 (3d Cir. 2000) (en banc) ("Proscription of conduit contributions (with the concomitant requirement that the true source of contributions be disclosed) would seem to be at the very core of the Court's analysis [in *Buckley*].").

[162]    *See* AS 15.13.040(r). This is why Plaintiffs' characterization of Ballot Measure 2's "true source" definition as being a "secondary donor" requirement is misplaced. *See* Plaintiffs' Motion at 28. Ballot Measure 2's provisions do not require a contributor to report where the contribution came from ad infinitum. Those provisions only require that the "true source" is disclosed — i.e., "the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling

The U.S. Supreme Court has made it abundantly clear that voters and the government have an interest in knowing who contributes to IEOs, and precise tailoring of the "true source" requirement means the public will be less likely to mistake an intermediary for the real origin of funding.[163] After all, the Court has recognized that disclosure and disclaimer requirements for IEOs are a constitutionally less restrictive way for the government to ensure transparency for the unlimited donations to IEOs influencing our elections.[164] Prompt disclosure of the "true source" of contributions to IEOs serves that informational interest and enhances the government's ability to enforce the law.[165]

In sum, *every* informational interest implicated by a campaign finance regime is promoted when the true source of funds is revealed. Without that disclosure, the publicly available information will be either misleading or incomplete, potentially defeating the anti-corruption and educational value of the information in the first place.

In contrast, Plaintiffs' expressed concerns in their motion for preliminary injunction about Ballot Measure 2's "true source" requirement make no sense. In essence, Plaintiffs

---

goods or services" — and nothing more, unless the contribution comes from an intermediary. *See* AS 15.13.400(19). And each of the individual Plaintiffs would satisfy Ballot Measure 2's definition of "true source." *See* Complaint at ¶¶ 5-9.

[163]   *See Citizens United*, 558 U.S. at 367; *see also McConnell*, 540 U.S. at 196. For example, the IEO "Council on Good Government" received contributions from FLF in 2020, who in turn received contributions from the "Republican State Leadership Committee" and "GOPAC" in 2018 and 2019 respectively. *See* Kendall Aff. at ¶¶ 11-13.

[164]   *See Citizens United*, 558 U.S. at 366-71; *SpeechNow.org*, 599 F.3d at 696.

[165]   For example, full disclosure of original sources helps ensure that foreign interests do not interfere in Alaska's elections. *See* AS 15.13.068 (prohibiting foreign contributions or expenditures).

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 34 of 38

are asking this Court to conclude that there is a First Amendment right for a donor to anonymously give unlimited sums of money to influence the outcome of elections.[166] But there is no constitutional right to make "dark money" contributions. The U.S. Supreme Court has held that individuals and corporations may indeed give unlimited sums of money to entities who intend to influence the outcome of elections.[167] However, in reaching this conclusion, the Court recognized that disclosure and disclaimer requirements are a constitutionally-valid and less restrictive way for the government to ensure transparency for the unlimited contributions.[168] Plaintiffs cite no Court, *anywhere*, that has held donors making unlimited contributions to IEOs must be allowed to do so anonymously.[169] There is no reason for this Court to be the first.

Additionally, Plaintiffs' claimed cascade of negative effects is a fantasy untethered to reality. If an organization contributes to an IEO, that organization and the contributor will *only* need to disclose the true source (or sources) of that *contribution*, *not* the true source or sources of its entire budget or all of the money it has ever received.[170] This is a reasonable limitation which requires disclosure only up to the amount of the contribution

---

[166]     *See* Plaintiffs' Motion at 28-33.

[167]     *See Citizens United*, 558 U.S. at 365-66; *see also SpeechNow.org*, 599 F.3d at 696.

[168]     *See Citizens United*, 558 U.S. at 366-71; *see also SpeechNow.org*, 599 F.3d at 698.

[169]     *See* Complaint at ¶¶ 72-75; *see also* Plaintiffs' Motion at 28-33. Perhaps one reason for this is to "deter actual corruption and avoid the appearance of corruption." *See Buckley*, 424 U.S. at 67; *see also* AS 15.13.068 (prohibiting foreign contributions or expenditures).

