Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N Street, Ste. 100
Anchorage, Alaska 99501
Email: crichards@alaskaprofessionalservices.com

Daniel R. Suhr (WI No. 1056658)
Liberty Justice Center
440 N. Wells St., Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjusticecenter.org

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SMITH et al.,<br><br>     Plaintiffs,<br><br>v.<br><br>HELZER et al.,<br><br>     Defendants. | Case No. 3:22-cv-00077<br><br>REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION |

N.B. The State and ABE also filed motions to dismiss which addressed the merits (*see* Fed. R. Civ. Pro. 12(b)(6)). However, those motions are not yet ripe and will not be ripe in time for the June 13 hearing (Plaintiffs will file an amended complaint). Nevertheless, because ABE's preliminary injunction response cross-references its motion to dismiss brief on the likelihood of success on the merits, Plaintiffs address their brief in that context ("ABE Mot. to Dismiss").

## INTRODUCTION

Earlier this month, the Supreme Court again criticized duplicative campaign finance regulation, applying "a measure of skepticism to" "yet another in a long line of 'prophylaxis-upon-prophylaxis approaches' to regulating campaign finance. . . . Such a prophylaxis-upon-prophylaxis approach, we have explained, is a significant indicator that the regulation may not be necessary for the interest it seeks to protect." *FEC v. Cruz for Senate*, 2022 U.S. Lexis 2403, *27 (May 16, 2022). That is precisely the place we find ourselves in this case. Not content to have independent expenditure organizations (IEOs) report the contributions they receive, the State now requires everyday Alaskans making such contributions also report the same donations—within 24 hours—on pain of penalty. Not content to make those donations visible instantaneously on the Internet, the State insists upon the inclusion of donor information on the face of advertisements. And not only must the actual contributor be reported, but an entire genealogy of money must be submitted. Any marginal increase in auditing efficiency or the informational interest does not justify these duplicative, prophylaxis-upon-prophylaxis policies.[1]

## ARGUMENT

### I.    A preliminary injunction is appropriate in this instance.

Unsurprisingly, the State and ABE begin by trying to raise the bar as high as possible to secure a preliminary injunction. However, Ninth Circuit case law says even post-*Winter*

---

[1] Though the phrase originated in a contribution limits case rather than a disclosure case, courts have rightly seen it as a broader principle applicable to disclosure, and to the application of intermediate scrutiny more generally. *See, e.g., Calzone v. Summers*, 942 F.3d 415, 424 (8th Cir. 2019) (en banc); *Mance v. Sessions*, 896 F.3d 390300 (5th Cir. 2018) (Elrod, J., dissenting from denial of rehearing en banc).

that a plaintiff may secure a preliminary injunction when he shows "serious questions going to merits" as long as he also shows that a "balance of hardships that tip sharply" in his favor along with irreparable injury and the public interest. *All. For The Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). Such relief is especially appropriate here "in light of the Ninth Circuit's permissive case law regarding preliminary injunctive relief to protect First Amendment rights." *Chiafalo v. Inslee*, 224 F. Supp. 3d 1140, 1145 (W.D. Wash. 2016). *See McDermott ex rel. NLRB v. Ampersand Publ'g LLC*, 593 F.3d 950, 958 (9th Cir. 2010) (showing special solicitude for preliminary injunction protecting First Amendment interests post-*Winter*). "[A]s this case involves First Amendment rights of association which must be carefully guarded against infringement by public office holders, we judge that injunctive relief is clearly appropriate in these cases." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). If this Court believes the Plaintiffs have raised a serious question as to the merits, it should not hesitate to grant preliminary relief and allow their intended speech during the coming election.

## II.     The Plaintiffs are likely to succeed on their challenge to BM2.

*i.      The State does not have a sufficient interest in requiring both the donor and recipient IEO to simultaneously report the same donation with 24 hours.*

The State has two responses in defense of its double-reporting rule. First, the State says donor-side reporting is necessary because "[t]he donor is the one who can trace the 'true source' of the donor's funds, so the law reasonably obligates the donor to provide and certify the truth of this information. Placing this obligation solely on the recipient would

lead to incomplete or inaccurate reporting of true sources. Requiring both sides of the transaction to report also ensures that no transactions are missed." State Br. 12.

