**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DOUG SMITH; ROBERT GRIFFIN; ALLEN VEZEY; ALBERT HAYNES; TREVOR SHAW; FAMILIES OF THE LAST FRONTIER; ALASKA FREE MARKET COALITION, | No. 22-35612 |
| | D.C. No. 3:22-cv-00077-SLG |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| ANNE HELZER, in her official capacity as chair of the Alaska Public Offices Commission; LANETTE BLODGETT; RICHARD STILLIE, Jr.; SUZANNE HANCOCK; DAN LASOTA, official capacities as members of the Alaska Public Offices Commissions, | |
| *Defendants-Appellees*, | |
| ALASKANS FOR BETTER ELECTIONS, INC., | |
| *Intervenor-Defendant-Appellee*. | |

Appeal from the United States District Court
for the District of Alaska
Sharon L. Gleason, Chief District Judge, Presiding

Argued and Submitted February 9, 2023
Portland, Oregon

Filed March 15, 2024

Before:  Mary H. Murguia, Chief Judge, and Danielle J.
Forrest and Jennifer Sung, Circuit Judges.

Opinion by Chief Judge Murguia;
Partial Concurrence and Partial Dissent by Judge Forrest

## SUMMARY[*]

### First Amendment/Campaign Finance

The panel affirmed the district court's denial of a preliminary injunction sought by five individual donors and two independent-expenditure organizations who sued the Alaska Public Offices Commission ("Commission") alleging that certain campaign finance regulations, enacted after Alaska voters passed Ballot Measure 2 to illuminate the use of dark money in their state's elections, facially violated the First Amendment.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Plaintiffs challenged two campaign finance regulations: (1) the individual-donor contribution-reporting requirement, which generally requires the reporting within twenty-four hours of contributions that exceed an annual aggregate of $2,000 to an entity making expenditures for a candidate in prior or current election cycles, and a sub-part of the contribution-reporting requirement providing that contributors must report the true sources of the contributions; and (2) the on-ad donor-disclaimer requirement for political advertisements, which requires the disclosure of certain identifying information about donors in any communications intended to influence the election of a candidate.

The panel first held that, assuming this appeal would otherwise be moot because the 2022 general election has already taken place, the capable-of-repetition-yet-evading-review exception applies.

The panel held that the district court did not abuse its discretion when it concluded that the contribution-reporting and on-ad donor-disclaimer requirements were substantially related and narrowly tailored to the government's asserted interest in providing the electorate with accurate, real-time information.

Because both the contribution-reporting and donor-disclaimer requirements were regulations directed only at disclosure of political speech, they were subject to exacting scrutiny. Plaintiffs conceded that the government's interest in an informed electorate was "sufficiently important" in the campaign finance context to warrant disclosure requirements and satisfied the first prong of the exacting scrutiny test.

The panel rejected plaintiffs' argument that the contribution-reporting requirement was not narrowly tailored. The requirement was not duplicative of existing criminal laws because the covered donations were outside the limited reach of the criminal laws and were not unconstitutionally redundant. Moreover, nothing in the record indicated that compliance with the reporting structure was overly burdensome.

Applying the holdings and reasonings in *No on E v. Chiu*, 85 F.4th 493 (9th Cir. 2023), the panel rejected plaintiffs' arguments that the on-ad donor-disclaimer requirement was not narrowly tailored because it added marginal additional value while imposing a substantial cost on the speaker and took up too much space and time on political advertisements. The panel further rejected plaintiffs' argument that the disclaimer requirement for organizations that receive most of their contributions from sources outside of Alaska was unconstitutionally discriminatory. Nothing in the outside-entity disclaimer restricts out-of-state speakers' speech. Rather, the disclaimer only requires that organizations communicate whether most of their contributions came from outside Alaska—information that is already validly disclosed to the Commission.

Concurring in part and dissenting in part, Judge Forrest agreed with the majority that this case is not moot but for a different reason: The challenged provisions of Ballot Measure 2 continue to be enforceable in the present, and plaintiffs have suffered and continue to suffer the constitutionally sufficient injury of self-censorship. Judge Forrest also agreed that the district court did not abuse its discretion in concluding at this preliminary stage that plaintiffs failed to show they were likely to succeed in establishing that Ballot Measure 2's on-ad disclaimers failed

under exacting scrutiny. Judge Forrest disagreed, however, that plaintiffs' challenge to Ballot Measure 2's individual-donor reporting requirement was unlikely to succeed. Plaintiffs were likely to succeed in showing that the duplicative individual-donor contribution-reporting requirement failed to satisfy exacting scrutiny because the burdens it imposes are not in proportion to the interest served.

## COUNSEL

Daniel R. Suhr (argued) and Reilly Stephens, Liberty Justice Center, Chicago, Illinois; Craig W. Richards, Law Offices of Craig Richards, Anchorage, Alaska; for Plaintiffs-Appellants.

Scott M. Kendall (argued) and Jahna M. Lindemuth, Cashion Gilmore & Lindemuth, Anchorage, Alaska, for Intervenor-Defendant-Appellee Alaskans for Better Elections, Inc.

Laura Fox (argued), Jessica M. Alloway, and Kimberly D. Rodgers, Assistant Attorneys General, Alaska Office of the Attorney General, Department of Law, Anchorage, Alaska; for Defendants-Appellees.

6                           SMITH V. HELZER

## OPINION

MURGUIA, Chief Circuit Judge:

"Sunlight," the Supreme Court has recognized, is "the best of disinfectants" in elections. *See Buckley v. Valeo*, 424 U.S. 1, 67 (1976) (per curiam) (quoting Louis D. Brandeis, *Other People's Money* 62 (1933)). To illuminate the use of dark money in their state's elections, Alaska voters enacted by ballot measure certain campaign-finance regulations. Five individual donors and two independent-expenditure organizations then sued the members of the Alaska Public Offices Commission ("Commission")—the agency charged with administering the state's campaign-finance laws— alleging that three of these regulations facially violate the First Amendment. The district court denied plaintiffs' motion for a preliminary injunction, concluding that they failed to establish a likelihood of success on the merits of their claims. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1) and reviewing the denial of a preliminary injunction for abuse of discretion, *No on E v. Chiu*, 85 F.4th 493, 497 (9th Cir. 2023), we affirm.

## I

On November 3, 2020, Alaska voters made three "sweeping changes to Alaska's system of elections" by approving the "Alaska's Better Elections Initiative" ("Ballot Measure 2"). *Kohlhaas v. State*, 518 P.3d 1095, 1100 (Alaska 2022). Ballot Measure 2 (1) "repealed the existing system of party primaries in favor of an open primary"; (2) "adopted ranked-choice voting for the general election"; and (3) implemented a series of amendments to Alaska's campaign-finance laws that "addressed the use of 'dark money' in elections." *Id.* at 1101. In *Kohlhaas*, the Alaska

Supreme Court unanimously upheld the constitutionality of
the first two changes, *id.* at 1100–01; we now consider the
constitutionality of a subset of the third.

At the district court, plaintiffs challenged three of Ballot
Measure 2's campaign-finance regulations: (1) the
individual-donor contribution-reporting requirement,
Alaska Stat. § 15.13.040(r); (2) the true-source requirement,
*id.* §§ 15.13.040(r) & 15.13.400(19); and (3) the on-ad
donor-disclaimer requirement for political advertisements,
*id.* § 15.13.090.

Under the contribution-reporting requirement, any donor
who "contributes more than $2,000 in the aggregate in a
calendar year to an entity" that either (1) "made . . .
independent expenditures" in candidate elections in the
previous or current election cycle or (2) "the contributor
knows or has reason to know is likely to make independent
expenditures . . . in the current election cycle" must report
that contribution to the Commission within twenty-four
hours.[1]  *Id.* § 15.13.040(r).  Failing to report such a
contribution subjects the contributor to "a civil penalty of not

---

[1] In this context, subject to some exclusions, a contribution is any
"purchase, payment, promise or obligation to pay, loan or loan
guarantee, deposit or gift of money, goods, or services for which charge
is ordinarily made, and includes the payment by a person other than a
candidate or political party, or compensation for the personal services of
another person" that is "made for the purpose of," among other things,
"influencing the nomination or election of a candidate[.]" Alaska Stat.
§ 15.13.400(4). Similarly, an independent expenditure is "a purchase or
a transfer of money or anything of value, or promise or agreement to [do
so], incurred or made for the purpose of" among other things,
"influencing the nomination or election of a candidate" and "that is made
without the direct or indirect consultation or cooperation with, or at the
suggestion or the request of, or with the prior consent of, a candidate" or
their agents. *Id.* §§ 15.13.400(7), (11).

more than $1,000 a day for each day the delinquency continues." *Id.* § 15.13.390(a)(2).

The true-source requirement—which is a subpart of the contribution-reporting requirement—provides that contributors must "report and certify the true sources of the contribution, and intermediaries, if any" and "provide the identity of the true source to the recipient of the contribution simultaneously with providing the contribution itself." *Id.* § 15.13.040(r). Any "person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services" is that contribution's true source. *Id.* § 15.13.400(19). So a contributor "who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source." *Id.*

Finally, the donor-disclaimer requirement mandates that any communication intended to influence the election of a candidate contain an easily discernible on-ad disclaimer. *See id.* § 15.13.090. Since 2010, that disclaimer has required (1) the name and title of the speaking entity's principal officer; (2) a statement from that principal officer approving the communication; and (3) "identification of the name and city and state of residence or principal place of business, as applicable, of each of the person's three largest contributors . . . during the 12-month period before the date of the communication." *Id.* Ballot Measure 2 amended the donor-disclaimer requirement to include that, if the entity communicating is an independent-expenditure organization that "received more than 50 percent of its aggregate contributions" during the previous 12-month period "from true sources . . . who, at the time of the contribution, resided or had their principal place of business outside Alaska," the communication must disclaim that a majority of

contributions to the entity came from outside the State of Alaska. *See id.* § 15.13.400(15).