[170]     *See* AS 15.13.040(r).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*
Page 35 of 38

Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 35 of 38

itself and not a penny more.[171]  And not only would a church likely lose its nonprofit status

if it gave to an IEO in the manner suggested by Plaintiffs,[172] but Plaintiffs' example of a

realtor being listed as a true source would also run contrary to how organizations are able

to support IEOs without making unsuspecting private donations public.[173]   Alaska

Statute 15.13.074(i) already requires certain IEOs to inform would-be contributors that

they intend to influence the outcome of an election before soliciting any contributions,[174]

and — as the State's proposed regulations confirm[175] — IEOs can create segregated

accounts to allow donors to give to an account that is not used to make contributions to

IEOs if the donor prefers.[176]  In other words, realtors who donate to an organization that

contributes to an IEO can make clear that their donations should not be used for election

purposes; if and when that organization contributes to an IEO, those realtors who did not

---

[171]    *See id.*  For example, if a $100 million organizational contributor made a $1 million contribution to an IEO, the IEO (and contributor) would only need to report the true source of $1 million.  *See id.*  This is not a "dramatic mismatch."  *See Ams. for Prosperity Found.*, 141 S. Ct. at 2386.

[172]    *See* Plaintiffs' Motion at 29; *see also* 26 U.S.C. § 501(c)(3) (stating that such organizations shall "not participate in, or intervene in . . . any political campaign on behalf of (or in opposition to) any candidate for public office").

[173]    *See* Plaintiffs' Motion at 29-30.

[174]    AS 15.13.074(i).

[175]    *See* Exhibit E at 2 *to* Kendall Aff. (providing proposed regulation changes).

[176]    *See* Exhibits D, F *to* Kendall Aff. (providing advisory opinions on how an entity can engage in separate accounting so that certain contributions to IEOs will protect the identities of a parent entity's donors); *see also* AS 15.13.374(e)(3) (establishing a safe harbor to follow advisory opinions).

ABE's Motion to Dismiss
*Smith et al. v. Helzer et al., Case No. 3-22-CV-00077-SLG*                                    Page 36 of 38
Case 3:22-cv-00077-SLG   Document 33   Filed 05/16/22   Page 36 of 38

want their donations to be used for election purposes will not be named as true sources. Ballot Measure 2 cannot account for outright fraud or misuse of funds.[177]

The First Amendment does not guarantee individuals and corporations the right to give misleading information about the source of campaign contributions. Ballot Measure 2's definition of "true source," which seeks to shine a light on the proliferation of "dark money" in politics, is both substantially related and narrowly tailored to achieve the State's informational interest in knowing and publishing the actual identity of those trying to influence the outcome of elections.

## V.    **<u>CONCLUSION</u>**

Under the Constitution, the electorate is entitled to know who is influencing Alaska's elections. The voters passed Ballot Measure 2 to ensure they had this transparency. As stated in Ballot Measure 2 itself:

> The people of Alaska have the right to know in a timely manner the source, quantity, timing, and nature of resources used to influence candidate elections in Alaska. This right requires the prompt, accessible, comprehensible, and public disclosure of the true and original sources of funds used to influence these elections, and is essential to the rights of free speech, assembly, and petition guaranteed by the First Amendment to the United States Constitution and shall be construed broadly.[178]

---

[177]    *See* Plaintiffs' Motion at 29-30; *see also* 26 U.S.C. § 501(c)(3); AS 15.13.074(i).

[178]    *See* Ballot Measure 2 at 2 (Exhibit A *to* Kendall Aff.).

Because the disclosure and disclaimer requirements in Ballot Measure 2 are constitutional, Plaintiffs have not stated a claim upon which relief can be granted. This Court should DISMISS Plaintiffs' claims.

CASHION GILMORE & LINDEMUTH
Attorneys for Defendants

DATE: <u>May 16, 2022</u>          <u>/s/Scott M. Kendall</u>
Scott M. Kendall
Alaska Bar No. 0405019
Jahna M. Lindemuth
Alaska Bar No. 9711068