This is exactly the sort of better bookkeeping rationale the Supreme Court rejected as insufficient to survive exacting scrutiny in *Americans for Prosperity Foundation (AFPF)*. California made the same type of argument: "the up-front collection of Schedule B information improves the efficiency and efficacy of the Attorney General's important regulatory efforts." 141 S. Ct. at 2385. California said other measures, such as subpoenas or audit letters for specific investigations, "are inefficient and ineffective compared to up-front collection" of information from everyone. *Id*. at 2386. The Supreme Court rejected this rationale: "ease of administration" "cannot justify the disclosure requirement." *Id*. at 2387. "[T]he prime objective of the First Amendment is not efficiency. Mere administrative convenience does not remotely reflect the seriousness of the actual burden . . . on donors' association rights." *Id*. Just so. The State may find double-reporting more efficient for bureaucrats, but this convenience cannot justify the burden on citizens.

Defendants wrongly dismiss *AFPF* because it concerns charitable disclosure rather than campaign disclosure. ABE Mot. To Dismiss 23. First, the Court's discussion of exacting scrutiny simply sets the standard. ABE's logic is like saying a decision discussing strict scrutiny in a free-speech case is irrelevant to a case applying strict scrutiny to a religious-liberty claim. Second, the Supreme Court itself in *AFPF* says these principles apply in both the campaign and noncampaign context. 141 S. Ct. at 2383. Third, the State is wrong to distinguish *AFPF* by saying in that case the information was "rarely used," whereas here all of the information is used. State Br. 11. The information collected by APOC from the

*donor* report is "rarely used," because in the vast majority of cases it is duplicative of the information already provided simultaneously by the recipient IEO—only in those instances where the IEO fails in its responsibility to accurately and fully report is donor reporting useful. This is precisely the type of backend, bookkeeping rationale rejected in *AFPF*.

ii.     *The double-reporting requirement imposes a substantial burden on Alaska citizens and businesses.*

The State says that the reporting requirement is not that onerous, just a few clicks on a website. State Br. 12. If only it were that easy. For starters, donors must know of the requirement in the first place. Under federal law and the laws of the 49 other states, the obligation to report rests on a recipient entity, not on an individual donor.[2] Thus, a donor must know that Alaska is the only state in the union to impose this requirement. And ignorance of the law is not bliss—those who contribute in violation of rules of which they are not even aware are nevertheless subject to hefty fines, and APOC is not obligated to let them fix it first. *RBG Bush Planes, LLC v. APOC*, 361 P.3d 886, 897 (Alaska 2015).

Then the donor must be aware of APOC's opinion about the difference between a "contribution" and a "donation" to know which category his gift falls in. *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1035 (9th Cir. 2009) (Noonan, J., concurring) ("To comply with the statute, the pastor would first have to understand what the statute requires in the framework of Montana election law. This understanding is not materially assisted by the regulations issued by the Commissioner of Political Practices."). *Accord Sampson v. Buescher*, 625 F.3d 1247, 1259-60 (10th Cir.

---

[2] Nat'l Conf. of State Legislatures, *State Campaign Finance Disclosure Requirements 2015-2016 Election Cycle*, www.ncsl.org/Portals/1/documents/legismgt/elect/StateCampaignFinanceDisclosureRequirementsChart2015.pdf.

2010) ("The average citizen cannot be expected to master on his or her own the many campaign financial-disclosure requirements set forth. Even if those rules that apply may be few, one would have to sift through them all to determine which apply.") (cleaned up).

Second, the donor must know whether the group to which he is contributing is actively undertaking independent expenditures, undertook independent expenditures in the last cycle, or if he has any information that the group plans to undertake independent expenditures later in this cycle. AS 15.13.040(r). The State says "[i]t is reasonable to expect that someone who wants to give an entity over $2,000 will already know whether the recipient makes independent expenditures in candidate elections." State Br. 13. Such speculation about what is reasonable, without any evidence or foundation in the record, is insufficient to satisfy exacting scrutiny. For courts applying intermediate scrutiny to a speech challenge, the government's "burden is not satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993). *Accord Cruz for Senate*, 2022 U.S. LEXIS 2403, *29 ("We have never accepted mere conjecture as adequate to carry a First Amendment burden." (cleaned up)).