Plaintiffs moved to preliminarily enjoin all three requirements, alleging that having to comply with these regulations in advance of the 2022 general election would irreparably harm their First Amendment rights. The district court denied the motion, finding that plaintiffs failed to establish a likelihood of success on the merits of their claims. Plaintiffs now timely appeal the district court's denial of that motion only as to the contribution-reporting and donor-disclaimer requirements.

## II

In their merits briefing before this court, plaintiffs reiterated that their claims for relief were rooted in their desire and right to "participate fully in the November 2022 election . . . without these unconstitutional impositions." While this appeal was pending, the 2022 general election took place. We therefore ordered the parties to file simultaneous supplemental briefing to address, among other things, whether this preliminary-injunction appeal must be dismissed as moot for want of jurisdiction.

"An interlocutory appeal of the denial of a preliminary injunction is moot when a court can no longer grant any effective relief sought in the injunction request." *Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016). That is, such an "interlocutory appeal may be moot even though the underlying case still presents a live controversy." *Id.* Put simply, when the event from which plaintiffs' alleged irreparable harm "flow[s]" has "concluded" or "taken place," the appeal—but not necessarily the underlying dispute—is moot. *See In Def. of Animals v. U.S. Dep't of Interior*, 648 F.3d 1012, 1013 (9th Cir. 2011) (per curiam).

And "when an appeal is moot, we lack jurisdiction and must dismiss" it. *Ahlman v. Barnes*, 20 F.4th 489, 493 (9th Cir. 2021) (cleaned up).

We nevertheless retain jurisdiction over otherwise moot disputes that are capable of repetition yet evade review. *Akina*, 835 F.3d at 1011. This exception is used "sparingly," *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836–37 (9th Cir. 2014), and "is reserved for extraordinary cases in which (1) the duration of the challenged action is too short to be fully litigated before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to the same action again," *Akina*, 835 F.3d at 1011 (internal quotation marks omitted). "Election cases often fall within this exception, because the inherently brief duration of an election is almost invariably too short to enable full litigation on the merits." *Porter v. Jones*, 319 F.3d 483, 490 (9th Cir. 2003).

Assuming that this appeal would otherwise be moot, we conclude that the capable-of-repetition-yet-evading-review exception applies.[2] This case, like the many others involving facial challenges to election laws and campaign-finance regulations, is exceptional. In *Alaska Right to Life Committee v. Miles*, we held that a facial First Amendment challenge to Alaska campaign-finance-disclosure laws was "not moot simply because the . . . election ha[d] come and gone." 441 F.3d 773, 779 (9th Cir. 2006). There, "[t]he provisions of Alaska law challenged by [the plaintiff]

---

[2] The partial dissent maintains that the appeal is not moot because "the challenged regulations remain in effect" and therefore "we can still grant effective relief." But we cannot grant any relief that would address plaintiffs' concerns about irreparable harm around the 2022 election, which formed the basis of the preliminary injunction motion.

remain[ed] in place, and there [wa]s sufficient likelihood that [the plaintiff would] again be required to comply with them that its appeal [wa]s not moot." *Id.* at 779–80. So too here.

### III

This appeal presents questions central to our rights as American citizens. But because of its interlocutory nature, we are restricted in our ability to "assist in the final resolution of the critical issues before the district court." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 723 (9th Cir. 1983). Our review at this stage is "much more limited than review of an order granting or denying a permanent injunction." *Id.* at 724. When all evidence is taken and considered, the district court's findings and conclusions may differ from its preliminary order—as may our view of them. Because our analysis is confined and the factual record yet to be fully developed, "our disposition of appeals from most preliminary injunctions provides little guidance on the appropriate resolution of the merits." *Id.* And once we have disposed of this appeal, the district court will render a final judgment on the merits, after which the losing party may appeal again. *Id.*

### IV

"The grant or denial of a motion for a preliminary injunction lies within the discretion of the district court. Its order granting or denying the injunction will be reversed only if the district court abused its discretion." *Zepeda*, 753 F.2d at 724. And an abuse of discretion occurs only when the district court fails to "employ the appropriate legal standards[,]" misapprehends the law, or "rests its decision . . . on a clearly erroneous finding of fact." *Id.* at 724–25. "A finding of fact is clearly erroneous when 'the reviewing

court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 725 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). We are "not empowered to substitute [our] judgment for that" of the district court, so "we will not reverse the district court's order simply because we would have reached a different result." *Id.*

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). In *Winter*, the Supreme Court held that, to obtain an injunction, plaintiffs "must establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Id.* at 20. But "[w]here, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

**A**

To show a likelihood of success on the merits "in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478 (9th Cir. 2022) (cleaned up), *cert. denied*, 143 S. Ct. 1749 (2023). Plaintiffs here facially challenge the contribution-reporting and donor-disclaimer requirements, alleging that these regulations impermissibly burden their First Amendment right to free speech. Facial challenges are

"disfavored," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), and "are the most difficult to mount successfully," *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015) (cleaned up).  In the First Amendment context, a facial challenge is colorable if plaintiffs show that "a substantial number of [the regulations'] applications are unconstitutional, judged in relation to [their] plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).    The Supreme Court has cautioned courts "not to go beyond the [regulations'] facial requirements and speculate about 'hypothetical' or 'imaginary' cases." *Wash. State Grange*, 552 U.S. at 449–50 (citation omitted).

Because both the contribution-reporting and donor-disclaimer requirements are "regulations directed only at disclosure of political speech," they are subject to exacting scrutiny, which is a "somewhat less rigorous judicial review" than strict scrutiny. *Nat'l Ass'n for Gun Rts., Inc. v. Mangan*, 933 F.3d 1102, 1112 (9th Cir. 2019) (emphasis omitted); *No on E*, 85 F.4th at 503 (collecting cases in which we and the Supreme Court have applied exacting scrutiny to disclaimer and disclosure requirements).  Once the movants establish a colorable First Amendment challenge to the regulations, exacting scrutiny demands that the government show that it has (1) a sufficiently important interest (2) to which the challenged regulations are substantially related and narrowly tailored. *Ams. for Prosperity Found.*, 141 S. Ct. at 2383.  "To withstand [exacting] scrutiny, the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Id.* (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)).  Unlike strict scrutiny, however, "exacting scrutiny does not require that

disclosure regimes be the least restrictive means of achieving their ends." *Id.* Narrow tailoring in this context therefore "require[s] a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* at 2384 (quoting *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 218 (2014)).

In sum, to succeed on appeal, plaintiffs must show that the district court abused its discretion when it concluded that the contribution-reporting and donor-disclaimer requirements were each substantially related and narrowly tailored to the government's asserted interest. Because we conclude that plaintiffs have not met this heavy burden, we affirm the district court's denial of plaintiffs' motion for a preliminary injunction. In so doing, we do not reach the remaining *Winter* factors, which were not passed upon by the district court and are unnecessary to our holding.

**B**

Defendants assert, and plaintiffs concede, that the government's interest in an informed electorate is "sufficiently important" in the campaign finance context to warrant disclosure requirements and satisfy the first prong of the exacting scrutiny test. Indeed, the Supreme Court has long made that clear. *See, e.g.*, *Buckley*, 424 U.S. at 66–67, 84 (upholding disclosure requirements and noting that providing the electorate information regarding campaign finance serves various governmental interests).[3]  So have

---

[3] *See also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 369 (2010) (finding the public's "informational interest" in "knowing who is speaking about a candidate shortly before an election" sufficient to

we. *See, e.g.*, *No on E*, 85 F.4th at 505 ("We have repeatedly recognized an important (and even compelling) informational interest in requiring ballot measure committees to disclose information about contributions." (cleaned up)).[4]

With this important informational interest firmly in mind, we turn to its relationship with Alaska's contribution-reporting and donor-disclaimer requirements. For these regulations to survive exacting scrutiny, they must be substantially related to the interest and reasonably narrowly tailored to serving it. *No on E*, 85 F.4th at 504. We address these interrelated considerations, taking each of the two challenged requirements in turn.

**1**

Plaintiffs do not contest that the individual-donor contribution-reporting requirement is substantially related to

---

support law requiring disclosure of funding sources); *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 196 (2003) (recognizing "providing the electorate with information" as an "important state interest[]"), *overruled on other grounds by Citizens United*, 558 U.S. 310.

[4] *See also Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 540 (9th Cir. 2015) (en banc) ("[T]he government's interests in electoral integrity and in providing voters with information . . . constitute a sufficiently important governmental interest to which the . . . disclosure requirement bears a substantial relation." (cleaned up)); *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir. 2010) (upholding disclosure laws because "[p]roviding information to the electorate is vital" and "by revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention"); *Alaska Right to Life*, 441 F.3d at 793 ("[W]e believe that there is a compelling state interest in informing voters who or what entity is trying to persuade them to vote in a certain way.").

the state's asserted informational interest. Rather, they argue only that the requirement is not narrowly tailored. Plaintiffs reason that the requirement is (1) duplicative of existing criminal laws and reporting required by recipient organizations, and (2) too burdensome. The district court rejected both arguments as unpersuasive. We agree with the district court and conclude that the contribution-reporting requirement is both substantially related and narrowly tailored to the government's interest in providing the electorate with accurate, real-time information.