Not only does the State offer only conjecture, but it is questionable conjecture at that. A businessman who contributes $5,000 to the Alaska Chamber of Commerce is not thinking in that moment, "Last year the Alaska Chamber ran advertisements about the Governor; I'd better head to APOC's website to report this right away." Similarly, a retiree who donates $2,500 to Planned Parenthood of the Great Northwest is probably unaware of whether the organization is mailing flyers about a state legislator whose district covers the

opposite end of the state. Indeed, the retiree may live in Idaho or Washington State, but her donation to Planned Parenthood still must be reported within 24 hours.

The State says "entities wishing to receive large contributions will surely play a part in educating their donors about the need to complete this new form." State Br. 13. Again, this is total speculation. It's also unrealistic: the report must be made within 24 hours—so if the retiree mails in a check for $2,500 and gets a letter back a week later thanking her for her donation and reminding her to report it to APOC, she will have violated the law. And putting this in the small print of a solicitation is hardly helpful, while putting it in bold, underlined, large print will simply scare off potential donors from making any contribution.

This cannot pass exacting scrutiny. "It is easy to suppose these reporting and filing requirements are slight. They may be so for a large enterprise. They are care-demanding and time-consuming" for a single individual. *Canyon Ferry Rd. Baptist Church*, 556 F.3d at 1036 (Noonan, J., concurring). Given that the recipient committees, which are fully familiar with their own current and past independent expenditures, are also required to disclose this information, this requirement cannot survive exacting scrutiny.

iii.    *The State does not have a sufficient interest in requiring groups that are not actively making independent expenditures to report.*

BM2 also requires that donors report contributions to entities that engaged in independent expenditures the immediate past cycle or that the donor reasonably believes will make independent expenditures in the future. The State acknowledges this provision "might sweep in some excess information at the margins—because not every group that made independent expenditures in the last election cycle will do so this cycle," but

nevertheless insist "it does not make the law overbroad." State Br. 10. The State assures us "[c]overing contributions to entities *likely* to make relevant expenditures—because they have done so recently—is thus reasonable." *Id*. Exacting scrutiny demands a much tighter fit: "[A] substantial relation to an important interest is not enough to save a disclosure regime that is insufficiently tailored." *AFPF*, 141 S. Ct. at 2384 (cleaned up). Disclosure requirements must be "tied with precision to specific election periods." *Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1117-18 (9th Cir. 2019). This requirement is not.

ABE offers a different rationale for the provision: to avoid having an IEO pay for ads by accumulating debt and then paying it off right after the election. ABE Br. 24. This is again a wholly speculative rationale—ABE offers no evidence that there has been a raft of IEOs maxing out their credit cards to avoid disclosure. It also doesn't hold up to a moment's analysis: such a debt-driven strategy is a gamble for banks and vendors because it is hard to retire debt after an election, especially for those who don't win.

The State worries that an entity might "amass a secret war chest and delay reporting by beginning its expenditures at the last minute." State Br. 10. Again, this speculation is insufficient to pass exacting scrutiny. Besides, no group would actually undertake such a strategy because ads run on Election Day come too late—ads must be run at least a few days before an election to have any chance of sinking in with last-minute undecided voters.

There is no constitutional basis for the State to invade the privacy of nonprofit groups that have not made independent expenditures this cycle; any requirement must be narrowly tailored to the electoral activity that provides the substantial government interest that overrides the presumption of privacy. *See AFPF*, 141 S. Ct. at 2388.

### III. The on-ad disclaimer requirements should be preliminarily enjoined.

#### i. *The on-ad disclaimer is subject to strict scrutiny.*

The correct framework for compelled speech, as set out in the Supreme Court's most recent decision on compelled speech, is strict scrutiny. *Nat'l Inst. Of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018). This is so because any such law is necessarily content-altering. The State's heavy reliance on the First Circuit's decision in *Gaspee Project* is misplaced in this circuit where *ALCU of Nevada* controls and explains in depth why compelled on-ad speech is different in kind (and hence in scrutiny) from compelled disclosure on a form to a bureaucrat. 378 F.3d 979, 991 (9th Cir. 2004).