*First*, plaintiffs argue that because existing criminal laws prohibit making and receiving straw-donor contributions,[5] donations not made by true sources are illegal and reporting them would make little sense. Putting aside that this argument goes more to the true-source requirement—from which plaintiffs "do not seek relief . . . in this preliminary appeal"—violation of the criminal regulation that plaintiffs cite requires the offender to *intend* to make a straw-donor contribution, for example, by directing another to make the contribution or reimbursing them for doing so. *See* Alaska Admin. Code tit. 2, § 50.258(a). The challenged contribution-reporting requirement, on the other hand, requires disclosure of contributions regardless of whether they were made at the true source's behest. The contribution-reporting requirement therefore covers donations outside the limited reach of the criminal law.

---

[5] "A straw donor contribution is an *indirect* contribution from *A*, through *B*, to the campaign. It occurs when *A* solicits *B* to transmit funds to a campaign in *B*'s name, subject to *A*'s promise to advance or reimburse the funds to *B*." *United States v. O'Donnell*, 608 F.3d 546, 549 (9th Cir. 2010). "[S]traw donor schemes . . . facilitate attempts by an individual (or campaign) to thwart disclosure requirements and contribution limits." *Id.*

Nor is the contribution-reporting requirement unconstitutionally redundant. As the district court recognized, the reporting requirements for contributors and recipient organizations "overlap[] . . . but [are] not completely duplicative of" one another, especially because the "contributor will *always* be in a better position . . . to both identify the true source of its own contribution and quickly report it." The individual-donor contribution-reporting requirement works in concert with the recipient independent-expenditure organizations' disclosures to the Commission, helping to ensure that the information received by voters is reliable and accurate. As we emphasized in *Brumsickle*, "[a]ccess to *reliable* information becomes even more important as more speakers, more speech—and thus more spending—enter the marketplace, which is precisely what has occurred in recent years." 624 F.3d at 1007 (emphasis added). Prompt disclosure by both sides of a transaction ensures that the electorate receives the most helpful information in the lead up to an election.[6]

Plaintiffs attempt to analogize this case to *McCutcheon* and *Federal Election Commission v. Ted Cruz for Senate*,

---

[6] Indeed, the district court found that "requiring prompt disclosure by both parties maximizes the likelihood of prompt and accurate reporting of the information when it is most useful to the electorate," and that "the donor disclosure requirement is closely tailored to providing valuable funding information to the State and its citizens." Although the partial dissent questions "whether any marginal increase in the reliability and accuracy of information justifies the reporting burden placed on individual donors," we are "not empowered to substitute [our] judgment for that" of the district court. *Zepeda*, 754 F.2d at 725. Because the district court did not "apply incorrect substantive law" or make "a clearly erroneous finding of fact that is material to the decision," *id.*, the district court's analysis of the contribution-reporting requirement does not amount to an abuse of discretion.

142 S. Ct. 1638 (2022), but neither applies here because those cases considered redundant contribution limits, not disclosure requirements. In *McCutcheon*, the Supreme Court invalidated a "prophylaxis-upon-prophylaxis approach" to contribution limits in which a federal law targeting quid pro quo corruption in electioneering had restricted both the amount that a single donor could contribute to a candidate or committee and the amount that the donor could contribute in total to all candidates and committees. 572 U.S. at 221 (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 479 (2007)). And in *Cruz*, the Court similarly rejected a prophylaxis-upon-prophylaxis approach that limited the use of post-election contributions to repay loans the candidate made to his campaign committee. 142 S. Ct. at 1652–53. But the Supreme Court in *Citizens United* recognized a stark contrast between contribution limits and disclosure requirements. 558 U.S. at 366–67. Disclosure requirements, unlike contribution limits, "may burden the ability to speak, but they impose no ceiling on campaign-related activities" and do not "prevent anyone from speaking," so they may "be justified based on a governmental interest in providing the electorate with information about the sources of election-related spending." *Id.* (cleaned up). That is precisely the case here.[7]

---

[7] Plaintiffs' reliance on *Americans for Prosperity Foundation* also fails. That case involved neither public disclosure of information nor electioneering; rather, it arose in the context of a California law that required *all* 501(c)(3) nonprofit organizations to report confidentially their top donors to the state Attorney General each year. 141 S. Ct. at 2379–80. The government justified this broad disclosure by asserting that disclosure prevented charity fraud and self-dealing, but the record

*Second*, plaintiffs insist that the contribution-reporting requirement places an onerous burden on "everyday Americans" because it demands that the contributor know that they are required to report at all times and because the time in which to file a report—twenty-four hours—is too short. These burdens on the contributor do not cross the line into unconstitutionality.

Partly because of the posture of this appeal, and partly because plaintiffs failed to introduce any such evidence, there is nothing in the record to indicate that compliance with the reporting structure has been overly burdensome. Plaintiffs do not raise concerns about "technological literacy and internet access" discussed in the partial dissent. Nor have plaintiffs provided any evidence that the "everyday" American they repeatedly describe contributes $2,000 or more per calendar year to a single independent-expenditure organization such that the threshold is unconstitutionally overinclusive. Defendants may be correct that these are "major" contributors, not unsophisticated parties, but at the very least, the threshold is reasonably tailored to weed out contributors with *de minimis* involvement with the recipient organization. Regardless, because we cannot consider "'hypothetical' or 'imaginary'" cases to sustain a facial

---

showed that the information gathered was almost never used for any sort of investigative purpose. *Id.* at 2385–87. The Supreme Court held that "[i]n reality . . . California's interest is less in investigating fraud and more in ease of administration." *Id.* at 2387. This interest could not satisfy exacting scrutiny. *Id.* But, of course, neither fraud deterrence nor administrative ease is the interest the government asserts here. The informational interest—specific and central to the public's well-recognized stake in the factual circumstances of political advertising—justifies the limited disclosures mandated by the contribution-reporting requirement.

challenge,[8] we conclude that plaintiffs have failed to show that a substantial number of the applications of the contribution-reporting requirement are unconstitutional in relation to the law's "plainly legitimate sweep." *Wash. State Grange*, 552 U.S. at 449–50; *see also Ams. for Prosperity Found.*, 141 S. Ct. at 2387.

As the district court found, Ballot Measure 2's reporting mechanism is relatively simple and "straightforward." Contributors who hit the $2,000 threshold must fill out a short online form that asks for the amount of the triggering contribution, the aggregate total amount of their contributions, the name of the recipient independent-expenditure organization, and, if the donor is not the true source of the funds, the true source's identity and the identities of any intermediaries. The process is even easier when the donor is the true source of the funds—as plaintiffs claim they "always" are for their donations. As at least one of our sister circuits has held, the simplicity of an online form and the required promptness of the disclosure both advance the state's interest in providing real-time and accurate information about electioneering communications. *See Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 595 (8th Cir. 2013) ("With modern technology, the burden of completing the short, electronic form within two days of making a $750 expenditure is not onerous."). Without any evidence tending to show that the deadline or this brief online form—which could easily be filled out concurrently with an online donation or momentarily after signing a check—is unduly burdensome, we are not persuaded that the

---

[8] Plaintiffs raise several such hypotheticals in their briefing, including ones they concede are "far-fetched."

district court's findings and conclusions about its likely
constitutionality were erroneous.[9]

Similarly, exacting scrutiny simply requires that the
threshold at which contributions are disclosed be reasonably
narrowly tailored to fit the state's interest. As the Supreme
Court noted in *Buckley*, this line is "necessarily a judgmental
decision, best left" to the discretion of the legislature, here
the people of Alaska. 424 U.S. at 83. Because "[t]he
acceptable threshold for triggering reporting requirements
need not be high," we have routinely upheld reporting
thresholds much lower than the $2,000-per-calendar-year
one here. *Nat'l Ass'n for Gun Rts.*, 933 F.3d at 1118 (citing
cases upholding reporting thresholds as low as $100). On
this record, we uphold this one as well.

That Ballot Measure 2's contribution-reporting
requirement applies at all times, rather than only close to an
election, does give us some pause. We have held that, "in
valid electioneering disclosure laws, the frequency of
required reporting does not extend indefinitely to all
advocacy conducted at any time but is tied to election
periods or to continued political spending." *Id.* at 1117.
Although the contribution-reporting requirement here
applies whenever the contributor donates to an organization

---

[9] Plaintiffs briefly argue that because contributors to independent-
expenditure organizations may require the assistance of a campaign-
finance attorney to know when and how to report their contributions, the
reporting requirement is not narrowly tailored. The partial dissent makes
a similar argument. We are unconvinced. The form itself asks nothing
more than basic knowledge about the contribution the donor is making
or has made, and figuring out whether one must report their contribution
is as simple as asking the organization whether it has made or will make
an independent expenditure or conducting a quick search on the
Commission's database of independent-expenditure organizations.

that has made, will make, or is likely to make independent expenditures, the "frequency of required reporting" is limited to only "continued political spending." *Id.* Once the donor has hit the threshold and filled the form out once, they need only fill it out again if they continue making contributions to that independent-expenditure organization. Accordingly, the temporal application of the requirement is not an onerous burden on the contributor, and it is reasonably tailored to the state's important interests in keeping the public informed. The contribution-reporting requirement withstands exacting scrutiny.