The State's on-ad disclaimer cannot survive strict scrutiny: however important the informational interest is, it is not the same as national security or prison safety. Nor is it the least restrictive means—again, all this information is already disclosed and available "at the click of a mouse." *McCutcheon v. FEC*, 572 U.S. 185, 224 (2014). Strict scrutiny is almost always fatal to a law, and should be here too. But if this Court disagrees and finds *ACLU of Nevada* has been overruled (a holding the Ninth Circuit itself has never made), then the law still fails exacting scrutiny.

#### ii. Citizens United *does not control.*

*Citizens United* did uphold a "stand by your ad" disclaimer against two challenges: an as-applied challenge for commercial speech (since Citizens United was trying to run advertisements promoting a movie) and an under-inclusivity challenge (because the law exempted print and Internet advertisements). *Citizens United v. FEC*, 558 U.S. 310, 368

(2010). The Court said not one word about compelled speech. *Citizens United* is not even dicta beyond the holding; it simply did not address the issue Plaintiffs raise at all.

Instead *Citizens United* only controls what the Court addressed: a "stand by your ad" provision ("I'm Tim Smith and I approved this message."). However, Alaska's law goes far beyond that. It also requires disclaimer of the top three donors (Defendants are correct it's top three, not top five; counsel regrets the error in its earlier papers) and that a majority of money raised came from outside Alaska. The State's interest in forcing a candidate to acknowledge his own ad is different from exposing donors on the face of the ad.

###### iii.    *The State's interests do not survive even exacting scrutiny.*

The State and ABE suggest that the compelled speech is "no big deal" compared to the speech compelled by California in *NIFLA*, saying "[r]equiring political ads to list their top funding sources is in no way 'similar to forcing pro-life groups to share information about abortion access.'" State Br. 16. *Accord* ABE Mot. To Dismiss 29 ("forcing a pro-life organization to provide information that is categorically opposed to its mission has nothing to do with requiring a factual disclaimer about funding in election communications.").

This makes two mistakes. First, Plaintiffs are groups who believe in limited government, privacy, and free speech. Strait Decl. ¶ 4; Shaw Decl. ¶ 5. It absolutely violates those ideological convictions to submit to government control over their speech.

But regardless, "the right against compelled speech is not, and cannot be, restricted to ideological messages." *Frudden v. Pilling*, 742 F.3d 1199, 1206 (9th Cir. 2014). Rather, "compelled statements of fact, like compelled statements of opinion, are subject to First Amendment scrutiny." *Id*. (cleaned up). The State and ABE (and the First Circuit in *Gaspee*

*Project*) are wrong to act as though "a factual disclaimer" is any more or less compelled speech than an ideological message; the nature of what must be said doesn't matter.

The State justifies the "top three" donor disclaimer requirement by saying "[i]ncluding some of this information in the ads themselves advances this interest more efficiently and effectively than requiring voters to search for disclosure forms online." State Br. 17. But the First Amendment prioritizes the speaker's freedom; "efficiency" is not a constitutional priority. *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). "Public convenience" is "insufficient" to justify imposing on First Amendment rights. *Schneider v. State*, 308 U.S. 147, 161 (1939). The burden on speakers is great—they must say something they do not want to say, that conflicts with their beliefs, and that takes up their limited airtime—while the gain in the State's informational interest is a marginal increase in efficiency.

> iv.  *The State utterly fails to defend the massive quantity of speech it compels.*

The State says "plaintiffs offer no evidence to support their conclusory assertions that the disclaimers will take up too much space in their advertisements." State Br. 17. This is the State's only response to this element of Plaintiffs' claim; the State does not argue that political disclaimers are different from the commercial disclaimers at issue in *American Beverage Association v. City & County of San Francisco*, 916 F.3d 749 (9th Cir. 2019). Nor does the State argue that *Gaspee Project* includes any quantitative analysis; it does not. This *American Beverage Association* angle was not raised or decided in *Gaspee*.