**2**

We now turn to whether Ballot Measure 2's donor-disclaimer requirement is substantially related and narrowly tailored to the government's asserted informational interest. Plaintiffs argue that (1) the disclaimer requirement "adds marginal additional value while imposing substantial cost on the speaker" because the information in the disclaimer is "already available on [the Commission's] website"; (2) the disclaimer takes up too much space and time on political advertisements; and (3) the additional out-of-state donor notice is unconstitutionally discriminatory. We disagree and hold that the district court did not abuse its discretion in concluding that plaintiffs were unlikely to succeed on the merits of their claims as to the donor-disclaimer requirement.[10]

---

[10] Plaintiffs make two additional arguments, which we also reject. Plaintiffs broadly rely on the following language from the Supreme Court's decision in *McIntyre v. Ohio Elections Commission*: "The simple interest in providing voters with additional relevant information does not justify a state requirement that a writer make statements or disclosures

Our court recently addressed a relatively similar donor-disclaimer requirement. In *No on E*, the City of San Francisco had adopted an ordinance that required certain political advertisements to identify the speaker's top contributors, along with the top three donors to those contributors. 85 F.4th at 498–99. Recognizing the "strong governmental interest in informing voters about who funds political advertisements" and applying exacting scrutiny, we upheld the disclaimer requirement because, among other reasons, San Francisco "show[ed] that donors to local committees are often committees themselves and that committees often obscure their actual donors through

she would otherwise omit." 514 U.S. 334, 348 (1995). But as the district court correctly noted, *McIntyre* arose in a materially different factual context, one involving private individuals' independent and self-funded pamphleteering for ballot measures. We have previously distinguished disclaimer requirements in political advertisements from "*McIntyre*-type communications." *Yamada v. Snipes*, 786 F.3d 1182, 1203 n.14 (9th Cir. 2015) (quoting *Alaska Right to Life*, 441 F.3d at 793). And to whatever extent *McIntyre*'s reasoning applies here, it is undermined by the Supreme Court's subsequent decisions in *McConnell*, 540 U.S. at 196–97, and *Citizens United*, 558 U.S. at 369, in which the Court found the informational interest sufficient to uphold disclosure and disclaimer requirements. Indeed, in both cases, the Court did so over partial dissents that raised this very issue. *See Citizens United*, 558 U.S. at 480 (Thomas, J., concurring in part and dissenting in part); *McConnell*, 540 U.S. at 275–77 (Thomas, J., concurring in part and dissenting in part).

Plaintiffs also argue that the disclaimer requirement lacks a "limiting principle" because, if upheld, the state would have a "blank check" to require disclosure of "any and all information it wants," including the donors' contact information, "race, religion, political affiliation, sexual orientation, ethnic background, and interest-group memberships." As we have reiterated, these hypothetical and imaginary concerns are irrelevant to our analysis in the context of a facial challenge to a law that requires none of these disclaimers. *See Wash. State Grange*, 552 U.S. at 449–50.

misleading and even deceptive committee names." *Id.* at
505–06. Although the *No on E* appeal involved only an as-
applied challenge to the San Francisco ordinance, *see id.* at
502 n.5, we conclude that its holdings and reasoning readily
apply and control in the context of this facial challenge.

In upholding the donor-disclaimer requirement in *No on
E*, we rejected three arguments that mirror those made by
plaintiffs here. First, we found unpersuasive the plaintiffs'
argument that on-ad disclaimers took up too much space on
advertisements. *Id.* at 507–08.[11] Second, citing to a First
Circuit case that also upheld a donor-disclaimer requirement,
we rejected the plaintiffs' argument that the donor-
disclaimer requirement was not narrowly tailored because
the information to be disclaimed was already "available in
an online database." *Id.* at 509 (citing *Gaspee Project v.
Mederos*, 13 F.4th 79, 91 (1st Cir. 2021) (noting that "the
on-ad donor disclaimer 'provides an instantaneous heuristic
by which to evaluate generic or uninformative speaker
names'" and therefore more effectively serves the
government's informational interest than an online
database), *cert. denied*, 142 S. Ct. 2647 (2022))). And third,
we rejected the plaintiffs' claim that the disclaimer
requirement was insufficiently tailored because the plaintiffs

---

[11] The plaintiffs in *No on E* relied heavily on this court's decision in
*American Beverage Association v. City & County of San Francisco*,
which invalidated a city ordinance requiring health warnings for
beverage advertisements. *See Am. Beverage Ass'n v. City & Cnty. of San
Francisco*, 916 F.3d 749, 753–54 (9th Cir. 2019) (en banc). However,
that decision is readily distinguishable from cases arising in the
electioneering context.     *No on E*, 85 F.4th at 507–08 ("[T]he
governmental interest in informing voters about the source of funding
for election-related communications is much stronger and more
important than the governmental interest in warning consumers about the
dangers of sugar-sweetened beverages.").

did not challenge the *disclosure* of the information—only its presence on the disclaimer—and failed to show that one could be permissible but the other not. *Id.* at 510. Agreeing with the reasons we stated in *No on E*, we reject plaintiffs' equivalent arguments here.

Having jettisoned most of plaintiffs' challenges to the donor-disclaimer requirement, we consider the one major aspect in which the disclaimer required by Ballot Measure 2 differs from the San Francisco one upheld in *No on E*: the additional disclaimer requirement for organizations that receive a majority of their contributions from true sources outside of Alaska. *See* Alaska Stat. § 15.13.090. Plaintiffs argue that this disclaimer is not narrowly tailored and unconstitutionally discriminates against out-of-state speakers, relying on cases in which we and the Second Circuit invalidated *contribution limits* to which only out-of-state entities were subject. But those cases are inapposite.

As discussed *supra*, a contribution limit impacts speech in a manner much more severe than a disclosure or disclaimer requirement, so the former is subjected to strict scrutiny and can only be justified by the state's concern about risks of quid pro quo corruption, while the latter is subject to exacting scrutiny and can be justified by the state's informational interest. *See Citizens United*, 558 U.S. at 366–67. Nothing in the outside-entity disclaimer *restricts* out-of-state speakers' speech. Rather, the disclaimer only requires that organizations communicate whether most of their contributions came from outside Alaska—information plaintiffs concede is already validly disclosed to the Commission. And when "disclosures are permissible . . . we are not persuaded that a law requiring those same donors to be named in an on-advertisement disclaimer is insufficiently tailored." *No on E*, 85 F.4th at 511. Accordingly, at this

stage, we conclude that the disclaimer requirement is both substantially related and narrowly tailored to the state's informational interest.

**V**

We hold that the district court acted within its discretion to conclude that plaintiffs were unlikely to succeed on the merits of their First Amendment claims. Accordingly, the district court's order denying plaintiffs' motion for a preliminary injunction is

**AFFIRMED.**

---

FORREST, Circuit Judge, concurring in part and dissenting in part:

I agree that this case is not moot, but for different reasons than the majority. I also agree that the district court did not abuse its discretion in concluding at this preliminary stage that Plaintiffs failed to show they were likely to succeed in establishing that Ballot Measure 2's on-ad disclaimers fail under exacting scrutiny. I disagree, however, that Plaintiffs' challenge to Ballot Measure 2's duplicative individual-donor reporting requirement is unlikely to succeed. Therefore, I respectfully dissent in part.

## I.  BACKGROUND

### A.  Ballot Measure 2

Ballot Measure 2 was passed in November 2020, bringing significant changes to the rules governing Alaskan elections. *See* 2020 Alaska Laws Initiative Measure 2; *Kohlhaas v. State*, 518 P.3d 1095, 1100–01 (Alaska 2022).

The only provision that I discuss is Plaintiffs' challenge to the requirement that individual donors report certain contributions to the state within 24 hours.

Plaintiffs are politically active individuals who have donated money to entities that make "independent expenditures,"[1] and two independent-expenditure entities that receive financial donations. Plaintiffs sued members of the Alaska Public Offices Commission (APOC)—the agency that administers Alaska's election laws,[2] *see* Alaska Stat. § 15.13.030—asserting, among other things, a facial challenge to Alaska Statute § 15.13.040(r).[3] This provision requires individual donors to disclose their financial contributions that exceed an annual aggregate of $2,000 and that are made to an entity that has spent money for a candidate in the prior election cycle or has or may spend money on a candidate in the current election cycle. *Id.* The disclosure must be made within 24 hours of the triggering donation. *Id.* Section 15.13.040(r) reads in full:

> Every individual, person, nongroup entity, or
> group that contributes more than $2,000 in
> the aggregate in a calendar year to an entity

---

[1] "'[I]ndependent expenditure' means an expenditure that is made without the direct or indirect consultation or cooperation with, or at the suggestion or the request of, or with the prior consent of, a candidate, a candidate's campaign treasurer or deputy campaign treasurer, or another person acting as a principal or agent of the candidate." Alaska Stat. § 15.13.400(11).

[2] The state attorney general enforces Alaska's election laws based on APOC's investigations, examinations, reports, and recommendations. *See id.* § 15.13.030(8)–(9).

[3] Alaskans for Better Elections, Inc. intervened to defend Ballot Measure 2, which it sponsored.