Plaintiffs' claim is not a conclusory assertion. "[W]e do not need empirical evidence to determine that the law at issue is burdensome," *Ariz. Free Enterprise Club v. Bennett*, 564 U. S. 721, 746 (2011); simply reading the statutes is all that is required. Nor is "too much"

a floating standard: the Ninth Circuit has struck down warnings on commercial products when they "occupy at least 20% of the advertisement." *Am. Bev. Ass'n*, 916 F.3d at 754.

Here is what an IEO like Families of the Last Frontier must include in a radio ad: "Paid for by Families of the Last Frontier, 123 Main Street, Anchorage, Alaska 56789. This notice to voters is required by Alaska law. We certify that this advertisement is not authorized, paid for, or approved by any candidate. The top contributors of Families of the Last Frontier are Tim Smith, Sally Jones, and Jane Doe." AS 15.13.090(a) & (d) and AS 15.13.135(b)(2). And one cannot rush reading this announcement; "the . . . statements must be read in a manner that is easily heard." AS 15.13.090(d).

In a television ad, the message must include a video statement: "I am Steve Strait, president of Families of the Last Frontier, and I approved this message." AS 15.13.090(a)(2)(B). On the screen there must be text reading: "Paid for by Families of the Last Frontier, 123 Main Street, Anchorage, Alaska 56789. This notice to voters is required by Alaska law. We certify that this advertisement is not authorized, paid for, or approved by any candidate. The top contributors of Families of the Last Frontier are Tim Smith of Anchorage, Alaska, Sally Jones of Fairbanks, Alaska, and Jane Doe of Wasilla, Alaska. A MAJORITY OF CONTRIBUTIONS TO FAMILIES OF THE LAST FRONTIER CAME FROM OUTSIDE THE STATE OF ALASKA." AS 15.13.090(a), (c), & (g) and AS 15.13.135(b)(2). The statement must be "easily discernible" and must "remain onscreen throughout the entirety of the communication." AS 15.13.090(c) & (g).

Applying the *American Beverage Association* standard, these requirements easily and obviously consume 20 percent of a standard thirty- or sixty-second TV or radio ad.

>    *v.*    *The State's response defending discrimination against out-of-state*
>         *contributors is entirely unconvincing.*

The State and ABE fundamentally misunderstand the case law concerning out-of-state

persons participating in in-state elections. The cases concern discrimination against the

political activity of out-of-state persons *in general,* not specific to contributions or petition

circulation. *See, e.g., Vermont v. Sorrell*, 382 F.3d 91, 146-48 (2d Cir. 2004).

ABE admits the game: "It is one thing for one Alaska voter to influence another, it is

quite another for entities or persons with no ties to Alaska to influence the outcome of

elections within the State." ABE Mot. To Dismiss Br. 28. In other words, the State through

the mandated disclaimer is telling voters which ads to listen to and which ads to ignore

based on who supported the sponsor of the ad. This goes against the Supreme Court's

admonition that the "the Government may commit a constitutional wrong when by law it

identifies certain preferred speakers." *Citizens United*, 558 U.S. at 340. The Government

should not "deprive[] the disadvantaged person or class of the right to use speech to strive

to establish worth, standing, and respect for the speaker's voice." *Id*. Yet the obvious

impact of the out-of-state provision is to diminish the worth and respect of certain speakers'

voices. The State of Alaska is picking favorites as to speakers and content.

Finally, for both the State's top-three-donors disclaimer and the out-of-state disclaimer,

there is no logical stopping point to the so-called informational interest. If the State can

require the city and state of residence for the top three donors be included on an ad, why

not whether they are registered as Republicans or Democrats? That could be more useful

to voters than their names and cities—a voter in Anchorage viewing an ad may not know

Sally Jones of Fairbanks, but he knows he likes Democrats and opposes Republicans. Certainly Sally Jones' party affiliation would help him know if "Citizens for Alaska" is a front for Republican or Democrat interests. Because different voters find different information important as they consider an advertisement, the State could require donors to "disclose all kinds of demographic information, including the signer's race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships." *Doe v. Reed*, 561 U.S. 186, 207 (2010) (Alito, J., concurring). Or the State could require not only their name and city, but also their phone number or e-mail address to "more easily enable members of the voting public to contact them and engage them in discussion." *Id*. The "informational interest" is not a blank check for the State to require disclosure and now disclaimer of any and all information it wants; such a policy only encourages the cancel-culture bullies running rampant in society. Any such disclosure and disclaimer must survive exacting scrutiny: it must be narrowly tailored to a real interest.