> that made one or more independent
> expenditures in one or more candidate
> elections in the previous election cycle, that
> is making one or more independent
> expenditures in one or more candidate
> elections in the current election cycle, or that
> the contributor knows or has reason to know
> is likely to make independent expenditures in
> one or more candidate elections in the current
> election cycle shall report making the
> contribution or contributions on a form
> prescribed by the commission not later than
> 24 hours after the contribution that requires
> the contributor to report under this subsection
> is made. The report must include the name,
> address, principal occupation, and employer
> of the individual filing the report and the
> amount of the contribution, as well as the
> total amount of contributions made to that
> entity by that individual, person, nongroup
> entity, or group during the calendar year. For
> purposes of this subsection, the reporting
> contributor is required to report and certify
> the true sources of the contribution, and
> intermediaries, if any, as defined by AS
> 15.13.400(19). This contributor is also
> required to provide the identity of the true
> source to the recipient of the contribution
> simultaneously with providing the
> contribution itself.

I refer to this as the "individual-donor reporting
requirement" and to the described entities that receive the
donations that trigger this reporting requirement as

"independent-expenditure entities." Violating this individual-donor reporting requirement triggers a fine of up to \$1,000 for each day that the report is delayed—regardless of whether the donor was aware of the requirement or that the amount they donated exceeded the aggregate \$2,000 threshold. *Id*. § 15.13.390(a)(2).

Notably, the individual-donor disclosures are not the only donation disclosures required under Alaska law. The independent-expenditure entities also must report the donations that they receive. As an initial matter, within 10 days of making an independent expenditure, these entities must report their officers and directors, the date and amount of all their contributions and expenditures, and "the aggregate amount of all contributions" received. *Id*. §§ 15.13.040(e), 15.13.110(h). For donors who contribute more than \$50 in a year, the independent-expenditure entity also must disclose the donor. *Id.* § 15.13.040(e)(5)(A). If an independent-expenditure entity receives a contribution that exceeds an aggregate of \$2,000 from a single donor or makes an expenditure exceeding \$250 within 9 days of an election, the entity must file a disclosure report within 24 hours of receiving the triggering donation or making the triggering expenditure. *Id.* §15.13.110 (h), (k).

The information that independent-expenditure entities must report mirrors what the individual donors must report. Individual donors are required report their "name, address, principal occupation, and employer . . . the amount of the contribution . . . the total amount of contributions made to [the] entity [recipient] . . . during the calendar year" and the

"true source" of their donation.**[4]** *Id.* § 15.13.040(r). The receiving independent-expenditure entities are required to report for any individual donor who contributes more than $50 "the name, address, principal occupation, and employer" of the donor. *Id*. § 15.13.040(e)(5)(A). And for donors who give more than $2,000 in a year, the independent-expenditure entity must also report the true source of the donor's funds. *Id.* § 15.13.110(k). The overlap in these disclosure requirements is clear. For contributors who give more than $2,000 in a single year to one entity, the state receives all the same information from both the individual donor and the entity receiving the donation.

## B. District Court Proceedings

The district court denied Plaintiffs a preliminary injunction, concluding that they failed to demonstrate a likelihood of success on the merits on any of their challenges. *See Smith v. Helzer*, 614 F. Supp. 3d 668, 691 (D. Alaska 2022). Applying exacting scrutiny to Plaintiffs' challenge to the individual-donor reporting requirement, the

---

[4] "[T]rue source" is defined as:

> the person or legal entity whose contribution is funded from wages, investment income, inheritance, or revenue generated from selling goods or services; a person or legal entity who derived funds via contributions, donations, dues, or gifts is not the true source, but rather an intermediary for the true source; notwithstanding the foregoing, to the extent a membership organization receives dues or contributions of less than $2,000 per person per year, the organization itself shall be considered the true source.

Alaska Stat. § 15.13.400(19).

district court concluded that Alaska "has a sufficiently important governmental interest in providing voters with information related to the source of funds received by independent expenditure entities," *id.* at 677, and that this reporting requirement is substantially related to that informational interest and narrowly tailored to achieve its ends, *id.* at 678–81.

The district court rejected Plaintiffs' contentions that the individual-donor reporting requirement is unduly burdensome given its strict deadline and compliance burdens. *Id.* at 678–79. The district court found that the individual-donor reporting requirement is "not completely duplicative" of the independent-expenditure entities' disclosure requirement and reasoned that "requiring prompt disclosure by both parties [to a donation] maximizes the likelihood of prompt and accurate reporting of the information when it is most useful to the electorate." *Id.* at 680.

Finally, the district court determined that the temporal parameters of the individual-donor reporting requirement— covering donations made to independent-expenditure entities that have not, and may not, make expenditures in the current election cycle—do not render the law unconstitutional because the required disclosures help ensure voters have access to complete information in advance of an election and "prevents donors from sidestepping disclosure requirements by strategically donating in the final stretch of an election cycle." *Id.* at 681.

Plaintiffs timely appealed, and the district court stayed proceedings pending our decision.

## II. MOOTNESS

To begin with, I agree with the majority that this interlocutory appeal from the district court's denial of a preliminary injunction is not moot even though the 2022 election cycle is over. But I reach this conclusion for different reasons. In my view, this case is not moot in the first instance, and, therefore, there is no need to reach the capable-of-repetition-yet-evading-review exception to mootness.

"Mootness doctrine addresses whether an intervening circumstance has deprived the plaintiff of a personal stake in the outcome of the lawsuit." *Moore v. Harper*, 600 U.S. 1, 14 (2023) (internal quotation marks and citation omitted). Thus, a claim is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013)); *see also Flint v. Dennison*, 488 F.3d 816, 823 (9th Cir. 2007) ("A case that has lost its character as a present, live controversy is moot and no longer presents a case or controversy amenable to federal court adjudication." (internal quotation marks and citation omitted)). And "[w]here one of the several issues presented becomes moot, the remaining live issues supply the constitutional requirement of a case or controversy." *Powell v. McCormack*, 395 U.S. 486, 497 (1969).

Accordingly, we assess mootness by considering whether we can give the appellants *any* effective relief if we decide the controversy in their favor. *See NASD Disp. Resol., Inc. v. Jud. Council*, 488 F.3d 1065, 1068 (9th Cir. 2007) ("The test for whether such a controversy exists is 'whether the appellate court can give the appellant any effective relief

in the event that it decides the matter on the merits in his favor.'" (quoting *In re Burrell*, 415 F.3d 994, 998 (9th Cir. 2005))). This same test extends to considering whether an interlocutory appeal is moot, even if the underlying case still presents a live controversy. *See Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016). An appeal of the denial of a preliminary injunction is moot and, absent exception, must be dismissed if we cannot grant any effective relief. *See Ahlman v. Barnes*, 20 F.4th 489, 493 (9th Cir. 2021); *see also Pub. Util. Comm'n v. FERC*, 100 F.3d 1451, 1458 (9th Cir. 1996) ("The court must be able to grant effective relief, or it lacks jurisdiction and must dismiss the appeal.").

A mootness question arises when a preliminary injunction is denied and the harm the requested injunction sought to prevent occurs while the appeal is pending. For example, the plaintiffs in *Akina* sought to enjoin defendants from engaging in certain voter-registration activities or holding certain elections for Native Hawaiians. 835 F.3d at 1010. While this court was considering the appeal, the challenged election was cancelled, and a ratification vote that plaintiffs sought to challenge was never scheduled. *Id.* Accordingly, we determined the appeal was moot because we could not provide any effective relief. *Id.* Similarly, we have found appeals moot after an underlying dispute was resolved in separate litigation, *NASD Disp. Resol., Inc.*, 488 F.3d at 1067; after an inmate challenging denial of medical treatment was released before we decided the propriety of the district court's injunction ruling, *Norsworthy v. Beard*, 802 F.3d 1090, 1092 (9th Cir. 2015); and after a challenged injunction expired before we could rule, *Ahlman*, 20 F.4th at 494.

The circumstances in each of these cases are distinguishable from the present case. Plaintiffs here seek to

enjoin challenged provisions of Ballot Measure 2 while this litigation remains pending. And where the challenged regulations remain in effect, we can still grant effective relief for Plaintiffs. *Cf. McDonald v. Lawson,* --- F.4th ----, No. 22-56220, 2024 WL 854881 (9th Cir. Feb. 29, 2024). While it is true that *some* of the Plaintiffs here referenced the then-imminent 2022 election in their complaint, alleging that Ballot Measure 2 will impact their speech rights ahead of that election, nothing in the complaint itself suggests that Plaintiffs' claimed injuries are connected to that election alone. To the contrary, Plaintiffs clearly alleged that they contributed and received donations exceeding $2,000 in elections cycles before 2022 and intend to continue to do so in future election cycles. Plaintiffs' Motion for Preliminary Injunction is also not limited to relief related specifically to the 2022 election cycle, as the majority suggests, but makes clear that they intend to participate in electioneering activity that falls within the ambit of the challenged regulations after the 2022 election. As a result, Plaintiffs continue to have a "personal stake in the outcome of the lawsuit," *Moore*, 600 U.S. at 14 (quotation omitted), and, crucially, the court continues to have the ability to grant Plaintiffs *precisely* the relief that they seek: an injunction preventing enforcement of Alaska's challenged election regulations, *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (stating that an injury-in-fact exists where plaintiffs' "intended future conduct is 'arguably proscribed by the statute they wish to challenge'" (alterations adopted, internal quotation marks and citation omitted)).