## IV.    The "true source" requirement also fails exacting scrutiny.

Alaska's genealogical approach to campaign finance—requiring two and three and more layers of disclosure all the way back to the "true source" of the funds—is the most aggressive campaign finance regulation in the nation. No other state requires such deep disclosure. This Court must decide whether the State's informational interest in layers of donors survives exacting scrutiny. It does not.

The State and ABE in their briefs raises the specter of corrupting or foreign influences, State Br. 8 & 22; ABE Mot. To Dismiss n.165 & n.169, but that is only speculation. They provide the Court zero evidence that intermediary entities are used to mask non-American

donors to funnel money into Alaska elections, or that donors are cutting deals with incumbents and routing the money through front groups. Once again, such conjecture is insufficient to survive exacting scrutiny. And the U.S. Supreme Court has definitively rejected any possibility of an anti-corruption interest when it comes to independent expenditures. *Bennett*, 546 U.S. at 752 ("The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of quid pro quo corruption with which our case law is concerned.").

Thus, the State has only its informational interest in who is behind the group behind the group behind the group with the "misleading or opaque name." This must be weighed against the privacy interests of these secondary and tertiary groups. This is not as easy as saying "the Supreme Court has okayed disclosure," as the State and ABE suppose. The Supreme Court has approved *direct* contributor disclosure. It has never confronted this sort of layered disclosure because no state has a law as sweeping and aggressive as BM2.

And the weighing of interests in this novel world is simply different. The State's informational interest is lessened. It knows who gave the money to the IEO—for example, the Alaska State Chamber of Commerce. Citizens can look up that group. The State now demands to know who gave to the Chamber, and who gave to the groups that gave to the Chamber. This may provide voters with information, but it is less relevant at every step.

Meanwhile, the nonprofit sector's right to privacy is increasingly important at every step up the ladder. The First Amendment provides robust protection for the freedom to associate in "a wide variety of political, social, economic, educational, religious, and cultural" groups. *AFPF*, 141 S. Ct. at 2381. And this freedom is the right to associate

*privately*, because "compelled disclosure of affiliation . . . may constitute an effective restrain on freedom of association." *Id*. at 2382. There is a "vital relationship between freedom to associate and privacy in one's associations." *Id*.

The Court has countenanced disclosure of campaign-related contributions because of the informational interest in knowing who supports candidates. But if a group does not spend money on an ad, but only gives to a different group that does, two or three or four layers back, at each point those groups have increasingly greater expectations of privacy the further onto the periphery they are from the campaign activity at issue.

And the further onto the periphery a donation is, the greater imbalance of interests. Plaintiffs do not raise the specter of cancel culture to seek as-applied relief, but to illustrate the dangers of layered disclosure. Past Alaska independent expenditure contributors include Alaska Cannabis Cultivators, the ACLU, Human Rights Campaign, and Planned Parenthood.[3] As the ACLU said recently, "[T]he compelled disclosure of associational information to the public dramatically increases the risk of private retaliation against the members and supporters of potentially controversial groups."[4]

The State's brief only exemplifies and enhances the burdens it imposes on nonprofit groups and their donors. The State tells nonprofit groups they can only maintain their privacy (and that of their donors) if they create separate bank accounts, use different entities for different purposes, segregate certain donor funds from other donor funds, and always specify out loud how their funds should be used. This is not "slightly more work" for these

---

[3] aws.state.ak.us/apocreports/independentexpenditures/iecontributions.aspx.
[4] Brief for ACLU et al. as Amici Curiae Supporting Respondents, *Ams. For Propserity Found. v. Bonta*, 537 U.S. 418 (2003) (No. 19-251), 2002 WL 1987618.

nonprofit groups. State Br. 23. Again, as with the double-disclosure requirement above, the compliance burden cannot be justified compared to marginal increase in the State's interest.