*Clark v. City of Lakewood* helps illustrate the point. 259 F.3d 996 (9th Cir. 2001), *as amended* (Aug. 15, 2001). There, we concluded that a plaintiff whose business license expired "still ha[d] a legally cognizable interest in the

outcome" of his First Amendment challenge to an adult
cabaret licensing ordinance "sufficient to allow him to seek
injunctive relief." *Id.* at 1012. The challenged licensing
scheme remained in effect, impacting the plaintiff's ability
to conduct his business. *Id.* Acknowledging that "the
expiration of [plaintiff's] license may make it more difficult
for [him] to return to business," we concluded that this did
not moot his case because applying for a new license "is not
an insurmountable barrier." *Id.* Here, the individual
Plaintiffs similarly remain subject to the regulatory scheme
that they assert is infringing their constitutional rights. For
them to face a heavy fine, they only need to make a donation
exceeding the $2,000 threshold—an act they have carried
out multiple times in the past and intend to carry out in the
future—and not comply with the individual-donor reporting
requirement.

And Plaintiffs need not be prosecuted under the
challenged regulation to experience legally cognizable
harm; the ever-present, looming threat of prosecution is
enough is to have a chilling effect on their protected political
speech. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383,
393 (1988) (observing that self-censorship is "a harm that
can be realized even without an actual prosecution"); *but cf.
Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010)*, as
amended* Dec. 16, 2010 ("Mere allegations of a subjective
chill are not an adequate substitute for a claim of specific
present objective harm or a threat of specific future harm."
(alteration, internal quotation marks, and citation omitted)).
Because the challenged provisions of Ballot Measure 2 were
enforceable before the 2022 election and continue to be
enforceable in the present, Plaintiffs have and continue to
"suffer[] the constitutionally sufficient injury of self-
censorship, rendering [their] . . . challenge to the statute . . .

justiciable." *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1093 (9th Cir. 2003). Accordingly, as the state seemingly conceded in its supplemental briefing, this appeal simply is not moot as a threshold matter.**[5]**

The majority skips this first-level inquiry and resolves this question by applying the capable-of-repetition-yet-evading-review exception to mootness, which is commonly employed in election cases. Although I agree that there is a sufficient likelihood that Plaintiffs will be subject to enforcement in the future, I simply do not think we need to get to this (or any other) exception to mootness. Our jurisprudence applies the capable-of-repetition exception in two general categories of election cases. The first category involves plaintiffs, usually asserting as-applied First Amendment challenges, who are seeking relief for injuries premised on issues, candidates, or electioneering activities tethered to a particular election. *See, e.g.*, *No on E v. Chiu,* 85 F.4th 493, 500–02 (9th Cir. 2023), *as amended* Oct. 26, 2023 (opponents of a specific ballot measure in the 2020 election—California Proposition E—challenged on-ad disclosures); *Porter v. Jones*, 319 F.3d 483, 487–90 (9th Cir. 2003) (plaintiffs challenged cease-and-desist letter sent by California Secretary of State related to their website discussing strategy for 2000 presidential election); *Baldwin*

---

[5] Similarly, this case is constitutionally ripe for review because Plaintiffs have suffered self-censorship injury. *See Getman*, 328 F.3d at 1095 ("[A] finding that the plaintiff has suffered a harm 'dispenses with any ripeness concerns'" (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1007 n. 6 (9th Cir. 2003))); *see also Twitter, Inc. v. Paxton,* 56 F.4th 1170, 1173–74 (9th Cir. 2022) ("We 'appl[y] the requirement[] of ripeness . . . less stringently in the context of First Amendment claims.'" (quoting *Wolfson v. Brammer,* 616 F.3d 1045, 1058 (9th Cir. 2010))).

*v. Redwood City*, 540 F.2d 1360, 1362, 1364–65 (9th Cir. 1976) (plaintiffs prevented from erecting signs on behalf of a specific candidate for city council). The second category of cases involves plaintiffs seeking relief for allegedly unconstitutional impediments to political participation at specific and singular points in time in an election cycle—primarily the ballot stage. *See, e.g.*, *Norman v. Reed*, 502 U.S. 279, 287–88 (1992) (plaintiff-candidates prevented from registering party name on 1990 city election ballot); *Storer v. Brown*, 415 U.S. 724, 726–28, 737 n.8 (1974) (independent candidates and supporters challenged California statutory requirements for achieving ballot position in 1972 federal election); *Moore v. Ogilvie*, 394 U.S. 814, 815–16 (1969) (independent candidates blocked from certification and placement on 1968 Illinois state election ballot).

In both categories, the claimed harm is temporally limited. That is not true here. First, Plaintiffs are individual donors and organizations that have participated in multiple past elections, and their claimed injuries are not tied to any election-specific candidate, issue, or even the 2022 election generally. Second, Plaintiffs' injuries are not all based on prohibitions triggered at a singular stage in the election cycle. The challenged individual-donor reporting requirement applies all the time, and therefore Plaintiffs' self-censorship injuries are ongoing.

Although I reach the same result as the majority, the distinction in our reasoning is not one without a difference. On the initial question of whether a case is moot, the party asserting mootness has the burden. *See Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1209 (9th Cir. 2021). But where a court considers whether an exception to mootness applies (necessarily suggesting that

the case is moot), the burden shifts to the party opposing mootness. *See id.* (explaining that while defendants bear the burden on the initial mootness question, under the capable-of-repetition exception, the plaintiffs bear the burden of showing that there is a reasonable expectation that they will once again be subjected to the challenged activity). Indeed, the capable-of-repetition-yet-evading-review exception "provides only minimal protection to individual plaintiffs." *FERC*, 100 F.3d at 1459 (quoting *Doe v. Att'y General*, 941 F.2d 780, 784 (9th Cir. 1991)).

Moreover, we have a "virtually unflagging obligation . . . to exercise the jurisdiction given" to us. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Unlike "[s]tanding doctrine [that] functions to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake . . . by the time mootness is an issue, the case has been brought and litigated, often . . . for years." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 191 (2000). "To abandon the case at an advanced stage may prove more wasteful than frugal." *Id.* at 191–92. Appeals that are erroneously dismissed as moot transgress the obligation to exercise our jurisdiction and lead to waste, inefficiency, and "sunk costs to the judicial system." *Id.* at 192 n.5; *see also* Fed. R. Civ. P. 1 (emphasizing the need "to secure the just, speedy, and inexpensive determination of every action and proceeding"). And the risk of such error increases where the initial question of whether mootness even applies is skimmed over.[6]

---

[6] This practice seems particularly prevalent in election cases. *See, e.g., Alaska Right to Life Comm. v. Miles*, 441 F.3d 773, 779–80 (9th Cir.

Defendants' arguments that it would be more efficient and effective to resolve the complex issues raised by this case on an appeal from a merits decision, rather than in this interlocutory posture, are well-taken. We have said as much repeatedly. *See, e.g.*, *Dish Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011), *as amended* Aug. 9, 2011 ("[S]uch appeals often result in unnecessary delay to the parties and inefficient use of judicial resources." (internal quotation marks and citation omitted)); *Zepeda v. INS*, 753 F.2d 719, 724 (9th Cir. 1983) ("We think it likely that this case, for instance, could have proceeded to a disposition on the merits in far less time than it took to process this preliminary appeal . . . In addition, our disposition of this appeal will affect the rights of the parties only until the district court renders judgment on the merits of the case, at which time the losing party may appeal again." (internal citation omitted)). We also have cautioned district courts not to unnecessarily delay resolution by awaiting interim rulings on preliminary injunctions. *See California v. Azar*, 911 F.3d 558, 583–84 (9th Cir. 2018). Surely that concern is present here where the district court stayed proceedings pending this appeal without explanation and with dispositive motions pending. But, regardless of concerns about efficiency, we have jurisdiction over this appeal and, therefore, a duty to proceed. *Cf. Dish Network Corp.*, 653 F.3d at 776; *Zepeda*, 753 F.2d at 724; *Azar*, 911 F.3d at 584.

---

2006); *Gaspee Project v. Mederos*, 13 F.4th 79, 84 (1st Cir. 2021); *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 135–36 (3d Cir. 2022); *Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 661–62 (5th Cir. 2006); *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1324 n.6 (11th Cir. 2001).

## III. INDIVIDUAL-DONOR REPORTING REQUIREMENT

As the majority explains, the *Winter* factors govern whether Plaintiffs are entitled to a preliminary injunction enjoining the challenged provisions in Ballot Measure 2. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The district court addressed only whether Plaintiffs had shown a likelihood of success on the merits. *See Smith*, 614 F. Supp. 3d at 691. We review a district court's decision to deny a preliminary injunction for abuse of discretion. *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022). "A district court abuses its discretion if it rests its decision on an erroneous legal standard or on clearly erroneous factual findings." *Am. Beverage Ass'n v. City & County of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019) (en banc) (internal quotation marks and citation omitted). In assessing the likelihood-of-success factor "in the First Amendment context, [plaintiffs] . . . bear[] the initial burden of making a colorable claim that [their] First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Cal. Chamber of Com.*, 29 F.4th at 478 (citation omitted).