This will inevitably sweep in numerous everyday nonprofits. Plaintiffs' hypotheticals were not drawn from thin air: the list of contributors to past IEOs includes the Alaska State Chamber of Commerce, the Anchorage Board of Realtors, and the Anchorage Baptist Temple, to give only examples found under the letter A.[5] These are not dark money groups with "opaque or misleading names." State Br. 21. They are everyday trade associations, community groups, and religious bodies whose interests are affected by the government. They will inevitably unexpectedly be subject to surprise disclosure because another group two layers down the line decided to run a political ad.

And segregation of funds is not a realistic answer. First, this concept is nowhere in the text of BM2 (unlike other states)—it is a creation based on an interpretation by APOC. Second, APOC makes political intention the assumption—donations to a group that in turn donates to an IEO are reportable unless the group maintains a separate account. Return again to our realtor example—when she gives $2,500 to her local association, she has zero political intention; she just wants to pay her dues to be a member in good standing. And when that local gives to the state association, it has zero political intention. But if the state association gives to the state chamber of commerce for an IE, with an explicit political intention, then the donations are reportable all the way back, even if the local never offered a nonpolitical option in the first place because it had no political interest or intention. This

---

[5] aws.state.ak.us/apocreports/independentexpenditures/iecontributions.aspx.

is the problem with layered reporting—there must be segregated funds at every layer to preserve the privacy of the original giver, even if early layers don't do politics.

ABE's complaints about the "dark money" behind Families of the Last Frontier actually illustrates the lack of tailoring in BM2. Under existing law, ABE's counsel is able to trace money from the Council on Good Government to the Families of the Last Frontier to GOPAC and the Republican State Leadership Committee. *See* ABE Mot. To Dismiss n.164. GOPAC and the RSLC both are regulated election entities whose donations are reported and are publicly available.[6] Their names are not opaque or misleading—their political party preference is obvious from their names. And their donors are fully disclosed, showing again that this is again prophylaxis-upon-prophylaxis that creates additional compliance burdens without any actual pay-off for the State's informational interest.

Also, Plaintiffs' hypotheticals are appropriate. As the State points out, this is not an as-applied challenge. This is a facial challenge. And it is made during the first election cycle covered by BM2, such that hypotheticals are necessary where no actual cases of APOC enforcement exist yet. And note that the State does not dispute the factual accuracy of Plaintiffs' scenarios—this is exactly how the system is designed to work, whether the "true source" is a local realtor paying $2,500 in association dues or a Koch brother donating $250,000. But at the end of the day, no factual development or record is necessary: this case presents a legal question of whether the nation's most aggressive disclosure regime stands up to exacting scrutiny. It does not.

---

[6] RSLC is a 527 that reports its donors to the IRS, which posts those reports at irs.gov/charities-non-profits/political-organizations/political-organization-filing-and-disclosure. GOPAC is a PAC/SuperPAC that reports all of its donor information to the FEC, which posts those reports at fec.gov/data/committee/C00559740.

**V.     The equitable factors favor the Plaintiffs.**

In a constitutional case such as this, "likelihood of success on the merits is the most important factor." *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018). The Plaintiffs do not "collapse the *Winter* test into the first prong in every constitutional case"—the Ninth Circuit has done so. "Because Plaintiffs have a colorable First Amendment claim, they have demonstrated that they will likely suffer irreparable harm." *Am. Bev. Ass'n*, 916 F.3d at 758. "The fact that Plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in Plaintiffs' favor." *Id*. (cleaned up). "Finally, we have consistently recognized the significant public interest in upholding First Amendment principles." *Id*. (cleaned up). (Indeed, one is struck that the standard is a "colorable" First Amendment claim, or "raised serious First Amendment questions").

Plaintiffs did not sleep on their rights, *contra* ABE Br. 7. First, the Alaska Supreme Court considered a challenge to the entirety of BM2 in December 2021. On January 19, 2022, it indicated that it would uphold BM2. Plaintiffs filed this case after the state Supreme Court said it would not strike down the entire measure. Second, Plaintiffs acted months before their irreparable harm arises (the weeks leading up to the fall election). Third, APOC has not even finalized its own regulations for the election (State Br. n.39).