### A.

Plaintiffs challenge Ballot Measure 2's individual-donor reporting requirement as violative of the First Amendment. The First Amendment, through the Fourteenth Amendment, forbids states from enacting laws that "abridg[e] the freedom of speech." U.S. Const. amend. I. Political speech "is central to the meaning and purpose of the First Amendment." *Citizens United v. FEC*, 558 U.S. 310, 329 (2010). This is so because "[s]peech is an essential mechanism of democracy,"

"it is the means to hold officials accountable to the people," and it is a "precondition to enlightened self-government and a necessary means to protect it." *Id.* at 339; *see also Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."). Accordingly, "[t]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political office," *Citizens United*, 558 U.S. at 339 (internal quotation marks and citations omitted), and the Supreme Court has "frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).

Notwithstanding the favored status of political speech, regulation of the *disclosure* of such speech is subject to "exacting" rather than "strict" scrutiny. *See Nat'l Ass'n for Gun Rights, Inc. v. Mangan*, 933 F.3d 1102, 1112 (9th Cir. 2019). Exacting scrutiny provides a slightly lower standard of judicial skepticism than strict scrutiny, but it is not a rubber stamp. The state must demonstrate "a substantial relation between the disclosure requirement and a sufficiently important governmental interest . . . and that the disclosure requirement [is] narrowly tailored to the interest it promotes." *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2385 (2021) (internal quotation marks and citations omitted).

Although the precise bounds of exacting scrutiny are not well defined and the cases applying it are inherently context dependent, some general principles guide this analysis. One principle running through the jurisprudence is a concern that overly burdensome or complex regulations may stifle

important political expression. "The First Amendment does not permit laws that force speakers to retain a campaign finance attorney . . . ." *Citizens United*, 588 U.S. at 324. We addressed this point in *Canyon Ferry Road Baptist Church of East Helena, Inc. v. Unsworth*, 556 F.3d 1021 (9th Cir. 2009). In that case, Montana law required "incidental committees" to disclose their political expenditures. *Id.* at 1026–27. These committees also had to register and identify their treasurers and other officers; their expenditures; and their donors' names, addresses, and occupations. *Id.* at 1027, 1034. "Incidental committee" was broadly defined to cover any time two or more persons made an expenditure for or against a candidate or ballot proposition. *Id.* at 1026. While we recognized that Montana, as a general matter, had an important interest in providing information about the constituencies advocating for and against ballot issues, we held that this interest was not served in proportion to the burdens imposed on donors making small, in-kind expenditures by, for example, printing copies of a ballot petition. *Id.* at 1031, 1033–34. Judge Noonan, concurring, identified two primary burdens imposed on donors under Montana's regulations: (1) having to "[r]ead[] and understand[] the statute with the help of counsel" and (2) having to form "an independent political committee, registered with the state, equipped with a campaign treasurer, a depository, and a new name" and file the required forms. *Id.* at 1035–36 (Noonan, J., concurring).

Another principle at play is the Supreme Court's repeated concern about "'prophylaxis-upon-prophylaxis approaches' to regulating campaign finance." *FEC v. Cruz*, 596 U.S. 289, 306 (2022) (alteration adopted) (quoting *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014)). The Court has explained that stacking regulations on top of more

regulations "is a significant indicator that the [challenged] regulation may not be necessary for the interest it seeks to protect." *Id*. In *Cruz*, for example, the Court held that regulations limiting candidates from being repaid more than $250,000 on loans made to their own campaigns in order to advance anti-corruption interests failed under "closely drawn" scrutiny where individual contributions to candidates were already regulated for the same anti-corruption purposes. *Id.* at 293–95, 305–06. And in *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, the Court struck down an Arizona matching-funds regulation, noting that the provision did little to serve the state's anti-corruption interests where the state also maintained "ascetic contribution limits, strict disclosure requirements, and the general availability of public funding." 564 U.S. 721, 752 (2011). While aspects of these cases are distinguishable, the central theme—that as regulations become increasingly duplicative, their service to the asserted governmental interest becomes more trivial—is an apt one.

*Americans for Prosperity Foundation* is further illustrative. There, the Supreme Court considered a First Amendment associational challenge to a California law requiring charitable organizations to disclose their major donors. *Ams. for Prosperity Found.*, 141 S. Ct. at 2379, 2382. Reviewing the law under exacting scrutiny, the Court found that there was a "dramatic mismatch" between the interest promoted—policing fraud—and the disclosure regime enacted. *Id.* at 2386. The Court explained that the collected information played no role in advancing California's investigative, regulatory, or enforcement efforts and "[m]ere administrative convenience" for the state was not a sufficient justification for the burdens imposed on donors. *Id.* at 2386–87. Accordingly, the Court held that

California's compelled-disclosure regulation was facially unconstitutional. *Id*. at 2385.

### B.

Plaintiffs assert a facial challenge[7] to Ballot Measure 2's individual-donor reporting requirement, arguing that the law is duplicative and not narrowly tailored and that it imposes significant burdens on their political speech without adequately advancing Alaska's informational interests.

#### i. Alaska's Interest

Alaska indisputably has an important interest in informing voters about who funds political activity. *See Citizens United*, 558 U.S. at 371 (stating that disclosures "enable[] the electorate to make informed decisions and give proper weight to different speakers and messages"); *No on E*, 85 F.4th at 504 (observing that "[c]ourts have long recognized the governmental interest in the disclosure of the sources of campaign funding"). But under exacting scrutiny, that interest—important as it is—does not govern in a vacuum. We must assess to what degree the challenged regulation promotes this interest in the context of the full complement of reporting requirements. *See Ams. for Prosperity Found.*, 141 S. Ct. at 2385–87. Through that lens, the challenged individual-donor reporting requirement does

---

[7] While the majority correctly notes that facial challenges are *generally* "disfavored," Maj. Op. at 12–13, it fails to mention that facial challenges to legislation in the First Amendment context are treated with more solicitude. *See S. Or. Barter Fair v. Jackson County, Or.*, 372 F.3d 1128, 1134 (9th Cir. 2004) ("Courts generally disfavor facial challenges to legislation, although this reluctance is somewhat relaxed in the First Amendment context.").

very little—*if anything at all*—to further Alaska's
informational interest.

As described above, the individual-donor reporting
requirement mirrors the reporting requirement imposed on
the independent-expenditure entities that receive the
donations, which has not been challenged. At the $2,000
threshold, both the donors and the recipient entities must
report the same information by the same deadline—within
24 hours of the triggering donation. Alaska Stat.
§§ 15.13.040(e), (r), 15.13.110(k). Additionally, both parties
must report the true source of the funds donated. Given this
overlap, the individual-donor reporting requirement furthers
Alaska's informational interest only minimally. *See Ams. for
Prosperity Found.,* 141 S. Ct at 2386 (discussing the
"means-ends fit that exacting scrutiny requires" and
concluding a state "is not free to enforce *any* disclosure
regime that furthers its interests"); *see also McCutcheon*,
572 U.S., at 218 ("In the First Amendment context, fit
matters. Even when the Court is not applying strict scrutiny,
[it] still require[s] 'a fit . . . whose scope is 'in proportion to
the interest served . . . .'" (quoting *Bd. Trs. of State Univ. of
N.Y. v. Fox*, 492 U.S. 469, 480 (1989))).

The majority (as well as the district court and
Defendants) agrees, as a general matter, that Alaska's
interest is "informational" or in obtaining "reliable and
accurate" information. *See* Maj. Op. at 17. But in explaining
how the individual-donor reporting requirement promotes
this interest, the majority first echoes the district court's
claims that "the contributor will *always* be in a better
position than the [independent-expenditure entity] to both
identify the true source of its own contribution and quickly
report it." *Smith*, 614 F. Supp. 3d at 680 (emphasis added).
While there is no doubt that the donors are in the best

position to know the true source of their donated funds, Ballot Measure 2 addressed this concern by requiring individual donors that give more than \$2,000 to a single independent-expenditure entity in a year to provide to the entity "the identity of the true source . . . of the contribution simultaneously with providing the contribution." Alaska Stat. § 15.13.040(r). This undermines any suggestion that the independent-expenditure entities do not have access to this information. Likewise, there is every expectation that in submitting their reports, the independent-expenditure entities are simply going to parrot what their donors told them about the true source of the contributions. In fact, Defendants admitted as much. Thus, it remains true that the two layers of reporting are duplicative.

The district court and the majority further assert that "maximiz[ing] the likelihood" of accurate information is itself a justifiable basis for imposing a reporting requirement, even if the added requirement is a duplicative, belt-and-suspenders safeguard. *Smith*, 614 F. Supp. 3d at 680. This reasoning inevitably implicates a false binary (the information received by the state is either "reliable and accurate" *because of* the duplicative reporting requirements, or it is not reliable and accurate) and ignores that gradations of reliability and accuracy occur on a spectrum. Of course, any *single* disclosure report may be accurate or inaccurate. But when assessing whether the state's informational interest is advanced by the individual-donor reporting requirement, we must consider whether the donor reports increase the reliability and accuracy of the *aggregate* information provided to the public. Thus, the proper question is whether any marginal increase in the reliability and accuracy of information justifies the reporting burden placed

on individual donors.**[8]** I am not convinced that it is here
because exacting scrutiny requires "a substantial relation
between the disclosure requirement and a sufficiently
important governmental interest." *Ams. for Prosperity
Found.*, 141 S. Ct. at 2385 (quoting *Doe v. Reed*, 561 U.S.
186, 196 (2010)); *see also Acorn Invs., Inc. v. City of Seattle*,
887 F.2d 219, 225–26 (9th Cir. 1989) (explaining that a
substantial relation exists when the challenged law
"further[s]" or advances an important government interest).