ABE's other arguments are also red herrings. The Plaintiffs seek to enjoin a brand-new law the first time it is in effect for a statewide election. This is not a mandatory injunction but a prohibitory one; it simply enjoins it from enforcing the challenged portions of its rules. 42 Am. Jur. 2d Injunctions § 5 (2017). *See Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (collecting examples of prohibitory injunctions against various policies).

ABE's invocation of *Purcell* is also a red herring. *Purcell* does not apply to campaign finance, but the mechanics of election administration. *Make Liberty Win v. Ziegler*, 499 F. Supp. 3d 635, 645 (W.D. Mo. 2020); *Holland v. Williams*, 457 F. Supp. 3d 979, 996 (D. Colo. 2018). Second, *Purcell* concerns changes "on the eve of the election" or "at the eleventh hour." *Ariz. Democratic Party v. Hobbs*, 976, F.3d 1081, 1086 (9th Cir. 2020). *Hobbs* cited three recent Supreme Court decisions invoking *Purcell* for changes imposed 32, 33, and 61 days before an election before reversing an injunction issued September 10. Obviously here we are more than five months from the November general election.

Justice Kavanaugh's concurring opinion provides a guide for when to invoke *Purcell*: "Changes that require complex or disruptive implementation must be ordered earlier than changes that are easy to implement." *Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (2022). Here, the State can make the changes easily—it can update its website and not enforce the provisions. This is not the sort of "complex or disruptive implementation" where scores of volunteer precinct election officials are being given different rules at the last minute.

The State wrongly minimizes the irreparable harm to Plaintiffs. It is not simply the fact that they will be forced to disclose when they would not otherwise, which can never be undone. They or their supporters (or their supporters' supporters' supporters) may find themselves subject to thousands of dollars in fines from APOC for failing to instantly double-report contributions. The IEO Plaintiffs will have to turn over 20 percent or more of the advertisements they pay for to reading the State's mandated script, a script which makes them voice things in conflict with their fundamental ideological principles. And even if the IEO Plaintiffs choose not to make any independent expenditures this cycle to

avoid coming within BM2's ambit, their donors will *still* have to report their donations because the IEO Plaintiffs made such expenditures last cycle. To say such freedoms are "not very serious," State Br. 30, is simply wrong.

Let us end where we began. The State's harm is virtually non-existent because these measures are "prophylaxis-upon-prophylaxis." The law will require all of the same contributor information from the IEOs if the double-disclosure provision is enjoined. The State will lose information on who donates today to groups that are not actively making expenditures, but that loss means nothing to the informational interest. All of the information required to be recited in an ad will still be available online. And voters will still have as much information as they had in 2020: the contributors to groups that make independent expenditures. With such "prophylaxis-upon-prophylaxis" measures, where the effect on the State's interest is marginal, the harm to the State is marginal as well.

## CONCLUSION

The briefs from the State and ABE are mostly conjecture and speculation mixed with generic citations to cases that have not addressed the laws at issue here. The latter of which is no surprise, because these laws are entirely novel, the most aggressive in the country. They are also needless and duplicative, and thus fail exacting scrutiny (or strict scrutiny, for the compelled speech claim) and should be preliminary enjoined.

Respectfully submitted,[7]

Daniel R. Suhr (WI No. 1056658)*
Liberty Justice Center
440 N. Wells St. Suite 200
Chicago, Illinois 60654
Ph.: 312-263-7668
Email: dsuhr@libertyjusticecenter.org

/s/ Craig W. Richards
Craig W. Richards (AK No. 0205017)
Law Offices of Craig Richards
810 N Street, Ste. 100
Anchorage, Alaska 99501
Email: crichards
@alaskaprofessionalservices.com

*pro hac vice

---

[7] Local Civil Rule 7.4(a)(2) permits reply briefs of up to ten pages. For the convenience of the Court and counsel, Plaintiffs are filing one combined reply brief of twenty pages rather than two separate briefs of ten pages each.