### ii. Burdens Imposed

The individual-donor reporting requirement imposes
several burdens on donors. First, as in *Canyon Ferry Road*,
individual donors face the burden of "[r]eading and
understanding the statute with the help of counsel." 556 F.3d
at 1035–36 (Noonan, J., concurring). Alaska's statutory
scheme, which utilizes numerous specialized and unfamiliar
terms and multiple cross references, is not simple to
understand. While becoming informed about the law is not a
unique or insurmountable obligation, it is still a burden that
must be considered, particularly where the relatively low
financial threshold triggering the reporting requirement is
unlikely to ensure that only those with significant resources

---

[8] I am not disputing the district court's factual finding that duplicative
reporting requirements may as a general matter increase the accuracy of
information. I dispute that the district court properly applied exacting
scrutiny in analyzing Alaska's asserted information interest relative to
the burdens being imposed by the duplicative individual-donor reporting
requirement. *See Cruz*, 596 U.S. at 306; *see also Bennett*, 564 U.S. at
752.

will be required to file donation reports.[9] It must also be
remembered that the reporting requirement imposes strict
liability for failure to comply. *See* Alaska Stat.
§ 15.13.390(a); *see also Gertz v. Robert Welch, Inc.*, 418
U.S. 323, 340 (1974) (noting that "a rule of strict liability
that compels a publisher or broadcaster to guarantee the
accuracy of his factual assertions may lead to intolerable
self-censorship").

Additionally, the individual-donor reporting requirement
forces donors to predict whether the entities that they are
donating to are "likely to make independent expenditures in
one or more candidate elections in the current election
cycle." Alaska Stat. § 15.13.040(r). The majority assumes
that individual donors can accomplish this by simply
conducting a "quick search on the [APOC]'s database of
independent-expenditure organizations" or "simpl[y] . . .
asking the organization" directly "whether it has made or
will make an independent expenditure." Maj. Op. at 21 n.9.
I also reject these assumptions. The donor's deadline for
filing a required report is 24 hours from the time of donation.
It is unreasonable to assume that a donor will have all the
information about the recipient entity necessary to determine
whether a report is required before making a donation. And

---

[9] The majority suggests that "everyday" Americans do not donate over
$2,000 in a year to a single political organization and that this financial
threshold may well ensure that the reporting requirement will apply only
to "'major contributors,' not unsophisticated parties." Maj. Op. at 19.
Without supporting evidence, this seems an improbable assumption. It
does not naturally follow that because a donor can afford to contribute
$2,001 towards political activity, she either has the sophistication to
understand election law or can afford to pay an attorney hundreds of
dollars an hour for advice about complying with her reporting
requirement.

if a donor were to reach out to the recipient entity to confirm the necessary information, the donor is not guaranteed to receive a timely response—presumably most or all independent-expenditure entities operate during normal business hours. Moreover, unlike knowledge of the law, internet access is not a requirement of citizenship. Nor is it a given that all donors will have internet access. Many Americans take online connectivity for granted, but there are obstacles to accessing the internet that may have particular relevance in Alaska, the vast majority of which is remote.[10] An Alaskan who does not have personal internet access may not be able to simply jaunt down to a nearby coffee shop or library.

The significance of the burdens placed on individual donors is highlighted by comparison to the burdens imposed by the independent-expenditure entities' overlapping reporting requirement. Independent-expenditure entities must register with APOC, and they are necessarily familiar with their reporting obligations and the filing process given that their normal operations, including receiving donations, fall under regulated activity. *See* Alaska Stat. § 15.13.050. Thus, it is reasonable to expect that these entities have more experience and resources than individual donors for

---

[10] As of 2020, Alaska had the *worst* internet speeds and coverage in the country. *See* Kristen M. Renberg, PhD & Angela Sbano, *The Air We All Breathe: Internet Bans in Probation Conditions*—Dalton v. State, 38 Alaska L. Rev. 171, 180 (2021) ("Alaska ranks lowest in terms of Internet coverage, prices, and speeds, 'with 61% wired and fixed wireless broadband coverage and no low-priced (wired) plan availability'" (citing Tyler Cooper & Julia Tanberk, *Best and Worst States for Internet Coverage, Prices and Speeds, 2020*, BroadbandNow Res. (Mar. 3, 2020))). "Alaska faces a particularly steep challenge to widespread, equitable Internet access . . . . [L]ess than 60% of people living on tribal lands have access to broadband . . . ." *Id*.

understanding their obligations and compiling and filing the
required reports within the statutory deadline.

Beyond understanding the reporting obligation,
preparing and filing the required reports imposes burdens on
individual donors. While the form itself may be
straightforward, the 24-hour filing deadline is very short. *Id.*
§ 14.13.040(r). The report form also must be filled out and
filed online. Discounting the tangible obstacles imposed by
these circumstances, the majority all but accepts the state's
description of the online filing process as streamlined,
which, in turn, leads to glaring blind spots about
technological literacy and internet access, previously
referenced. The filing process is also not as simple as filling
in a few data fields and hitting "submit." Individual donors
must create an account in APOC's online filing system. The
state provided screenshots of the report form, but it did not
present evidence of how accounts are created or how donors
must navigate the APOC website to file their reports.[11]
These details matter in a system where if a donor fails at any
step of the process, or takes more than 24 hours to complete
the process, she faces a fine of up to $1,000 a day, with no
outer limit. To summarize: The civically minded retiree who
donates over $2,000 to any organization that supports or may
support a candidate seeking election must know about the
individual-donor reporting requirement and what it
demands, determine whether her donation triggers a report,
access the internet, register for an APOC account, locate the
required reporting form on the APOC website, and fill it out
within 24 hours of making a triggering donation. If she fails

---

[11] The screenshots of the "test" site the state submitted appear to indicate
a donor would need to navigate through five different pages to reach the
proper disclosure form.

to check every one of these boxes in time, she is on the hook for what could be significant fines. All of this so that the state can collect the same information from her that it receives from the organization to which she donated. In my view, this is another example of a "mismatch" between the state's asserted informational interest and the requirement it is imposing. *See Ams. for Prosperity Found.*, 141 S. Ct. at 2379.

Moreover, I share the majority's apprehension about the limitless temporal bounds of the 24-hour reporting requirement. I frankly fail to see any justification for a strict enforcement regime that surveils year-round and imposes harsh penalties on contributors for potentially minor violations before, during, and after an election cycle. Even assuming that prompt disclosure is helpful to voters *during an election cycle*, why a 24-hour filing deadline is needed in the lulls between active elections is a mystery.

* * * * *

"[Alaska] is not free to enforce *any* disclosure regime that furthers its interests. It must instead demonstrate its need for universal production in light of any less intrusive alternatives." *Id.* at 2386. It has not done so here. Rather, Plaintiffs have shown that they are likely to succeed in showing that Ballot Measure 2's individual-donor reporting requirement fails to satisfy exacting scrutiny because the burdens it imposes are not "in proportion to the interest served."[12] *Id.* (quoting *McCutcheon*, 572 U.S. at 218). In

---

[12] Because of the procedural posture of the case, I do not reach the issue of severability. However, if the district court determines that Ballot Measure 2 is severable under Alaska state law, then it can sever

denying Plaintiffs' motion for a preliminary injunction, the
district court failed to properly weigh the burdens of the
individual-donor reporting requirement against the degree to
which Alaska's informational interest is actually served by
requiring individual donors to report the same information
that is collected from the entities that receive the donations.
*See id.*; *Ariz. Free Enter. Club's Freedom Club PAC*, 564
U.S. at 752. The majority's characterization of the
obligations imposed on individual donors glosses over the
practical realities for individuals who may choose to engage
in political expression by donating money and the significant
financial penalties that will result if they do not perfectly
comply with the near-immediate reporting requirement.
Moreover, it is reasonable to expect that the individual-
donor reporting requirement risks chilling individual donors
from fully participating in political expression. *See, e.g.*,
*Counterman v. Colorado*, 600 U.S. 66, 75 (2023)
("Prohibitions on speech have the potential to chill, or deter,
speech outside their boundaries. A speaker may be unsure
about the side of a line on which his speech falls. . . . Or he
may simply be concerned about the expense of becoming

---

potentially unconstitutional provisions of the statute when it decides the
merits of this case. *See Sam Francis Found. v. Christies, Inc*., 784 F.3d
1320, 1325 (9th Cir. 2015) (en banc) ("Severability is a matter of state
law." (alteration and citation omitted)); *see also Forrer v. State*, 471 P.3d
569, 598 (Alaska 2020) ("A provision is severable if the portion
remaining is independent and complete in itself so that it may be
presumed that the legislature would have enacted the valid parts without
the invalid part. However, when the invalidation of a central pillar so
undermines the structure of the Act as a whole, then the entire Act must
fall." (alteration, internal quotation marks, and citation omitted));
*Planned Parenthood of the Great N.W. v. State*, 375 P.3d 1122, 1153
(Alaska 2016) (Fabe, C.J., concurring) ("[T]he *presence* of a severability
clause does not necessarily mean that a statute's constitutionally invalid
provisions are severable from the remainder of the statutory scheme.").

entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed—a cautious and restrictive exercise of First Amendment freedoms." (internal quotation marks and citation omitted)). For all these reasons, I would reverse as to Plaintiffs' challenge to the individual-donor reporting requirement and remand for the district court to consider the remaining *Winter* factors.

I respectfully dissent in part.